# 23-7183(L), 23-7186(CON)

*To be Argued by:*
ALEXANDRA A.E. SHAPIRO

## United States Court of Appeals

*for the*

## Second Circuit

UNITED STATES OF AMERICA,

*Appellant,*

— v. —

HERNAN LOPEZ, FULL PLAY GROUP, S.A.,

*Defendants-Appellees,*

JEFFREY WEBB, EDUARDO LI, JULIO ROCHA, COSTAS TAKKAS, JACK WARNER, EUGENIO FIGUEREDO, RAFAEL ESQUIVEL, JOSE MARIA MARIN, NICOLAS LEOZ, ALEJANDRO BURZACO, AARON DAVIDSON, HUGO JINKIS, MARIANO JINKIS, JOSE MARGULIES, JOSE LAZARO, ALFREDO HAWIT, ARIEL ALVARADO, RAFAEL CALLEJAS, BRAYAN JIMENEZ, RAFAEL SAGUERO, HECTOR TRUJILLO, REYNALDO VASQUEZ, JUAN ANGEL NAPOUT, MANUEL BURGA, CARLOS CHAVEZ, LUIS CHIRIBOGA, MARCO POLO DEL NERO, EDUARDO DELUCA, JOSE LUIS MEISZNER, ROMER OSUNA, RICARDO TEIXEIRA, CARLOS MARTINEZ, GERARD ROMY,

*Defendants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF NEW YORK (BROOKLYN)

## BRIEF FOR DEFENDANT-APPELLEE HERNAN LOPEZ

ALEXANDRA A.E. SHAPIRO
DANIEL J. O'NEILL
THEODORE SAMPSELL-JONES
SHAPIRO ARATO BACH LLP
1140 Avenue of the Americas,
   17th Floor
New York, New York 10036
(212) 257-4880

JOHN GLEESON
DAVID SARRATT
JOSHUA N. COHEN
DEBEVOISE & PLIMPTON LLP
66 Hudson Boulevard
New York, New York 10001
(212) 909-6000

*Attorneys for Defendant-Appellee Hernan Lopez*

# <u>TABLE OF CONTENTS</u>

**PAGE**

TABLE OF AUTHORITIES.................................................................. iii

INTRODUCTION ............................................................................1

STATEMENT OF THE ISSUES ........................................................4

STATEMENT OF THE CASE ...........................................................4

    A.   The Charges ......................................................................4

    B.   Trial.................................................................................6

        1.   The Copa Libertadores Scheme.................................7

        2.   FIC's Acquisition Of An Ownership Interest In T&T
            And Subsequent Developments..........................................10

        3.   The Government's Scant Evidence Of Lopez's Involvement
            In The Copa Libertadores Scheme ...................................12

    C.   Procedural History...........................................................14

        1.   Pretrial Motion......................................................14

        2.   Posttrial Motion ....................................................15

        3.   The District Court's Rule 29 Decision ...........................17

SUMMARY OF ARGUMENT..........................................................18

ARGUMENT .................................................................................21

I.     THE DISTRICT COURT CORRECTLY HELD THAT § 1346
      DOES NOT REACH FOREIGN COMMERCIAL BRIBERY .....................21

    A.   Foreign Commercial Bribery Was Not Clearly Established
        As Honest-Services Fraud Before *McNally* .............................22

    B.   This Court Has Already Recognized That Relevant Law
        Is Unsettled And Unclear ..........................................................25

C.  Section 1346 Cannot Be Read To Extend Far Beyond Other Federal Bribery Statutes ..........................................27

D.  The Constitutional Avoidance Canon And Lenity Compel A Narrow Reading ..........................................31

E.  The Government's Substantive Arguments Fail ...................33

    1.  That Domestic Bribery Is Covered Does Not Establish That Foreign Bribery Is Covered ........................................33

    2.  The Cases The Government Cites Do Not Establish That Foreign Commercial Bribery Is Covered ...............................35

F.  The Government's Procedural Complaints Fail ....................39

    1.  The Government Ignored Lopez's Statutory Argument Below ...........................................39

    2.  The District Court Did Not Violate Any Mandate From *Napout* ...........................................43

II.  THE GOVERNMENT FAILED TO PROVE A FIDUCIARY DUTY GIVING RISE TO HONEST-SERVICES LIABILITY ...................................45

A.  There Is No General Fiduciary Duty To Employers In The Relevant Jurisdictions ...........................................46

B.  FIFA's And CONMEBOL's Ethics Codes Did Not And Could Not Create A Fiduciary Duty ...............................50

III.  THE GOVERNMENT IS NOT ENTITLED TO A NEW TRIAL AGAINST LOPEZ ...........................................55

IV.  A JUDGMENT OF ACQUITTAL IS ALSO WARRANTED BECAUSE THE GOVERNMENT FAILED TO PROVE A CONSPIRACY TO DECEIVE CONMEBOL ...........................57

CONCLUSION ...........................................63

ii

# TABLE OF AUTHORITIES

CASES                                                                    PAGE(S)

*Burks v. United States,*
    437 U.S. 1 (1978)..................................................................20, 55, 56

*Cameron v. City of New York,*
    598 F.3d 50 (2d Cir. 2010) ..................................................50

*Ciminelli v. United States,*
    598 U.S. 306 (2023)......................................................*passim*

*Clark v. Martinez,*
    543 U.S. 371 (2005)..............................................................33

*Cleveland v. United States,*
    531 U.S. 12 (2000)................................................................33

*Erlenberg v. United States,*
    409 U.S. 239 (1972)..............................................................27

*Fasulo v. United States,*
    272 U.S. 620 (1926)..............................................................63

*Gen. Elec. Co. v. N.Y. Dep't of Labor,*
    936 F.2d 1448 (2d Cir. 1991) ..............................................52

*Green v. United States,*
    355 U.S. 184 (1957)..............................................................56

*Hoffler v. Bezio,*
    726 F.3d 144 (2d Cir. 2013) ................................................57

*Johnson v. Priceline.com, Inc.,*
    711 F.3d 271 (2d Cir. 2013) ................................................48

*LaRue v. DeWolff, Boberg, & Assocs.,*
    552 U.S. 248 (2008)..............................................................47

*McNally v. United States,*
    483 U.S. 350 (1987)......................................................*passim*

*Metro. Life Ins. Co. v. Glenn*,
    554 U.S. 105 (2008) ................................................................48

*Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*,
    53 F.4th 869 (5th Cir. 2022) ...................................................52

*New Eng. Ins. Co. v. Healthcare Underwriters Mut. Ins. Co.*,
    352 F.3d 599 (2d Cir. 2003) ....................................................44

*In re Nortel Networks Corp. Sec. Litig.*,
    539 F.3d 129 (2d Cir. 2008) ....................................................45

*NRDC v. EPA*,
    464 F.3d 1 (D.C. Cir. 2006) ....................................................52

*Percoco v. United States*,
    598 U.S. 319 (2023) ...........................................................*passim*

*Pfizer, Inc. v. U.S. Dep't of Health & Hum. Servs.*,
    42 F.4th 67 (2d Cir. 2022) ......................................................58

*Ross v. Blake*,
    578 U.S. 632 (2016) ................................................................29

*Skilling v. United States*,
    561 U.S. 358 (2010) ...........................................................*passim*

*In re Trib. Co. Fraudulent Conv. Litig.*,
    946 F.3d 66 (2d Cir. 2019) ....................................................48

*United States v. Abdelaziz*,
    68 F.4th 1 (1st Cir. 2023) .........................................24, 58, 62

*United States v. Austin*,
    273 F. Supp. 360 (S.D.N.Y. 1967) .......................................38

*United States v. Avenatti*,
    81 F.4th 171 (2d Cir. 2023) .........................35, 37, 38, 42

*United States v. Bahel*,
    662 F.3d 610 (2d Cir. 2011) .........................35, 37, 38, 42

iv

*United States v. Bruno*,
661 F.3d 733 (2d Cir. 2011) .................................................................56

*United States v. Carpenter*,
791 F.2d 1024 (2d Cir. 1986) ...............................................................58

*United States v. Coplan*,
703 F.3d 46 (2d Cir. 2012) ...................................................................60

*United States v. Cramer*,
777 F.3d 597 (2d Cir. 2015) .................................................................57

*United States v. DeFries*,
129 F.3d 1293 (D.C. Cir. 1997) ...........................................................58

*United States v. Dexter*,
165 F.3d 1120 (7th Cir. 1999) .............................................................43

*United States v. Gaudin*,
515 U.S. 506 (1995).............................................................................46

*United States v. Giffen*,
326 F. Supp. 2d 497 (S.D.N.Y. 2004) ....................................26, 37, 40

*United States v. Groves*,
122 F.2d 87 (2d Cir. 1941) ...................................................................38

*United States v. Halloran*,
821 F.3d 321 (2d Cir. 2016) .................................................................36

*United States v. Hoskins*,
902 F.3d 69 (2d Cir. 2018) ...................................................................28

*United States v. Lorenzo*,
534 F.3d 153 (2d Cir. 2008) .................................................................57

*United States v. Margiotta*,
688 F.2d 108 (2d Cir. 1982) ..................................................23, 34, 36

*United States v. Maybusher*,
735 F.2d 366 (9th Cir. 1984) ...............................................................44

v

*United States v. Napout*,
963 F.3d 163 (2d Cir. 2020) ..........................................................*passim*

*United States v. Olin Matheson Chem. Corp.*,
368 F.2d 525 (2d Cir. 1966) ..........................................................38

*United States v. Pauling*,
924 F.3d 649 (2d Cir. 2019) ..........................................................60

*United States v. Percoco*,
13 F.4th 180 (2d Cir. 2021) ..........................................................34

*United States v. Rybicki*,
354 F.3d 124 (2d Cir. 2003) ..........................................................*passim*

*United States v. Sindona*,
636 F.2d 792 (2d Cir. 1980) ..........................................................38

*United States v. Stanley*,
54 F.3d 103 (2d Cir. 1995) ..........................................................43

*United States v. Uccio*,
940 F.2d 753 (2d Cir. 1991) ..........................................................44

*United States v. Ustica*,
847 F.2d 42 (2d Cir. 1988) ..........................................................56

*Van Buren v. United States*,
593 U.S. 374 (2021)..........................................................52

*In re W.R. Grace & Co.*,
591 F.3d 164 (3d Cir. 2009) ..........................................................43

*Yates v. United States*,
574 U.S. 528 (2015)..........................................................33

**STATUTES & RULES**

15 U.S.C. § 78dd-1 *et seq.* ..........................................................28, 29

18 U.S.C. § 201 ..........................................................27, 28, 29

18 U.S.C. § 666..........................................................27

18 U.S.C. § 1001 .................................................................................38

18 U.S.C. § 1346 .............................................................................*passim*

Fed. R. App. P. 28 .............................................................................20

**OTHER AUTHORITIES**

169 Cong. Rec. H6964 (daily ed. Dec. 14, 2023) ..................................29

Comm. on Homeland Sec., 118th Cong., *Countering Threats Posed by Nation-State Actors in Latin America to U.S. Homeland Security: Hearing Before the Subcommittee on Counterterrorism, Law Enforcement, and Intelligence* (Comm. Print 2023) ..........................29

Exec. Order No. 13259, 67 Fed. Reg. 13239 (2002) ...............................30

Peter Hefti, *Trusts and Their Treatment in Civil Law*, 5 Am. J. Compar. L. 553 (1956) ...............................................................48

Note, *Bribery in Commercial Relationships*, 45 Harv. L. Rev. 1248 (1932) ..............................................................49

Katharina Pistor & Chenggang Xu, *Fiduciary Duty in Transitional Civil Law Jurisdictions*, *in* Global Markets, Domestic Institutions (Curtis Milhaupt ed., 2003) ...............................................................48

Restatement (Second) of Agency ...........................................................47

Restatement (Second) of Trusts ......................................................47, 48

Restatement (Third) of Agency ......................................................47, 48

David J. Seipp, *Trust and Fiduciary Duty in the Early Common Law*, 91 B.U. L. Rev. 1101 (2011) ...............................................................47

## **INTRODUCTION**

For several decades, the same cycle has been repeated over and over. Federal prosecutors push to broaden the reach of federal criminal fraud statutes, beyond limits Congress and the Constitution have placed in their way. These arguments get traction in the lower courts. Eventually, however, the Supreme Court steps in to trim the statutes back to what is actually prohibited by their text and constitutionally based canons of construction. Then prosecutors renew their push for expansion, and the cycle repeats. What was different here was that the district court got the Supreme Court's message. It faithfully applied the Court's two most recent decisions to correctly hold that 18 U.S.C. § 1346 does not reach foreign "commercial bribery." This Court should affirm Judge Chen's well-reasoned opinion.

Congress has repeatedly *declined* to criminalize foreign "commercial bribery," acting with precision to punish only certain forms of foreign public-official bribery. Nevertheless, the government claims § 1346 criminalizes payments to South American officials of a private South American soccer confederation, for the rights to broadcast South American soccer tournaments. Neither the payments, nor commercial bribery generally, is a crime in the countries where the officials resided, where the confederation was based, or where the soccer matches were played. Nor is the Anglo-American legal concept of "fiduciary

duty" even recognized in these countries. Yet the government maintains that these payments proved an "honest services" fraud conspiracy because the South Americans who received the money violated a duty supposedly created by the private codes of conduct of a foreign soccer confederation. It is wrong.

Section 1346's text—which prohibits the deprivation of "the intangible right of honest services"—is notoriously amorphous. Four Justices have found it unconstitutionally vague: "To this day, no one knows what 'honest-services fraud' encompasses." *Percoco v. United States*, 598 U.S. 319, 333 (2023) (Gorsuch, J., concurring in judgment, joined by Thomas, J.); *see also Skilling v. United States*, 561 U.S. 358, 415-24 (2010) (Scalia, J., concurring in judgment, joined by Kennedy and Thomas, JJ.). The full Court agreed that a challenge to its facial validity had "force," and thus insisted on a limiting construction paring § 1346 to the "core" of pre-*McNally* honest-services caselaw. *Skilling*, 561 U.S. at 404-05.

No pre-*McNally* case involved commercial bribery that allegedly deprived a foreign private employer of the honest services of its foreign employees. Congress thus could not have intended to revive a hidden power to punish foreign commercial bribery—a vast and ill-defined global mandate—under the vague banner of honest services. And *Percoco* squarely rejects the government's argument that the pre-*McNally* "core" covered by § 1346 includes any payment prosecutors call a "bribe." *Percoco* too involved payments, but they were not

2

bribes, because the supposed fiduciary duty was recognized in only "a smattering of pre-*McNally* decisions." 598 U.S. at 328-29. Here there are no such decisions.

The Supreme Court has spoken clearly and unanimously. It has held that § 1346 does not reach novel theories outside the pre-*McNally* core of honest-services caselaw and, more generally, that the federal fraud statutes must not be construed in ways that "vastly expand[] federal jurisdiction without statutory authorization." *Ciminelli v. United States*, 598 U.S. 306, 315 (2023). This Court should therefore hold, as the Supreme Court plainly would, that § 1346 does not cover foreign commercial bribery.

Two alternative grounds supported by the record also mandate affirmance. First, the government failed to prove the required breach of fiduciary duty. There was no evidence that any of the countries at issue would recognize any such duty, and the private ethics codes the government relied on could not create one. Second, the government failed to prove a conspiracy to deceive the alleged victim soccer confederation, whose key members all knew about the payments.

Finally, the government's belated, Hail Mary attempt to retry the case should be rejected. Hernan Lopez was not charged in any domestic bribery scheme, and there is no evidence that would support any such charge. Giving the government a do-over would violate the Double Jeopardy Clause. The judgment should be affirmed.

## STATEMENT OF THE ISSUES

1.     Whether the district court correctly entered a judgment of acquittal on the ground that 18 U.S.C. § 1346 does not encompass foreign commercial bribery.

2.     Whether, even if § 1346 could apply to foreign commercial bribery in some circumstances, the government failed to prove a fiduciary duty that could create honest-services-fraud liability here.

3.     Whether a new trial is barred by the Double Jeopardy Clause.

4.     Whether the judgment should be affirmed on the alternative ground that the government failed to prove any conspiracy to deceive CONMEBOL.

## STATEMENT OF THE CASE

### A.     The Charges

In 2015, the government charged thirty individuals with participating in various schemes to corrupt international soccer.  (SA1-404).[1]  The defendants included (1) officials of CONCACAF, the private confederation of North American, Central American, Caribbean, and Guianese soccer associations with a principal administrative office in the United States; (2) officials of CONMEBOL, the private confederation of South American soccer associations headquartered in Paraguay; and (3) sports marketing executives involved in business deals with

---

[1] "SA," "GA," "SGA," "GB," and "DE" refer to Appellees' supplemental appendix, the government's appendix, the government's special appendix, the government's brief, and district court docket entries, respectively.  Unless otherwise noted, citations omit quotation marks, footnotes, emphasis, and alterations in the original source.

CONCACAF and CONMEBOL relating to soccer competitions those confederations organize. (SA11-12, 16-24, 182-93). Various counts alleged bribery concerning specific soccer tournaments. All defendants were also charged with a racketeering conspiracy involving a broadly defined enterprise including FIFA, the private international governing body of soccer associations; FIFA's continental confederations, including CONCACAF and CONMEBOL; regional soccer federations; national soccer associations; and sports marketing companies. (SA3, 115, 168, 316-17). Most of those defendants pleaded guilty. Three proceeded to trial in 2017; two were convicted, and one was acquitted. In June 2020, this Court affirmed those convictions. *United States v. Napout*, 963 F.3d 163 (2d Cir. 2020).

Five years after the original indictment, and three years after the *Napout* trial, the government superseded three additional defendants, including former Fox International Channels ("FIC") executives Hernan Lopez and Carlos Martinez, into its original case. (GA1-71). Lopez was the President and Chief Executive Officer of FIC, and Martinez was the President of FIC for Latin America. (GA9, 721-22; SA742-43, 787).

In contrast to all other defendants, Lopez and Martinez weren't charged with racketeering conspiracy. (GA36). And in contrast to all previously charged sports marketing defendants, neither Lopez nor Martinez was charged with a bribery

5

scheme involving CONCACAF officials. Instead, they were alleged solely to have participated in a scheme to bribe CONMEBOL officials to obtain the broadcasting rights to the Copa Libertadores, a regional South American club tournament. (GA22-23). Count Nine charged Lopez and Martinez with participating in a wire fraud conspiracy "to deprive FIFA and CONMEBOL and their constituent organizations of their respective rights to honest and faithful services" (GA42); and Count Twenty-One charged the same conduct as a money laundering conspiracy (GA46).[2] The government alleged that Lopez and Martinez joined this scheme a decade after its inception. (SA244; DE1636, at 2).

### B.    Trial

After the district court denied Lopez's motion to dismiss (discussed *infra*, at 14-15), the case proceeded to trial against Lopez, Martinez, and Appellee Full Play Group S.A. ("Full Play"). Lopez's principal argument to the jury was that he was unaware of the payments to the CONMEBOL officials—which began before he or his company had any involvement in broadcasting the tournaments. To prove Lopez's knowing involvement, the government relied on the uncorroborated testimony of Alejandro Burzaco, one of the scheme's major players, who claimed to have discussed the payments with Lopez and Martinez in meetings conveniently not attended by any other witness. As the district court observed, "Burzaco was

---

[2] The government also charged Lopez and Martinez with substantive wire fraud (GA43-46) but abandoned those charges before trial. (DE1864).

the only witness who testified about Lopez's knowledge of, and role in, the Copa Libertadores bribery scheme."  (SGA8 n.5).

The jury deliberated for four days.  It convicted Lopez on Counts Nine and Twenty-One, acquitted Martinez of those same charges, and convicted Full Play on all counts submitted to the jury.

        1.    <u>The Copa Libertadores Scheme</u>

CONMEBOL organized the Copa Libertadores and other South American soccer tournaments and, starting in 1999, owned the exclusive broadcasting rights to those tournaments, which CONMEBOL licensed to sports media companies. (GA158; SA443-44).  FIFA did not own any of the rights to, and had no responsibility for organizing, the Copa Libertadores.  (SA443-44).

The alleged bribery scheme commenced two years later, in 2001.  At that time, a joint venture called T&T Sports Marketing Ltd. ("T&T") owned the exclusive broadcasting rights to the Copa Libertadores pursuant to a contract with CONMEBOL.  (GA974-79).  In 2001, T&T extended that contract at the same price in exchange for payments to CONMEBOL officials.  (GA172-73, 174, 980-85).  This is the bribery conspiracy the government alleged Lopez joined a decade later:  a conspiracy to pay and facilitate the payment of "annual bribe and kickback payments to certain high-ranking CONMEBOL officials…in exchange for the

7

officials' support of T&T as the holder of the rights to the Copa Libertadores and other soccer events."  (GA23).

Initially, T&T paid six key decision-makers at CONMEBOL—soccer officials from Argentina, Bolivia, Brazil, Paraguay, and Uruguay—for the Copa Libertadores broadcasting rights.  (GA174-75, 178-79).  In 2005, Burzaco, the government's key cooperating witness, invested in one of the sports media companies in the T&T venture, Torneos y Competencias ("Torneos"), and joined the scheme.  (GA171, 174).  By 2006, Burzaco was Torneos' CEO and a key figure in arranging the payments.  (GA173-74; SA447-48).  By 2008, T&T had secured the Copa Libertadores broadcasting rights through 2018.  (GA986-90).

In 2009, Burzaco began working with Hugo and Mariano Jinkis, the owners of the Argentine sports media company Full Play, who were paying a different group of six members of CONMEBOL's Executive Committee for broadcasting rights to various World Cup qualifying matches and friendly matches between national teams.  (GA204, 457-58; SA455-58).  This "Group of Six" included representatives from Bolivia, Colombia, Ecuador, Paraguay, Peru, and Venezuela. (SA458).  Burzaco secured the Group of Six's support for T&T's continued control of the broadcasting rights to the Copa Libertadores in exchange for payments made with the Jinkises' help.  (GA211-12, 214).

8

By 2010, nearly all CONMEBOL's leaders, including its president, vice president, secretary general, and treasurer, were demanding payments for the Copa Libertadores rights. (GA221-22; SA559, 723-24, 766-69). CONMEBOL President Nicolas Leoz even sent letters signed in his official capacity directing T&T to pay companies owned by the Jinkises which, in turn, paid CONMEBOL officials. (GA223-30, 2273, 2274-76; SA851). Notably, commercial bribery is not a crime in either Paraguay, where CONMEBOL is headquartered, or other relevant foreign jurisdictions. (*See* DE1594-1, at 7-8). Indeed, the government's own witness, Santiago Peña, refused to call the payments "bribes," instead referring to them as "private payments." (*E.g.*, SA633).

Although Burzaco testified that two CONMEBOL Executive Committee members did not receive private payments, no one testified that they were unaware of the payments or the alleged scheme. (GA222). Rather, Burzaco testified that he attempted to pay one but never got confirmation that he received the payment and that the other's replacement accepted private payments. (SA471-74).

9

2.    FIC's Acquisition Of An Ownership Interest In T&T
      And Subsequent Developments

Although the government calls T&T the "Fox Joint Venture" (GB11), the

Fox company where Lopez worked (FIC) did not acquire its interest in T&T until

late 2011 (GA499-500; SA897).[3]

As the district court observed, the relationship between Torneos and its joint

venture partner in T&T "chilled" after FIC acquired that partner.  (SGA14).

Torneos made money through agreements to produce matches for broadcasting.

(GA183, 188).  With the previous joint venture partner, Burzaco considered the

renewal of these agreements automatic.  (SA737-39).  FIC, however, made clear

that it would not necessarily renew them.  (SA739-41, 893).

Consequently, when CONMEBOL and T&T were renegotiating the Copa

Libertadores contract in late 2012 and discussing potentially renewing the rights

for 2019-2022, Burzaco sought to maintain the profits from the production services

agreements.  To gain leverage in negotiations with FIC, he convinced

CONMEBOL to assign the 2019-2022 rights to a subsidiary of Torneos, his own

company, rather than continuing with T&T, the joint venture with Fox.  (SA528-

_____

[3] Before then, Fox owned a minority interest in Fox Pan American Sports
("FPAS"), which co-owned T&T with Torneos, but that minority interest was held
by a Fox division managed separately from FIC.  (GA161, 719; SA897).  Until FIC
acquired it in 2011, FPAS was controlled by its non-Fox majority owner.  (GA161;
SA536-37, 897).

32; GA1004-11). Meanwhile, Burzaco told Lopez no extension had been obtained. (SA533-35; *see* SA852-55).

The next year, on December 12, 2013, the CONMEBOL Executive Committee approved—for the first time—an ethics code prohibiting bribery. (GA2225-52). All the contracts that the government alleges were tainted by bribery were negotiated and signed *before* this date. (GA736-1011; SA897).

Then, on December 24, 2013, Paco Casal, a competing sports media executive, instigated a lawsuit in Uruguay accusing CONMEBOL officials of accepting bribes for soccer broadcasting rights. (GA207-08, 297-98; SA511, 856-92). FIC learned about the lawsuit, and in the spring of 2014—at the request of Lopez and FIC's CFO—put T&T on its audit schedule over concerns about the allegations and to get "more transparency into the business." (SA797-98).

In the summer of 2014, Lopez met with Casal, who provided further details about the lawsuit and furnished proof that CONMEBOL had agreed to sell the 2019-2022 Copa Libertadores broadcasting rights to a Torneos subsidiary rather than T&T. (GA2352). After the meeting, Lopez requested that the scheduled audit of T&T be accelerated. (SA790-91, 798-99). Lopez also entered negotiations in the fall of 2014 with Burzaco and CONMEBOL to terminate the contract for the 2019-2022 Copa Libertadores rights, eliminate T&T as an intermediary, and assign the 2019-2022 rights directly to Fox. (SA512-13, 538-

11

39).  Burzaco testified that the purpose of these negotiations was to "leave Fox nearly completely out of the loop" of the bribery scheme.  (GA415).  While negotiations were still ongoing in 2015, the government unsealed its first indictment.  (GA2363; SA1).

> ### 3.   The Government's Scant Evidence Of Lopez's Involvement In The Copa Libertadores Scheme

Of the twenty-five witnesses who testified throughout the seven-week trial, only Burzaco testified that Lopez participated in the Copa Libertadores scheme. The government's suggestion that Peña, Eladio Rodriguez, and Luis Bedoya testified about "the defendants' involvement in the conspiracies" (GB33) is thus incorrect as to Lopez.  The government did not ask Peña a single question about Lopez—Peña did not even know who Lopez was.  (SA719-20).  Rodriguez, Burzaco's "person of trust" who paid the CONMEBOL officials, testified that he and Burzaco agreed it was essential *not* to involve Lopez or Martinez in the bribery scheme, contradicting Burzaco's testimony about Lopez's alleged involvement. (SA451-52, 728-29).  And Bedoya, the only CONMEBOL official who testified, stated unequivocally that he never discussed bribes with Lopez.  (SA759).

Burzaco claimed he and Lopez discussed the Copa Libertadores scheme during three in-person meetings before FIC acquired its stake in the T&T joint venture.  But he waffled on the details:  The supposed meetings occurred in February 2010 (or December 2009) in a hotel lobby in Miami or Fort Lauderdale,

in the News Corp. building in New York (perhaps in May 2010), and on the Fox lot in Los Angeles in August 2011. (GA234, 236-37; SA477-81, 524-25). Indeed, Burzaco's account of these meetings at trial did not appear in the government's voluminous Jencks Act disclosures even though Burzaco had met with the government *over 130 times* before trial. (SA517; *see* DE1934, at 1-10). Burzaco also claimed that at a meeting with Lopez and Martinez at a Dean & DeLuca near Rockefeller Center in November 2011, they discussed the "need to tidy up" T&T after FIC had acquired its stake in the venture. (GA281-82). No other witness could corroborate Burzaco's claim that bribes were discussed at these meetings.

Whenever meetings between Burzaco and Lopez or Martinez were attended by third parties who could potentially corroborate Burzaco's account—including CONMEBOL officials who participated in the Copa Libertadores scheme— Burzaco acknowledged that bribes were never discussed. (*E.g.*, SA508-10, 538-39).

Burzaco also claimed Lopez warned him about the 2014 T&T audit. (GA403-12, 433). But the government's assertion that Lopez "controlled" the audit (GB27) was contradicted by the four Fox witnesses (including one of the government's own witnesses) who were involved in the T&T audit and who testified that Lopez did not obstruct, mislead, control, or improperly influence the

audit (SA730-31, 764-65, 792-93, 800-03). To the contrary, Lopez cooperated with the audit and never refused any requests from the audit team. (SA794).

Despite its insinuation on appeal (*see* GB17), at trial the government never claimed Lopez made any money from the bribery scheme. And the emails the government claims demonstrate Lopez's knowledge of the bribery scheme support no such inference. (*See* GB22-23 (citing GA2277-91), 34 (citing GA2277, 2286-87, 2328-37, 2348-50, and exhibits not included in the government's appendix)). Instead, they concern business disputes involving no alleged wrongdoing, scheduling logistics, and Lopez's research before FIC acquired its interest in T&T, which witnesses described as basic due diligence that raised ordinary business concerns (e.g., tax implications)—not evidence of bribery. (*See* GA2277-91, 2328-37, 2348-50; SA734, 783-86).

### C. Procedural History

#### 1. Pretrial Motion

Lopez moved to dismiss the indictment for, inter alia, failure to state an offense. He argued that § 1346 is unconstitutionally vague as applied to him because, in contrast to statutes like the Foreign Corrupt Practices Act ("FCPA"), § 1346 contains no express prohibition against foreign bribery and does not allow the government to "police the relationship between a foreign employee and his foreign employer, particularly with respect to an alleged scheme involving South

14

Americans that took place almost entirely in South America." (DE1595-1, at 2, 9, 12).

The government opposed the motion and responded to the argument that there is "no case involving the theft of honest services from a foreign employer," and therefore the prosecution was precluded by *Skilling*. (DE1604, at 18). It contended that "*Skilling* did not restrict honest services fraud prosecutions to cases with facts or participants similar to those at issue before *McNally*; rather, it restricted prosecutions to cases that, like this one, involved bribes and kickbacks." (*Id.*).

At oral argument, Lopez's counsel explained that because of this total absence of pre-*McNally* caselaw, § 1346 "simply doesn't reach [the] foreign bribery that's alleged here." (SA407, 409-10, 414-15). Lopez's counsel also cited Congress's enactment of the FCPA as evidence that Congress did not understand honest-services fraud to encompass foreign bribery. (SA410-12).

The district court denied Lopez's motion. (DE1645).

### 2. Posttrial Motion

Lopez moved for a judgment of acquittal at the close of the government's case-in-chief. (GA701-02). The district court reserved decision, and Lopez renewed his motion at the close of his case-in-chief. (SA804).

Lopez then filed a Rule 29(c) motion after the jury returned its verdict. He renewed his arguments that "the honest services fraud statute does not encompass the extraterritorial commercial bribery alleged here" and that "§ 1346 should not be interpreted to proscribe foreign commercial bribery." (DE1987-1, at 9, 11). The motion explained *Skilling*'s holding that when Congress enacted § 1346, it meant to reinstate the "core" of pre-*McNally* honest-services caselaw, and argued that no pre-*McNally* case involved bribes or kickbacks to foreign citizens employed by foreign private organizations. (DE1987-1, at 9). Lopez also argued that the FCPA "would have been unnecessary had Congress believed that U.S. law already covered foreign bribery." (*Id.*). He also argued that because "the government failed to prove any bribe or kickback involving a U.S. employee-employer relationship" and because § 1346 cannot be interpreted to encompass foreign commercial bribery, the government "failed to prove a conspiracy to commit honest services fraud." (DE1987-1, at 9-10). Lopez also described the potential importance of the Supreme Court's pending decision in *Percoco* on his motion. (DE1987-1, at 11).

Lopez raised alternative arguments for acquittal, including that the government failed to prove that the alleged scheme was calculated to deceive CONMEBOL, because there was no evidence that anyone at CONMEBOL was unaware of the arrangement. (*See* DE1987-1, at 14-17).

16

On May 11, 2023, after Lopez filed his opening brief, the Supreme Court decided *Percoco* and *Ciminelli*.

The government filed its opposition more than three weeks later on June 2, 2023, discussing *Percoco* several times in its brief. (*See* DE1999, at 45, 51). However, the government chose to ignore Lopez's argument that no pre-*McNally* case involved bribes or kickbacks allegedly depriving a foreign private employer of the honest services of its foreign employees, except perhaps obliquely in a footnote stating: "To date, no Court of Appeals or Supreme Court opinion has suggested that the fraudulent scheme, as opposed to the wire use, must be domestic." (DE1999, at 44 n.6).

In reply, Lopez reiterated that § 1346 does not punish foreign commercial bribery—now citing previously unavailable precedents, including *Percoco* and *Ciminelli*. (DE2002, at 1-6).

The government did not request oral argument or a surreply.

### 3. The District Court's Rule 29 Decision

"After extensive consideration," the district court agreed that § 1346 "does not criminalize the conduct alleged in this case and…therefore the evidence at trial was insufficient to sustain Defendants' convictions under that statute." (SGA29).

In a well-reasoned, fifty-five-page opinion, the court retraced honest-services fraud's tortured history—from the Supreme Court's rejection of the entire

concept of honest-services fraud in *McNally* and Congress's enactment of § 1346, to the Court's paring of § 1346 to the "core" of pre-*McNally* caselaw in *Skilling* and its recent admonitions in *Percoco* and *Ciminelli* that § 1346 should not be interpreted to "vastly expand[] federal jurisdiction without statutory authorization," *Ciminelli*, 598 U.S. at 315.  (SGA30-38).

Because no pre-*McNally* case applied honest-services fraud to foreign commercial bribery, the district court held that "§ 1346 does not apply to foreign commercial bribery."  (SGA48).  The court observed that "Defendants' convictions are the casualties of the 'fundamental indeterminacy in honest-services-fraud theory,' despite decades of jurisprudence that has struggled to 'explain what kinds of fiduciary relationships are sufficient to trigger a duty of honest services in the first place.'"  (SGA49 (quoting *Percoco*, 598 U.S. at 335 (Gorsuch, J., concurring in judgment))).

Accordingly, the district court granted Lopez's motion and entered a judgment of acquittal.  This appeal followed.

## **SUMMARY OF ARGUMENT**

I.     To preserve § 1346 from unconstitutional vagueness, the Supreme Court confined it to the "solid core" of pre-*McNally* caselaw involving bribes or kickbacks received in violation of a clear fiduciary duty.  *Skilling*, 561 U.S. at 407. The Court reaffirmed that narrow statutory construction last term, holding that the

duty "must be defined with the clarity typical of criminal statutes" and that § 1346 "should not be held to reach an ill-defined category of circumstances simply because of a smattering of pre-*McNally* decisions." *Percoco*, 598 U.S. at 328-29. Not even a "smattering" of caselaw had extended the honest-services theory of federal fraud to the circumstance here—payments to foreign officials of private foreign organizations in connection with foreign business. Consequently, § 1346 must be construed to exclude foreign commercial bribery.

A contrary construction would be extraordinary, enabling U.S. prosecutors to impose American fiduciary principles on private relationships thousands of miles away, in localities that neither recognize fiduciary duties nor criminalize commercial bribery. Congress has never given any statute such an imperious, global scope. When Congress enacts federal legislation to combat foreign bribery—such as the FCPA—it manifests that intent in clear statutory language nowhere to be found in § 1346. As the district court correctly held, the statute's amorphous "intangible right of honest services" language does not empower the federal government to prosecute dishonest conduct anywhere in the world simply because some communication or payment touched a U.S. wire.

II. Even if § 1346 could apply to foreign commercial bribery, the government failed to prove that the payments here breached any fiduciary duty, as *Skilling* requires. The relevant relationship was between CONMEBOL, a

19

Paraguayan employer, and its employees, yet there was no evidence that this relationship was a "fiduciary" one, let alone that accepting private payments breached any *legal* duty the employees owed to their employer. Moreover, even if private FIFA and CONMEBOL "codes of ethics" could establish the requisite duty—they cannot—FIFA had no responsibility for the Copa Libertadores, and CONMEBOL had no such code at the relevant time.

III.    The Double Jeopardy Clause forecloses the government's request for a second attempt to prove a statutorily cognizable offense. *Burks v. United States*, 437 U.S. 1, 11 (1978). Permitting retrial also would be futile, because there is no charge or evidence Lopez participated in any scheme to bribe U.S. fiduciaries or defraud any U.S. entity, and the government does not claim otherwise.

IV.    Alternatively, this Court may affirm the judgment because the government failed to prove Lopez joined any scheme to deceive CONMEBOL. Further demonstrating the vast gulf between Paraguayan and American norms, nearly all CONMEBOL's leaders received private payments, and the government failed to prove that anyone at CONMEBOL was unaware of the payments.

V.    Pursuant to Federal Rule of Appellate Procedure 28(i), Lopez also joins Points I, II, and III.B of Full Play's brief.

## **ARGUMENT**

## I. **THE DISTRICT COURT CORRECTLY HELD THAT § 1346 DOES NOT REACH FOREIGN COMMERCIAL BRIBERY**

Liability under the honest-services statute depends on the existence of an applicable fiduciary duty. As the Supreme Court held in *Skilling*, the statute punishes defendants who, "in violation of a fiduciary duty, participated in bribery or kickback schemes." 561 U.S. at 407. Not everything that looks like bribery is covered—the existence of a fiduciary duty and the breach thereof are essential elements of the offense. Thus, last year in *Percoco*, the Supreme Court reversed the honest-services conviction of a defendant who had accepted a payment to influence government action because he, as a former government employee, did not owe a fiduciary duty to the public. *Percoco*, 598 U.S. at 329-33.

*Percoco* explicitly rejected this Court's dominance-and-control test for determining whether a fiduciary duty exists as too amorphous and insufficiently grounded in law. *Id*. at 322, 330-31. The *Percoco* Court held that the existence of the applicable fiduciary duty—and thus honest-services liability—"must be defined with the clarity typical of criminal statutes." *Id*. at 328. Given the facial deficiencies in the statutory text—proscribing deprivations "of the intangible right of honest services"—that clarity must come from "the core of pre-*McNally* honest-services case law" to which *Skilling* cabined the statute. *Id.*

21

The indictment and conviction of Lopez was premised exclusively on the theory that CONMEBOL employees and officials had breached a duty to CONMEBOL, a non-governmental Paraguayan organization. The question presented is thus whether pre-*McNally* caselaw clearly established that § 1346 covers foreign commercial bribery. The answer is no.

### A. Foreign Commercial Bribery Was Not Clearly Established As Honest-Services Fraud Before *McNally*

In *McNally v. United States*, 483 U.S. 350 (1987), the Supreme Court held that the mail and wire fraud statutes were limited to the protection of traditional property rights, and that they did not protect the so-called "right to honest services." *McNally* thus rejected the honest-services doctrine that had developed in lower courts. Congress responded by enacting § 1346 to revive the honest-services doctrine. But § 1346 is a constitutionally dubious statute, which lacks any textual definition of the scope of criminal liability. As Justice Gorsuch wrote recently: "To this day, no one knows what 'honest-services fraud' encompasses." *Percoco*, 598 U.S. at 333 (concurring in judgment). Thus, to salvage the statute, the Supreme Court in *Skilling* and *Percoco* held that it must be limited to its clearly defined pre-*McNally* core.

In *Skilling*, the Court recognized that in passing § 1346, Congress intended to re-enact the "doctrine developed in pre-*McNally* cases." 561 U.S. at 404. But in part because that doctrine itself was uncertain—riven with disagreements within

22

and among circuits on numerous points—the Court held that to preserve the statute, it was necessary to "pare that body of precedent down to its core." *Id*. Citing this Court's *Rybicki* decision, *Skilling* held that § 1346 could only be read to cover a limited subset of conduct, "not *all* intangible rights of honest services whatever they might be thought to be." *Id*. at 405 (quoting *United States v. Rybicki*, 354 F.3d 124, 137-38 (2d Cir. 2003) (en banc)). Thus, the Court held "that § 1346 criminalizes *only* the bribe-and-kickback core of the pre-*McNally* case law." *Id*. at 409.

Last year in *Percoco*, the Court made clear this requirement extends to the duty element as well. The *Percoco* defendants were charged with bribery, and the government alleged that they violated the sort of fiduciary duty that this Court had endorsed in a pre-*McNally* case, *United States v. Margiotta*, 688 F.2d 108 (2d Cir. 1982). The Supreme Court held that the government's theory was invalid, because the *Margiotta* honest-services theory was too amorphous and too weakly established to provide fair warning. "'The intangible right of honest services' must be defined with the clarity typical of criminal statutes and should not be held to reach an ill-defined category of circumstances simply because of a smattering of pre-*McNally* decisions." *Percoco*, 598 U.S. at 328-29.

In short, under *Percoco* and *Skilling*, § 1346 does not prohibit all bribery. The statute only reaches bribery that was clearly prohibited by the core of pre-*McNally* precedent.

Applying those principles here, this is an easy case. There is no clearly defined core of pre-*McNally* precedent declaring that the federal fraud statutes cover foreign commercial bribery. Indeed, there is not even a smattering of cases suggesting such breadth. The government cites no pre-*McNally* cases holding that the honest-services doctrine reaches foreign commercial bribery. As the district court noted, neither party in its Rule 29 briefing was "able to identify a single pre-*McNally* case applying honest services wire fraud to foreign commercial bribery, i.e., bribery of foreign employees of foreign non-government employers." (SGA48). That's because there are none. Under *Skilling* and *Percoco*, that is the end of the matter.

Indeed, in one of the "Varsity Blues" cases, the First Circuit held that a similar lack of pre-*McNally* precedent endorsing the government's theory was fatal. "The government has not cited any pre-*McNally* honest services case involving a purported bribe paid to an agent's purportedly betrayed principal, and does not dispute that *no* pre-*McNally* case involved such a payment." *United States v. Abdelaziz*, 68 F.4th 1, 30 (1st Cir. 2023). The same is true here. The

24

government has not cited any pre-*McNally* honest-services cases involving foreign commercial bribery.

As the district court correctly held, Lopez's conviction is the casualty of the "'fundamental indeterminacy' in the honest-services-fraud theory…that has struggled to 'explain[] what kinds of fiduciary relationships are sufficient to trigger a duty of honest services in the first place.'" (SGA49 (quoting *Percoco*, 598 U.S. at 335 (Gorsuch, J., concurring in judgment))). The court thus properly acquitted Lopez because the charged conduct fell outside the scope of § 1346.

## B. This Court Has Already Recognized That Relevant Law Is Unsettled And Unclear

Before *Percoco*, this Court had already held that whether § 1346 covers foreign commercial bribery is uncertain. In *Napout*, the defendants presented a similar claim—except they had not made the same argument below, so review was limited to plain error. *See* 963 F.3d at 183. As this Court explained, for an error to be plain, it must be "clear under current law," meaning there can be no plain error "where the operative legal question is unsettled." *Id*. It noted Justice Scalia's *Skilling* concurrence discussing the lingering ambiguities about what kinds of fiduciary duty may give rise to honest-services liability. *Id*. It ultimately concluded that "whether a foreign employee's duty to his foreign employer qualifies as an actionable element under § 1346 is a question that remains

unsettled," and therefore the defendants could not succeed on plain error review. *Id*. at 184.

Under *Percoco*, *Napout* is fatal to the government's claim. *Percoco* is clear that a duty sufficient to create honest-services liability "must be defined with the clarity typical of criminal statutes." 598 U.S. at 328. And if the pre-*McNally* caselaw recognizing that duty is "unsettled" because of "lingering ambiguities," then it is not defined with the clarity required of criminal statutes.

Moreover, the only case in this Circuit (or, to our knowledge, anywhere) to squarely address the question applied similar reasoning to conclude that § 1346 does not cover foreign bribery. In other words, the only decision on the books at the time of the charged conduct had *specifically rejected* the government's theory here. In *United States v. Giffen*, 326 F. Supp. 2d 497 (S.D.N.Y. 2004), the defendant was charged with honest-services fraud based on allegations that he bribed a Kazakh official, thus denying Kazakh citizens of his honest services. Following *Rybicki*, the district court noted that the "touchstone is whether any pre-*McNally* precedent supports prosecution of American citizens for depriving foreign nationals of the honest services of their own government officials." *Giffen*, 326 F. Supp. 2d at 505. It held that there was no such precedential support. To the contrary, it noted the "total absence of pre-*McNally* precedent supporting the Government's overseas application of the intangible rights theory." *Id*. It thus

26

dismissed the charge.  That was the correct result in 2004 and is even more correct now given the Supreme Court's intervening decisions in *Skilling* and *Percoco*.

The "emphatic directive" of *Percoco* is that honest-services liability cannot apply to an "ill-defined category of circumstances" based on a smattering of pre-*McNally* cases.  (SGA47 (quoting *Percoco*, 598 U.S. at 328-29)).  Here, the government cites *no* pre-*McNally* cases applying fraud statutes to this category of conduct.  The government's claim that honest-services liability for foreign commercial bribery was nonetheless clearly established and "defined with the clarity typical of criminal statutes," *Percoco*, 598 U.S. at 328, is baseless.

### C.     Section 1346 Cannot Be Read To Extend Far Beyond Other Federal Bribery Statutes

Congress's adoption of specific and limited bribery statutes further undermines the government's argument that § 1346 covers all bribery worldwide. Whereas § 1346 itself includes only the vaguest language, other bribery statutes define the offense with specificity.  The domestic bribery statutes, 18 U.S.C. §§ 201 and 666, do not cover foreign commercial bribery, but the Supreme Court in *Skilling* held that § 1346 "draws content" from these statutes because they define "similar crimes."  561 U.S. at 412.  It suggested, in other words, that § 1346 should be interpreted in pari materia with these statutes.  *See Erlenberg v. United States*, 409 U.S. 239, 243-44 (1972).  The *Skilling* Court also held that because honest-services bribery would be limited by the scope of § 201 and § 666, there was less

27

risk that the honest-services statute would be "stretched out of shape." 561 U.S. at

412. But extending § 1346 to foreign commercial bribery would stretch the statute

out of shape, far beyond any bribery statute previously enacted by Congress.

When Congress *does* seek to reach foreign bribery, it does so explicitly, and

to date, it has only done so in narrow circumstances. The FCPA punishes only

bribery of public officials. 15 U.S.C. § 78dd-1 to -3. As this Court has held, the

FCPA was drafted with "surgical precision" to "limit its jurisdictional reach" and

avoid excessive interference with the domestic affairs of foreign nations. *United

States v. Hoskins*, 902 F.3d 69, 84 (2d Cir. 2018). It would be odd for Congress to

address foreign governmental bribery with such surgical precision while

simultaneously firing a water cannon of honest-services liability across the globe.

Just a few months ago, Congress passed the Foreign Extortion Prevention

Act ("FEPA") to cover certain types of bribery not already covered by the FCPA.

FEPA targets bribery involving foreign government officials and "public

international organization[s]," a term that is specifically and narrowly defined. *See*

18 U.S.C. § 201(a)(4)-(5). Like the FCPA, the new provisions of FEPA do not

cover foreign commercial bribery. It is hard to understand why Congress would

have enacted FEPA at all if the same conduct (and much more) were already

covered by § 1346. "When Congress amends legislation, courts must presume it

intends the change to have real and substantial effect." *Ross v. Blake*, 578 U.S. 632, 641-42 (2016).

FEPA's legislative history makes clear that its purpose was to correct a perceived imbalance in U.S. anti-corruption laws. The FCPA punished U.S. companies and nationals for bribing foreign officials but did not punish the recipients of those bribes. *See* 169 Cong. Rec. H6964 (daily ed. Dec. 14, 2023) (statement of Rep. Jackson Lee) (FEPA "will finally enable U.S. law enforcement to indict foreign kleptocrats for extorting U.S. businesses and Americans individually"); Comm. on Homeland Sec., 118th Cong., *Countering Threats Posed by Nation-State Actors in Latin America to U.S. Homeland Security: Hearing Before the Subcommittee on Counterterrorism, Law Enforcement, and Intelligence* (Comm. Print 2023) (statement of Elaine K. Dezenski, Foundation for Defense of Democracies) ("U.S.-based and U.S.-listed companies face major consequences for bribing foreign officials under the [FCPA]" but "[c]orrupt officials…get off scot-free"). This legislative history again reflects that Congress understands both the FCPA and FEPA were carefully crafted to reach specifically defined conduct.

Moreover, the FCPA and FEPA provide the Executive Branch with a specific mechanism for covering foreign organizations: The President must issue an executive order designating an organization as a "public international organization" covered by the statutes. *See* 15 U.S.C. § 78dd-2(h)(2)(B)(ii); 18

29

U.S.C. § 201(a)(5)(B); *see also, e.g.*, Exec. Order No. 13259, 67 Fed. Reg. 13239 (2002) (designating the European Union and European Police Office as "public international organizations"). The President has not designated CONMEBOL (or any other international soccer organization) as an organization covered by the FCPA and FEPA. Individual U.S. Attorneys' offices should not be allowed to circumvent that process by using § 1346 to create a de facto designation.

Congress carefully crafted the FCPA and FEPA to reach only a small set of precisely defined foreign bribery, and it prescribed a specific process for determining what foreign organizations are covered. It strains credulity to suggest that Congress also enacted § 1346 to cover anything that looks like bribery, whether governmental or commercial, anywhere on the planet, so long as some wire touched an American bank or email server. A sensible reading is one that makes sense in the context of Congress's overall efforts to combat bribery. This Court should read § 1346 consistent with other federal bribery statutes, and not in a way that renders all other bribery statutes superfluous. If § 1346 is read in pari materia with existing bribery statutes, it cannot be read to reach an entirely new category of conduct—foreign commercial bribery—that Congress has declined to address.

### D. The Constitutional Avoidance Canon And Lenity Compel A Narrow Reading

The honest-services statute should be read narrowly for other reasons as well. As the Supreme Court held in *Skilling*, the constitutional avoidance canon counsels a narrow reading of the statute. The amorphous twenty-eight-word honest-services statute barely passes constitutional muster under any interpretation. Courts cannot extend the doctrine into new territory without aggravating the severe vagueness problems that afflict the statute. That is especially true here, where the government seeks to extend the statute into foreign contexts, based on supposed fiduciary duties that are some combination of unknown and nonexistent.

For reasons detailed further below, American prosecutors lack the ability to determine the existence and scope of employment-related fiduciary duties around the globe, especially in countries like Paraguay, whose legal system is not based on Anglo-American common law. Extending the honest-services statute abroad in this manner would make criminal liability contingent on an "undiscoverable" and "impenetrable jungle" of foreign law, *see Skilling*, 561 U.S. at 407—exactly what the Supreme Court has sought to avoid by restricting § 1346 to its pre-*McNally* core.

The United States is not the world's policeman, and Congress has never enacted a statute granting federal prosecutors the power to impose American notions of fiduciary duties—under threat of criminal sanction by American

31

courts—on foreign employer-employee relationships. The Supreme Court has warned that courts cannot endorse new theories of fraud liability that "vastly expand[] federal jurisdiction without statutory authorization." *Ciminelli*, 598 U.S. at 315. Just as principles of federalism counsel against interpreting vague statutes to cover matters traditionally left to states, *see id*. at 315-16, principles of international comity counsel against interpreting vague statutes to cover internal domestic affairs of foreign nations.

The government argues that, under *Napout*, any domestic wire is sufficient to give the fraud statutes extraterritorial application. (GB59). Even assuming that view could survive scrutiny, however, it doesn't mean American courts can apply American fiduciary duties to private foreign organizations. In fact, this Court made that very distinction in *Napout*, addressing extraterritoriality but expressly declining to resolve the "unsettled" question whether the substantive scope of § 1346 reaches foreign commercial bribery. *Compare* 963 F.3d at 180-81, *with id*. at 183-84.

Congress has not criminalized foreign commercial bribery in § 1346 or any other federal statute. Fundamental principles of statutory interpretation, as well as constitutional principles of fair warning and the related rule of lenity, prohibit a broad reading of the statute that would cover a vast new swath of foreign conduct. Until Congress expresses in "clear and definite" language that it intends to

criminalize foreign commercial bribery, courts should not extend underspecified statutory text to reach such conduct. *Yates v. United States*, 574 U.S. 528, 548 (2015) (quoting *Cleveland v. United States*, 531 U.S. 12, 25 (2000)); *see also Clark v. Martinez*, 543 U.S. 371, 380-81 (2005) (if one "of two plausible statutory constructions…would raise a multitude of constitutional problems, the other should prevail"). Unless and until Congress speaks more clearly, the honest-services statute must be limited to its pre-*McNally* core of domestic bribes and kickbacks—and only those that violate a fiduciary duty clearly established by that precedent.

### E. The Government's Substantive Arguments Fail

#### 1. That Domestic Bribery Is Covered Does Not Establish That Foreign Bribery Is Covered

The core strategy in the government's appellate brief is to reframe the question presented at a higher level of generality, to sweep in more conduct. The government says the question is not whether § 1346 covers foreign commercial bribery, but whether it covers bribery *in general*. Because *domestic* commercial bribery is covered under *Skilling* and *Rybicki*, the government argues, and neither case mentions "a domestic/foreign distinction or placed any such limitation on its holding" (GB55), then foreign commercial bribery must be included.

But this argument is flatly inconsistent with *Percoco*, which makes clear that § 1346 does not cover all "bribery"—rather, only payments that violate known and

specified fiduciary duties violate the statute. As the Solicitor General conceded in the government's brief in *Percoco*, "[a]fter *Skilling*, to convict a defendant of honest-services mail or wire fraud the government must prove that the defendant engaged in a scheme *to breach a fiduciary duty* through bribes or kickbacks." Brief for United States 19, *Percoco*, 598 U.S. 319 (No. 21-1158) (emphasis added). Thus, not everything that looks and smells like bribery violates the honest-services statute. Proof of guilt requires proof of an applicable fiduciary duty.

The result in *Percoco* did not turn on whether the charged conduct involved "bribery" in some general sense—no one disputed that. Rather, *Percoco* turned on whether there was a clearly identifiable fiduciary duty that rendered the receipt of payments illegal. The government there argued for the existence of a fiduciary duty based on *Margiotta*. It argued that an individual can owe a fiduciary duty to the public even without a formal position of government employment. This Court endorsed that idea, based on a general test that persons who have enough dominance and control over government operations are "in reality…the government" and thus "owe a fiduciary duty to the citizenry." *United States v. Percoco*, 13 F.4th 180, 194 (2d Cir. 2021). In other words, the Court held that an honest-services conviction can be premised on a test for fiduciary duty recognized (or created) in *Margiotta* as a matter of federal common law. The Supreme Court rejected that approach as both insufficiently grounded in pre-*McNally* caselaw and

34

far "too vague" to provide notice of what exactly is forbidden. *Percoco*, 598 U.S. at 330-31.

Thus, under *Percoco*, the requirement of clarity recognized in core, pre-*McNally* precedent extends to the duty element as well. Here, there is none.

### 2. The Cases The Government Cites Do Not Establish That Foreign Commercial Bribery Is Covered

To try to show that this Court has already endorsed its breathtakingly broad reading of § 1346, the government relies primarily on three of this Court's prior decisions—*Napout*, *Bahel*, and *Avenatti*. None supports its argument.

*First*, as discussed above, *Napout* expressly declined to reach the question of whether the honest-services statute covers foreign commercial bribery. The government therefore focuses primarily on Judge Hall's view that the defendants' argument would have failed even on plenary review. (*See* GB31, 56, 64-65 (citing *Napout*, 963 F.3d at 190-92 (Hall, J., concurring))). But a concurring opinion is just that—a concurring opinion. And while it is true, as the government points out, that the majority did not disagree with Judge Hall's analysis, it also did not agree with it. The majority refused to address the issue, and in response to the concurrence, reiterated its view "that the issue need not be addressed" because it was not preserved. 963 F.3d at 184 n.19. As Judge Chen correctly noted, a court "cannot rely on Judge Hall's concurrence as guiding precedent for the scope of

35

§ 1346 when the *Napout* majority expressly chose not to rule on the issue."
(SGA51).

The government also repeatedly notes that the majority held that the issue
was unsettled "at best" (GB30, 44, 64)—as if the phrase "at best" somehow
logically proves the converse proposition that the issue was actually settled in the
government's favor. That reading is inconsistent with the Court's opinion. The
majority noted that prior cases such as *Rybicki* provided only "possible guidance"
regarding the statute's scope. 963 F.3d at 183-84. And it ultimately concluded
that the issue was "not clear under current law." *Id*. at 184. The majority did not
agree with Judge Hall.

In any event, Judge Hall's arguments do not survive *Percoco*. Judge Hall
cited only a few pre-*McNally* cases extending honest-services liability to *domestic*
commercial bribery cases. Those cases are orthogonal to the question presented
here. And to demonstrate an applicable fiduciary duty, Judge Hall relied on a
general test of "reliance, and de facto control and dominance." *Id*. at 191 (quoting
*United States v. Halloran*, 821 F.3d 321, 338 (2d Cir. 2016)). That is the same
reliance, dominance-and-control test that this Court endorsed in *Margiotta*. 688
F.2d at 122, 124. And it is the same test the Supreme Court rejected as "too
vague" in *Percoco*. 598 U.S. at 330-31.

36

*Second*, the government relies on *United States v. Bahel*, 662 F.3d 610 (2d Cir. 2011). (GB56-61). In *Bahel*, this Court affirmed the conviction of a U.N. employee who had deprived the U.N. of his honest services. It held that American fiduciary duties applied because the U.N. was "an organization headquartered in the United States, entitled to defendant's honest services in the United States, and receiving its largest financial contributions from the United States." 662 F.3d at 632. This Court neither endorsed nor repudiated *Giffen*; instead, it distinguished *Giffen* on the grounds that the putative victims there were "a foreign government's citizens" rather than a U.S.-based organization. *Id*.

The question presented in *this* case is whether § 1346 covers foreign commercial bribery. *Bahel* does not answer that question because the organization there was neither foreign nor commercial. As the district court explained, "[e]ven assuming the United Nations is a commercial (versus public) entity, 'more than a smattering' of pre-*McNally* precedent supports the application of § 1346 to the 'domestic' bribery scheme charged in that case." (SGA52 n.32). The same cannot be said here, where the entity that was allegedly deprived of the honest services of its foreign employees is a commercial entity headquartered in Paraguay.

*Third*, the government relies on a footnote in *United States v. Avenatti*, 81 F.4th 171 (2d Cir. 2023), where this Court distinguished *Percoco*. (GB74-76). In that footnote, this Court observed that it is "hornbook" law that there is a fiduciary

37

relationship between an attorney and his client. 81 F.4th at 194 n.27. But, as discussed further below, there is no such hornbook law establishing a fiduciary relationship between foreign employers and their foreign employees—American hornbooks and Restatements do not apply in Paraguay. *Avenatti* involved a fiduciary relationship between a U.S. lawyer and his U.S. client. That has nothing to do with the question presented here.

In short, as the district court correctly held, "the *Avenatti* panel did not address the issues raised in this case." (SGA46).

\* \* \* \*

Beyond *Napout*, *Bahel*, and *Avenatti*, the government relies on a grab bag of other pseudo-authority. It cites *United States v. Groves*, 122 F.2d 87 (2d Cir. 1941), and *United States v. Sindona*, 636 F.2d 792 (2d Cir. 1980). (GB79). But in those cases, defendants were charged with defrauding American corporations. It relies on *United States v. Olin Matheson Chemical Corp*., 368 F.2d 525 (2d Cir. 1966), and *United States v. Austin*, 273 F. Supp. 360 (S.D.N.Y. 1967). But those cases were § 1001 prosecutions, not fraud prosecutions. The very fact that those defendants were charged only under § 1001 suggests an understanding that the underlying fraud itself could not be prosecuted in this country.

Finally, the government cites four newspaper articles from the 1970s reporting several cases where executives were charged with, or pleaded guilty to,

38

some sort of foreign bribery of *government* officials shortly before the FCPA's enactment. (GB80-82). It argues that these articles show how questions of foreign bribery "pervaded the public consciousness" at the time. (GB80). That argument has the distinct ring of scraping the bottom of the barrel. Newspaper articles are not caselaw, indictments and plea agreements do not create precedent, and vague assertions that foreign bribery entered the "public consciousness" in the 1970s do not demonstrate that pre-*McNally* caselaw clearly established that federal fraud statutes extended to *foreign commercial bribery*.

The very fact that the government must resort to newspaper articles demonstrates the weakness of its legal arguments. The honest-services statute has never been interpreted to cover foreign commercial bribery. Pared to its core, as *Skilling* and *Percoco* require, it does not reach such conduct. "If Congress desires to go further…it must speak more clearly." *Skilling*, 561 U.S. at 402.

### F. The Government's Procedural Complaints Fail

The government also makes two procedural challenges that are meritless, if not frivolous.

#### 1. The Government Ignored Lopez's Statutory Argument Below

The government asserts it was not until Lopez's posttrial Rule 29 reply that he argued § 1346 does not encompass foreign commercial bribery. (GB5, 38-39, 43-44, 49 n.6, 77 n.9, 82). It complains that the district court decided the issue

39

"without full briefing" and "without seeking responses from the government," and "[t]he government was not given an opportunity to point the district court" to supposedly pertinent authority. (GB5, 39, 82). None of this is true.

In fact, *more than two years* before the district court's decision, Lopez moved to dismiss the honest-services charge on the grounds that § 1346 as applied to the alleged conduct is "void for vagueness" and that "properly construed and taking those vagueness concerns into account, [it] simply doesn't reach foreign bribery that's alleged here." (SA407). Lopez argued that *Skilling* confined the statute to core pre-*McNally* honest-services caselaw; that this caselaw "did not include any foreign bribery prosecutions"; and consequently that "1346 doesn't reach foreign bribery schemes." (SA408-16; *see* DE1629 ("[A]lthough the pre-*McNally* honest services precedents were 'legion…none of them apply the intangible rights theory to corruption in a foreign nation,'" and therefore § 1346 "[can]not be construed as extending to foreign bribery schemes." (quoting *Giffen*, 326 F. Supp. 2d at 506))). Lopez noted that the question the Second Circuit declined to answer on plain error review in *Napout*—"whether a foreign employee's duty to his foreign employer qualifies as an actionable element under § 1346"—was now properly before the district court. (DE1595-1, at 10-11 (quoting *Napout*, 963 F.3d at 184)). At oral argument, the government acknowledged and responded to Lopez's argument, conceding "that's true, you

40

won't find a case like that pre-*McNally* where there is a foreign national working for [an] international organization." (SA417). But, the government argued, as it does in its appellate brief, that "if you are paying bribes and kickbacks in violation of an employer/employee relationship, [you're] out of luck." (SA418-19).

And Lopez raised this same statutory argument again after trial, putting it front and center in his opening Rule 29 brief. He argued, once again, that "the honest services fraud statute does not encompass the extraterritorial commercial bribery alleged here" because *Skilling* confined § 1346 to the "solid core" of pre-*McNally* cases, and "none of the pre-*McNally* precedents involved bribes or kickbacks to foreign citizens employed by foreign governments, much less private organizations." (DE1987-1, at 9). Those are the very same arguments the district court ultimately adopted in granting the judgment of acquittal, and which are now before this Court on appeal.

Lopez didn't cite *Percoco* or *Ciminelli* initially (GB38), but that was only because neither case had been decided when he filed his opening brief—they were decided after he filed his motion, but before the government submitted its opposition. And of course, Lopez raised the new Supreme Court decisions at the first opportunity, in his reply. At that time, he once again reiterated the same statutory argument and explained how the Supreme Court's new decisions validated that argument. (*E.g.*, DE2002, at 5-6 (*Percoco* "emphasized that § 1346

covers only 'the "core" of pre-*McNally* honest services case law and d[oes] not apply to all intangible rights of honest services whatever they might be thought to be.'")).

The government, however, ignored Lopez's statutory argument in its opposition, and instead tried to use *Percoco* for other purposes. It made the strategic choice to focus its opposition exclusively on "The Defendants' Vagueness Challenges" (DE1999, at 38-53), which Lopez had presented as merely a fallback, arguing that "[a]t a minimum," extending § 1346 to foreign commercial bribery "would render the statute unconstitutionally vague." (DE1987-1, at 10). The government elected not to respond to Lopez's argument that § 1346 does not reach foreign commercial bribery. (DE1987-1, at 9-10).[4] Nor did the government seek permission to file a surreply after Lopez addressed *Percoco* and *Ciminelli* in his reply. For good reason: the government had already discussed *Percoco* (and *Napout*, *Bahel*, *Avenatti*, and *Rybicki*) several times in its opposition, to argue that an employer-employee relationship is not an "ill-defined category." (DE1999, at 26, 42, 45, 47, 51-52).

---

[4] The district court stated Lopez "framed this argument in his opening Rule 29 brief" as a vagueness challenge. (SGA29 n.15). In fact, Lopez made a pure statutory argument, but noted *Skilling* had narrowed § 1346 "to the 'solid core' of honest-services cases that were prosecuted before *McNally…because otherwise it would have held the statute unconstitutionally vague*." (DE1987-1, at 9-10) (emphasis added).

The government's protest that it was denied any meaningful opportunity to litigate this issue is thus squarely belied by the record.

### 2. The District Court Did Not Violate Any Mandate From *Napout*

The government argues the district court violated the "mandate rule" and law-of-the-case principles because it granted an acquittal without incorporating, and supposedly in spite of, this Court's "Rule 29 analysis" in *Napout*, which the government labels "the same case." (GB62-63).

As an initial matter, the mandate rule applies only to subsequent proceedings after a higher court remands a case to a lower court. *See United States v. Stanley*, 54 F.3d 103, 108 (2d Cir. 1995) (de novo resentencing not permitted where Court identified only "a narrow issue for remand"). Lopez's case was not on remand from *Napout* and is before this Court now for the first time. Although both cases were litigated under the same docket number in the district court, Lopez's case involved a separate trial, with different evidence, concerning defendants charged in an indictment that was not even filed until long after the *Napout* trial had ended. *Napout* could not conclude legal issues for Lopez's case before Lopez was afforded any opportunity to litigate them. *See, e.g.*, *In re W.R. Grace & Co.*, 591 F.3d 164, 174 (3d Cir. 2009) (identity of "parties and issues…is required for application of the law of the case doctrine"); *United States v. Dexter*, 165 F.3d 1120, 1124 (7th Cir. 1999) ("[B]ecause [defendant] was not a party to the merits

decision in the original appeal [by his co-defendant] he is not precluded from raising the same arguments anew….”); *United States v. Maybusher*, 735 F.2d 366, 370 (9th Cir. 1984) (prior opinion not binding for defendant whose “conviction did not occur as a result of the same trial as his co-defendants”).  Stated differently, because *Napout* did not and could not have decided anything with respect to the evidence in *Lopez's* trial, the mandate rule “has no applicability to the present case.”  *United States v. Uccio*, 940 F.2d 753, 757 (2d Cir. 1991).

Moreover, as discussed above, in *Napout* this Court expressly declined to decide whether a foreign employee’s duty to his foreign employer qualifies as an actionable element under § 1346 because the issue was presented only for plain error review.  963 F.3d at 183-84.  The *Napout* Court’s mandate thus did not constrain the district court from deciding that legal question in the first instance when properly presented by Lopez.  “[A] mandate is controlling only as to matters within its compass.”  *New Eng. Ins. Co. v. Healthcare Underwriters Mut. Ins. Co.*, 352 F.3d 599, 606 (2d Cir. 2003).

Further, the portion of *Napout* addressing the sufficiency of the government’s evidence of fiduciary duty in that trial follows the discussion of the statutory question, and thus presumes that a foreign employee’s duty to his foreign employer is an actionable element under § 1346.  963 F.3d at 184-85.  By holding that the FIFA and CONMEBOL codes of ethics sufficed to prove a fiduciary

relationship, the *Napout* Court did not hold that such documents established the requisite element for § 1346, let alone that those codes of ethics would have sufficed to establish a fiduciary relationship in Lopez's trial.  Indeed, the evidence in Lopez's trial established that the relevant contracts were signed *before* CONMEBOL's code of ethics went into effect.  (GA2252).

Regardless, the government did not raise its mandate rule argument before the district court and has therefore forfeited that argument on appeal.  *See In re Nortel Networks Corp. Sec. Litig.*, 539 F.3d 129, 132 (2d Cir. 2008) (per curiam) (appellant waives argument "by failing to present it below").

## II. THE GOVERNMENT FAILED TO PROVE A FIDUCIARY DUTY GIVING RISE TO HONEST-SERVICES LIABILITY

In the alternative, even if § 1346 could theoretically apply to foreign commercial bribery in some cases, the government would still be required to prove the existence of an applicable fiduciary duty.  The government has not done so here.  The only relevant relationship in this case, at least as to Lopez and Fox, is between a private Paraguayan employer and its employees.  There is no reason to believe that Paraguay, a civil-law country, recognizes any sort of fiduciary duty akin to what courts have created as a matter of Anglo-American common law.  The government thus attempted to prove the existence of a fiduciary duty by introducing evidence of FIFA's code of ethics.  But corporate policies are not

45

sufficient to create fiduciary duties, and in any event, FIFA's code of ethics could not create fiduciary relationships between CONMEBOL and its employees.

The government argues that because a fiduciary duty was proven in *Napout*, it was also necessarily proven here, and that Lopez is foreclosed from arguing otherwise. That argument, derived from the mandate rule, is wrong in part for the reasons given above. It is also wrong because *Napout* was decided before *Percoco* tightly restricted which fiduciary duties are sufficiently clear and well established to support a conviction for honest-services fraud. And it is wrong because the existence of a fiduciary duty is an element of the offense that must be proven in each case. That the element was proven in a different case, with different evidence, cannot establish that the same element was proven in this case. Nor can the question be decided as a pure matter of law. Even assuming § 1346 could extend to some foreign employer-employee relationships, the existence and applicability of a fiduciary duty is a mixed question of law and fact that must be proven beyond a reasonable doubt in each case. *See United States v. Gaudin*, 515 U.S. 506, 512-14 (1995). The government did not prove it here.

### A. There Is No General Fiduciary Duty To Employers In The Relevant Jurisdictions

As discussed, an essential element of honest-services fraud is proof of a fiduciary duty owed by the alleged recipient of the bribe to the victim. In this case, that means the government had to prove that Lopez conspired with CONMEBOL

officials to violate the fiduciary duties that the latter owed to CONMEBOL. The question, therefore, is whether there is such a duty, and where it comes from. The government mostly seeks to avoid answering that question. The fiduciary duties posited by the government in this case—namely, fiduciary duties owed by foreign persons, such as CONMEBOL employees, to foreign entities, such as CONMEBOL—are neither grounded nor definite. Indeed, they are nonexistent.

It is not even clear that the Paraguayan legal system, for example, has any concept of fiduciary duties that remotely resembles the unique Anglo-American conception. Fiduciary duties were not engraved on stone tablets at Mount Sinai. Rather, fiduciary duties as we know them were developed as a particular feature of Anglo-American law. They had their origin in the law of trusts, created by English courts of equity, and the concept eventually migrated into English courts of law in part through the fusion of law and equity.[5]

They are decidedly a creature of Anglo-American common law. When the Supreme Court seeks to determine the scope and meaning of fiduciary duties, it often turns to the Restatements of Agency and of Trusts. *E.g.*, *Percoco*, 598 U.S. at 329 (citing Restatement (Third) of Agency); *Skilling*, 561 U.S. at 418 (Scalia, J., concurring in judgment) (citing Restatement (Second) of Trusts and Restatement (Second) of Agency); *LaRue v. DeWolff, Boberg, & Assocs.*, 552 U.S. 248, 253 n.4

---

[5] *See* David J. Seipp, *Trust and Fiduciary Duty in the Early Common Law*, 91 B.U. L. Rev. 1101, 1101 (2011).

(2008) (citing Restatement (Second) of Trusts); *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 112 (2008) (same). This Court has done the same. It has relied on Restatements to determine the presence and scope of fiduciary relationships, and it has noted repeatedly that agency is a fiduciary relationship created and defined *by common law*. *In re Trib. Co. Fraudulent Conv. Litig*., 946 F.3d 66, 79 (2d Cir. 2019); *Johnson v. Priceline.com, Inc*., 711 F.3d 271, 276 n.2, 277 (2d Cir. 2013).

The Restatements do not purport to set forth universal principles of natural law. Rather, the Restatements set forth principles of Anglo-American common law, developed over centuries in English and American courts. For example, the Restatement of Agency's basic definition of a fiduciary duty arising from an agency relationship—which was cited in *Percoco*—is by its own lights a "common-law definition." Restatement (Third) of Agency § 1.01, cmt. c.

These common-law definitions and principles have not been adopted in civil-law systems. As a general matter, civil-law jurisdictions have not recognized trusts.[6] In part for that reason, civil-law jurisdictions have very different notions of fiduciary duties, to the extent that they have any at all.[7] Nearly all South American

---

[6] *See* Peter Hefti, *Trusts and Their Treatment in Civil Law*, 5 Am. J. Compar. L. 553, 553 (1956) ("In the civil law there is no legal institution that directly corresponds to the common law trust.").

[7] *See* Katharina Pistor & Chenggang Xu, *Fiduciary Duty in Transitional Civil Law Jurisdictions*, *in* Global Markets, Domestic Institutions 78 (Curtis Milhaupt ed.,

countries, including Paraguay, are former Spanish or Portuguese colonies with legal systems based on continental, civil-law predecessors.

The American Law Institute's Restatement of Agency, therefore, does not accurately state the law of employer-employee relations in Paraguay. When Judge Hall wrote that fiduciary duties are "obviously inherent in employer-employee relationships," *Napout*, 963 F.3d at 191, that observation may have been correct when applied in New York, Connecticut, and Vermont, but it is far from obvious when applied to Paraguay. Nor is there any reason to believe that Congress, when it enacted § 1346, sought to create a worldwide enforcement mechanism for Anglo-American fiduciary duties.

The government nonetheless contends that it "proved" the existence of an applicable fiduciary duty here. (GB44). As background legal material, the government claims it submitted "numerous" sources demonstrating the existence of a fiduciary duty in "civil law" and "foreign law." (GB65). But the government's legal authority borders on laughable. The government cited two law review articles stating banal propositions such as "[m]ost continental countries have statutes punishing commercial bribery." (DE1999, at 50 n.10 (quoting Note, *Bribery in Commercial Relationships*, 45 Harv. L. Rev. 1248, 1252 n.34 (1932))).

---

2003) ("The same qualities that make the concept of fiduciary duties so resilient over time [in Anglo-American law] make it extremely difficult to transplant to other legal systems.").

That utterly nonspecific citation (from a student note nearly a century old) proves nothing.  The government has never pointed to any law in Paraguay, or any other relevant jurisdiction in this case, demonstrating the existence of a fiduciary duty.  Nor has the government demonstrated that there is any law in Paraguay that would cover the alleged conduct here.

What the government seems to suggest is that even if Paraguay itself has no applicable fiduciary duties, this Court should impose American fiduciary duties on Paraguayan employers and employees—backed by the long arm of the American criminal justice system.  That is an extraordinary argument to make, not remotely consistent with the Supreme Court's admonition that the fraud statutes should not be extended to new contexts without clear Congressional approval.

### B.  FIFA's And CONMEBOL's Ethics Codes Did Not And Could Not Create A Fiduciary Duty

As to actual evidence submitted at trial, the government relies principally on the testimony of FIFA lawyer Lara Elliot who, it asserts, testified to "the fiduciary duties that the [FIFA ethics] code established."  (GB33).  Her testimony established no such thing.

For starters, Elliot didn't testify about fiduciary duties at all—she literally never used the phrase.[8]  Nor could she, a lawyer for a Swiss organization, have

---

[8] Bedoya's conclusory assertion that he violated a fiduciary duty to CONMEBOL (SA760, 770-71) carries no weight.  *See Cameron v. City of New York*, 598 F.3d 50,

testified about fiduciary duties (or lack thereof) in Paraguay or other South American countries. Rather, she testified about FIFA's code of ethics, which was distributed to member organizations through mail and other means, and which prohibited bribery and required members to "act with integrity" and demonstrate "absolute loyalty" to FIFA. (GA111-14, 120). The government maintains that her testimony regarding FIFA's code of ethics established a fiduciary duty.

But the existence of some corporate policy is neither necessary nor sufficient to create a fiduciary duty. If Apple added an "absolute loyalty" provision to its iPhone terms of service, that would not create a fiduciary duty. Fiduciary duties are created by the law of a relevant jurisdiction, and as discussed above, the government has cited no applicable law showing that there was a fiduciary relationship between CONMEBOL and its officials.

Moreover, the Supreme Court has warned that it is dangerous to interpret criminal statutes in a way that predicates criminal liability on privately drafted employer policies. Employer polices change frequently, with little notice, and they often contain vague and uncertain terms, as well as provisions that are more in the nature of aspirations. As a result, allowing criminal sanctions to flow from violations of employment policies "would inject arbitrariness into the assessment

---

62 & n.5 (2d Cir. 2010) (even expert witnesses "may not present testimony in the form of legal conclusions" and "the impropriety of allowing a lay witness to testify in the form of a legal conclusion is all the clearer").

51

of criminal liability." *Van Buren v. United States*, 593 U.S. 374, 395 (2021).

Allowing privately drafted codes to function as the source of criminal liability also

raises serious constitutional concerns, because it effectively delegates lawmaking

power to private parties. *See Gen. Elec. Co. v. N.Y. Dep't of Labor*, 936 F.2d

1448, 1454-55 (2d Cir. 1991); *Nat'l Horsemen's Benevolent & Protective Ass'n v.*

*Black*, 53 F.4th 869, 880-81 (5th Cir. 2022). Those concerns are even more

pronounced when the drafting organization is a foreign organization such as FIFA.

*Cf. NRDC v. EPA*, 464 F.3d 1, 9 (D.C. Cir. 2006) ("There is significant debate over

the constitutionality of assigning lawmaking functions to international bodies.").

These dangers are on full display in this case, given that FIFA's ethics code,

in addition to requiring "absolute loyalty" (whatever that means), also required

officials to act with "integrity" and avoid doing anything that might reflect poorly

on FIFA. The same is true of CONMEBOL's later-adopted code. (GA2231).

Those provisions could cover nearly anything. An interpretation of the honest-

services statute that "stakes so much" on the "drafting practices of private parties is

hard to sell as the most plausible." *Van Buren*, 593 U.S. at 396.

The government relies on *Napout*'s holding that the evidence concerning

FIFA's and CONMEBOL's codes of ethics introduced in that trial was sufficient to

establish a fiduciary duty between those defendants and their employers. (GB61

(citing *Napout*, 963 F.3d at 184-85)). As discussed, that holding does not and

52

cannot decide the question here, which involves a different trial involving different defendants and different evidence. Moreover, that holding of *Napout* does not survive *Percoco*. As discussed, the Supreme Court held that "'the intangible right of honest services' must be defined with the clarity typical of criminal statutes and should not be held to reach an ill-defined category of circumstances." *Percoco*, 598 U.S. at 328. Even this Court's dominance-and-control standard was "too vague" to meet that standard. *Id.* at 330-32. Rather, to satisfy § 1346's fiduciary duty element, the Court held, the duty must be well defined in more than "a smattering of pre-*McNally* decisions," and "in concrete terms" that define the duty "with sufficient definiteness that ordinary people can understand what conduct is prohibited." *Id.* at 329-31. This Court in *Napout* did not have the opportunity to consider whether the FIFA and CONMEBOL codes of ethics satisfy the later-decided *Percoco*'s mandate. They do not. For the reasons discussed above, a private employer's ethics code is not sufficient to create a fiduciary duty, especially in a foreign jurisdiction that does not recognize fiduciary duties generally.

But even aside from that legal point, the factual problems with the government's theory are manifold.

The government relies primarily on the FIFA code of ethics. But the government's theory was that CONMEBOL officials violated a duty of loyalty to

53

CONMEBOL.  The FIFA code could not have created a fiduciary duty between CONMEBOL and its employees.  FIFA's continental confederations (e.g., CONMEBOL) are not members of FIFA (GA125), nor was there evidence suggesting FIFA's code applied to regional events such as the Copa Libertadores, organized by regional authorities rather than FIFA itself.  In sum, FIFA's ethics code did not create an enforceable fiduciary duty under Paraguayan law, nor did the government present any evidence that a violation of that code would have been enforceable in any way in any relevant local jurisdiction.

And CONMEBOL itself did not promulgate any ethics code until late 2013.  (GA2252).  Even if a corporate policy were sufficient to establish a fiduciary duty—which it is not—CONMEBOL's corporate policy was not created until after the contracts the government alleges were tainted by bribery were negotiated and signed.  Allowing a new corporate policy to convert performance of a preexisting agreement into a crime highlights the danger of allowing a corporate policy to substitute for a legal duty.  Thus, even if the honest-services statute can be stretched to cover foreign commercial bribery in some instances, the government has not identified any fiduciary duty that is sufficiently clear or grounded in law to trigger the application of the American honest-services statute here.

## III. THE GOVERNMENT IS NOT ENTITLED TO A NEW TRIAL AGAINST LOPEZ

The government argues that even if § 1346 does not reach foreign commercial bribery, the trial evidence was sufficient to prove honest-services fraud of a U.S. victim for "at least one scheme":  Full Play's agreement to pay a CONCACAF official for the rights to the Copa América Centenario tournament, which was played in the United States.  (GB83).  But Lopez was not charged in any of the Copa América counts.  The government's Copa América arguments thus apply solely to Full Play, not Lopez.  Unlike every other defendant convicted over the course of the government's multi-year FIFA prosecution, Lopez was charged only with allegedly participating in a single, entirely foreign scheme:  alleged bribes to foreign employees of a foreign organization, CONMEBOL, for rights to the Copa Libertadores tournament in South America.  As to *this* scheme, the government makes no attempt to argue that its evidence was sufficient to establish honest-services fraud involving any U.S.-based fiduciary relationship.

Rather, the government requests an opportunity for a new trial to "offer additional evidence" that would satisfy the correct legal standard.  (GB88).  But permitting the government another bite at the apple would violate Lopez's double jeopardy rights.  "The Double Jeopardy Clause forbids a second trial for the purpose of affording the prosecution another opportunity to supply evidence which it failed to muster in the first proceeding."  *Burks*, 437 U.S. at 11.  "[R]etrial is

never permitted" regardless of "whether [the] failure of proof is the fault of the government or the result of an erroneous ruling by the trial court." *United States v. Ustica*, 847 F.2d 42, 47 (2d Cir. 1988). If "the evidence [is] legally insufficient, the only just remedy available" is "a judgment of acquittal," and "the Double Jeopardy Clause precludes a second trial." *Burks*, 437 U.S. at 18; *see Green v. United States*, 355 U.S. 184, 187 (1957) ("[T]he State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense…."). Because the government failed to prove U.S. honest-services fraud in Lopez's trial—as it now effectively concedes—the Double Jeopardy Clause precludes the government from subjecting Lopez to the "embarrassment, expense and ordeal" of yet another trial. *Green*, 355 U.S. at 187.

The government cites *United States v. Bruno*, 661 F.3d 733 (2d Cir. 2011), but there the Court remanded for a new trial only after finding the government's evidence sufficient under *Skilling*, which the Supreme Court decided while Bruno's appeal was pending. 661 F.3d at 743-45. Because the evidence sufficed "under the standard announced in *Skilling*," "double jeopardy d[id] not bar retrial." *Id.* at 745. Here, unlike in *Bruno*, there was no evidence to sustain Lopez's convictions, nor does the government proffer any. Ordering a new trial in these circumstances would needlessly waste the parties' and the courts' resources and

"could result in the futility of a second conviction that would have to be reversed in a second appeal." *Hoffler v. Bezio*, 726 F.3d 144, 162 (2d Cir. 2013).

The foreign identity of the alleged bribe recipients and their foreign employer is beyond dispute and dispositively removes the Copa Libertadores scheme from the ambit of U.S. honest-services fraud. There is no "additional evidence on this ground" (GB88) the government could present to change that result. Because the government's evidence as to Lopez is insufficient as a matter of law, the Court should reject the government's plea for a new trial and affirm the judgment of acquittal.

## IV. A JUDGMENT OF ACQUITTAL IS ALSO WARRANTED BECAUSE THE GOVERNMENT FAILED TO PROVE A CONSPIRACY TO DECEIVE CONMEBOL

This Court may also affirm the judgment on the alternative ground that the government failed to prove Lopez intended to deceive CONMEBOL. Lopez raised this argument in his Rule 29 motion (DE1987-1, at 14-17), but the district court did not address it. *See United States v. Cramer*, 777 F.3d 597, 603 (2d Cir. 2015) ("[W]e are free to affirm a decision on any grounds supported in the record, even if it is not one on which the trial court relied.").

"[W]here the crime charged is conspiracy, a conviction cannot be sustained unless the Government establishes beyond a reasonable doubt that the defendant had the specific intent to violate the substantive statute[s]." *United States v.*

*Lorenzo*, 534 F.3d 153, 159 (2d Cir. 2008). To prove wire fraud, the government must prove an intent "to deceive and defraud" the victim. *United States v. Carpenter*, 791 F.2d 1024, 1035 (2d Cir. 1986). And for honest-services fraud specifically, the "deception" lies "in the continued representation of the employee to the employer that he is honest and loyal to the employer's interests" when, unbeknownst to the employer, the employee agrees to receive a bribe or kickback. *Skilling*, 561 U.S. at 401; *see United States v. DeFries*, 129 F.3d 1293, 1306 (D.C. Cir. 1997) (government must prove "non-disclosure…intended…to deprive the person to whom the [fiduciary] duty is owed of some legally significant benefit"). Thus, mere knowledge of a quid pro quo does not establish fraudulent intent; the requisite intent is lacking if the defendant nonetheless in "good faith believe[s] that such a quid pro quo was welcomed by the [organization] and so did not amount to bribery." *Abdelaziz*, 68 F.4th at 59; *see Pfizer, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 42 F.4th 67, 74 (2d Cir. 2022) (quid pro quo transactions are not necessarily corrupt).

The government failed to prove the charged conspiracy was calculated to deceive CONMEBOL. It failed to prove there was *even a single person* at CONMEBOL who did not know about the supposed bribes, or any other fact from which it could reasonably be inferred that the supposed bribery scheme was calculated to deceive CONMEBOL.

58

Quite the contrary, in proof that further highlights the gulf between Paraguayan and American norms, the government's witnesses testified that *nearly everyone* in CONMEBOL's leadership—including its president, vice president, secretary general, and treasurer—had received a payment, and thus knew about the supposed scheme.  (GA221-22 (beginning in 2010, all but two members of Executive Committee were receiving payments); SA559 (seven soccer federation presidents received payments in connection with Copa Libertadores); *see also* SA723-24, 766-69).  In fact, the evidence established that CONMEBOL's leaders had *demanded* the payments.  (*See, e.g.*, GA211-14 (Rafael Esquivel told Burzaco that Burzaco "need[ed] to start paying" the Group of Six to continue with the Copa Libertadores contracts)).  CONMEBOL's leadership could not have been deceived about loyalty to the organization when it was those leaders themselves who insisted on and received payments.  Similarly, CONMEBOL's president directed T&T to fund companies that were then used to pay soccer officials, and did so in letters signed in his official capacity.  (GA229-30).  No one would think CONMEBOL was being deceived when its own president took acts in an official capacity to facilitate the payments.

Although one government witness testified that two Executive Committee members—Harold Mayne-Nicholls and Sebastian Bauza—did not receive payments (SA470), there was no evidence that either of those individuals was

unaware of the payments to others or the scheme more generally. In fact, Burzaco

testified that he attempted to bribe Bauza but never received confirmation that

Bauza received the payment, and that Mayne-Nicholls's replacement, Sergio

Jadue, accepted bribes. (SA471-74).[9] Accordingly, the only way any reasonable

juror could conclude Bauza or Mayne-Nicholls was deceived by the alleged

scheme is through "impermissible speculation," which is legally insufficient to

sustain a conviction. *See United States v. Pauling*, 924 F.3d 649, 656-57, 662 (2d

Cir. 2019) (reversing conviction because even inference that was "likely" or

"probable" did not satisfy government's burden of proof beyond a reasonable

doubt); *United States v. Coplan*, 703 F.3d 46, 76 (2d Cir. 2012) (reversing

conviction based upon "speculation and surmise").

There was also testimony that the records of the payments to various soccer

officials were kept confidential at the officials' request (GA447-48, SA727), but no

one explained *why* or from whom they were kept secret. Critically, the

government presented zero evidence that the records were kept confidential to

deceive *CONMEBOL*, as opposed to banks, auditors, business partners, or

government authorities; indeed, there was ample evidence that the relevant actors

worried about discovery by auditors, various government agencies, and even

---

[9] Mayne-Nicholls refused to sign Full Play's Copa América contract, but that was because he was concerned about obligations CONMEBOL had pursuant to an existing contract with Traffic, which was also making private payments to CONMEBOL. (SA753).

DirecTV (*e.g.*, GA2259, 2267), but no evidence they worried about discovery by anyone within CONMEBOL itself.

In its Rule 29 arguments below, the government urged the district court to distinguish between CONMEBOL and its relevant individual officials (DE1999, at 28-29), but such a distinction is illusory when the relevant officials comprise the organization's entire leadership body. If the members of CONMEBOL's brain trust already knew about the scheme, how was CONMEBOL "deceived"? It is one thing to say that a handful of conspirators can hide something from a larger organization, or to say that the person running a corporation has deceived its board of directors, but the government could not cite any case (and we have found none) suggesting a jury can infer intent to deceive an organization even when substantially all of the organization's officials were aware of and, at a minimum, acquiesced in the charged conduct, and there are no shareholders. Given the lack of evidence that any of CONMEBOL's representatives were deceived or defrauded, a jury could not reasonably find that the charged conspiracy was intended to deceive CONMEBOL.

The government also argued that the alleged scheme was designed to defraud not just CONMEBOL, but also FIFA and its constituent organizations. (DE1999, at 26-27). But, as discussed above, the scheme in which Lopez was charged concerned the alleged bribery of CONMEBOL employees for the rights to

the Copa Libertadores tournament. CONMEBOL—not FIFA or any constituent organization—ran and held the broadcast rights to Copa Libertadores. Consequently, any decision influenced by a supposed bribe was a decision belonging to CONMEBOL, so only CONMEBOL could be the victim of the charged scheme.

Faced with a lack of evidence as to Lopez's specific intent, the government responded to Lopez's Rule 29 motion by pointing to evidence of *others'* secretive or otherwise deceptive acts. (DE1999, at 28-29). But such evidence necessarily fails to satisfy the government's burden to prove Lopez's specific intent beyond a reasonable doubt. *See Abdelaziz*, 68 F.4th at 57-60 (vacating conviction where "evidence risked leading the jury in considering her charges to impute the states of mind of [alleged coconspirators]").

Because of the complete lack of evidence that even a single person at CONMEBOL was unaware of the payments its leaders received, the government failed to prove that the Copa Libertadores payments were not "welcomed by" the organization, "and so [they] did not amount to bribery." *Id.* at 59. At a minimum, the government failed to prove Lopez possessed the requisite intent to deceive CONMEBOL, which provides an alternative basis for affirmance.

## **CONCLUSION**

"There are no constructive offenses; and before one can be punished, it must be shown that his case is plainly within the statute." *McNally*, 483 U.S. at 360 (quoting *Fasulo v. United States*, 272 U.S. 620, 629 (1926)). Foreign "commercial bribery" is not "plainly" covered by § 1346, nor is there even a single pre-*McNally* decision supporting the view that it is part of the "core" of honest-services fraud prohibited by § 1346. The district court's well-reasoned decision should be affirmed.

Dated: New York, New York
April 2, 2024

Respectfully submitted,

*/s/ Alexandra A.E. Shapiro*
Alexandra A.E. Shapiro
Daniel J. O'Neill
Theodore Sampsell-Jones
SHAPIRO ARATO BACH LLP
1140 Avenue of the Americas, 17th Floor
New York, NY 10036
(212) 257-4880

David Sarratt
John Gleeson
Joshua N. Cohen
DEBEVOISE & PLIMPTON LLP
66 Hudson Boulevard
New York, NY 10001
(212) 909-6000

*Counsel for Defendant-Appellee Hernan Lopez*

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS**

1. This brief complies with the type-volume limitation of Second Circuit Local Rule 32.1(a)(4) because it contains 13,995 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), according the Word Count feature of Microsoft Word.

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.


Dated: April 2, 2024          */s/ Alexandra A.E. Shapiro*
                              Alexandra A.E. Shapiro