# 23-7183(L)

## 23-7186 (CON)

*To be argued by:*
MICHAEL MARTINEZ

# United States Court of Appeals

### For the Second Circuit

UNITED STATES OF AMERICA,

*Appellant,*

—against—

JEFFREY WEBB, EDUARDO LI, JULIO ROCHA, COSTAS TAKKAS, JACK WARNER, EUGENIO FIGUEREDO, RAFAEL ESQUIVEL, JOSÉ MARIA MARIN, NICOLÁS LEOZ, ALEJANDRO BURZACO, AARON DAVIDSON, HUGO JINKIS, MARIANO JINKIS, JOSÉ MARGULIES, AKA JOSÉ LÁZARO, ALFREDO HAWIT, ARIEL ALVARADO, RAFAEL CALLEJAS, BRAYAN JIMÉNEZ, RAFAEL SALGUERO, HÉCTOR TRUJILLO, REYNALDO VASQUEZ, JUAN ÁNGEL NAPOUT, MANUEL BURGA, CARLOS CHÁVEZ, LUIS CHIRIBOGA, MARCO POLO DEL NERO, EDUARDO DELUCA, JOSÉ LUIS MEISZNER, ROMER OSUNA, RICARDO TEIXEIRA, CARLOS MARTINEZ, GERARD ROMY,

*Defendants,*

HERNÁN LOPEZ, FULL PLAY GROUP, S.A.,

*Defendants-Appellees.*

_____

**On Appeal From The United States District Court
For The Eastern District Of New York**

**BRIEF FOR FULL PLAY GROUP, S.A.**

MAYLING C. BLANCO
KATEY L. FARDELMANN
(pending admission)
Norton Rose Fulbright US
LLP
1301 Avenue of the Americas
New York, NY 10019
Tel: (212) 318-3000

CARLOS ORTIZ
KAYLEY B. SULLIVAN
Baker Hostetler
45 Rockefeller Plaza
New York, NY 10111-0110
Tel: (212) 589-4676

WILLIAM DEVANEY
Baker McKenzie
452 Fifth Avenue
New York, NY 10018
Tel: (212) 626-4100

MICHAEL MARTINEZ
Kramer Levin Naftalis & Frankel
LLP
1177 Avenue of the Americas
New York, NY 10036
Tel: (212) 715-9100

ROY T. ENGLERT, JR.
MATTHEW M. MADDEN
CHLOE C. BOOTSTAYLOR
Kramer Levin Naftalis & Frankel
LLP
2000 K Street NW, 4th Floor
Washington, DC 20006
Tel: (202) 775-4500

*Counsel for Full Play Group, S.A.*

## CORPORATE DISCLOSURE STATEMENT

Full Play Group, S.A. is incorporated under Uruguayan law. It has no parent corporation, and no publicly held corporation owns a 10% or greater interest in it.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................iv

PRELIMINARY STATEMENT ........................................................1

ISSUE FOR REVIEW ........................................................................4

STATEMENT OF THE CASE ...........................................................4

    A.    The Organization Of International Soccer ...........................4

    B.    The U.S. Prosecution Of Global Soccer Bribery ....................6

    C.    The Alleged Schemes Involving Full Play ............................8

    D.    Defendants' Motion To Dismiss And Trial...........................15

    E.    Full Play's Rule 29 Motion And Judgment Of Acquittal......18

SUMMARY OF ARGUMENT ...................................................23

ARGUMENT ................................................................................28

I.    Section 1346 Does Not Criminalize Foreign Commercial Bribery As Honest-Services Fraud........................................................28

    A.    The Intangible Right Of Honest Services Is Limited To Its Core Applications Before Section 1346's Enactment To Avoid Unconstitutional Vagueness ......................................28

    B.    Recent Supreme Court Cases Reinforce Constraints On Section 1346's Otherwise Limitless Reach ...........................36

    C.    Foreign Commercial Bribery Does Not Violate "The Intangible Right Of Honest Services" In Section 1346 ........42

II.    This Circuit's Post-*Skilling* Decisions Do Not Require Reversal..49

    A.    *United States v. Bahel*...............................................50

    B.    *United States v. Napout* .......................................53

III. The District Court Properly Acquitted Defendant Full Play On All Counts And Without Ordering Any Retrial .............................58

    A.    The District Court Did Not Err By Acquitting Full Play On The Copa América Counts .................................................59

    B.    The District Court Did Not Err By Not Granting The Government A New Trial.......................................................62

CONCLUSION ........................................................................................66

# TABLE OF AUTHORITIES

**Cases**                                                       **Page(s)**

*Burks v. United States,*
    437 U.S. 1 (1978) ................................................................ 65

*Ciminelli v. United States,*
    598 U.S. 306 (2023) ....................................................... *passim*

*Cleveland v. United States,*
    531 U.S. 12 (2000) ............................................................. 30

*Evans v. Michigan,*
    568 U.S. 313 (2013) ........................................................... 64

*Maryland v. Wilson,*
    519 U.S. 408 (1997) ........................................................... 58

*McNally v. United States,*
    483 U.S. 350 (1987) ....................................................... *passim*

*Percoco v. United States,*
    598 U.S. 319 (2023) ....................................................... *passim*

*Sindona v. Grant,*
    619 F.2d 167 (2d Cir. 1980) ............................................... 47

*Skilling v. United States,*
    561 U.S. 358 (2010) ....................................................... *passim*

*Smith v. Massachusetts,*
    543 U.S. 462 (2005) ..................................................... 63, 64

*United States v. Avenatti,*
    81 F.4th 171 (2d Cir. 2023) ............................... 22, 40, 41, 42

*United States v. Bahel,*
    662 F.3d 610 (2d Cir. 2011) ........................................... *passim*

*United States v. Bohonus,*
    628 F.2d 1167 (9th Cir. 1980) ........................................... 29

iv

*United States v. Brumley,*
    116 F.3d 728 (5th Cir. 1997) .................................................. 31

*United States v. Giffen,*
    326 F. Supp. 2d 497 (S.D.N.Y. 2004) ......................................... *passim*

*United States v. Groves,*
    122 F.2d 87 (2d Cir. 1941) ................................................. 46, 47

*United States v. Handakas,*
    286 F.3d 92 (2d Cir. 2002) .................................................. 31

*United States v. Kay,*
    359 F.3d 738 (5th Cir. 2004) ................................................ 49

*United States v. Mandel,*
    591 F.2d 1347 (4th Cir. 1979) ............................................... 29

*United States v. Margiotta,*
    688 F.2d 108 (2d Cir. 1982) ................................................. 38

*United States v. Minicone,*
    994 F.2d 86 (2d Cir. 1993) .................................................. 55

*United States v. Napout,*
    963 F.3d 163 (2d Cir. 2020) ................................................. *passim*

*United States v. Pauling,*
    924 F.3d 649 (2d Cir. 2019) ................................................. 62

*United States v. Percoco,*
    13 F.4th 180 (2d Cir. 2021) ................................................. *37*

*United States v. Price,*
    788 F.2d 234 (4th Cir. 1986) ................................................ 29

*United States v. Rybicki,*
    354 F.3d 124 (2d Cir. 2003) (en banc) ....................................... *passim*

*United States v. Sindona,*
    636 F.2d 792 (2d Cir. 1980) ................................................. 47

*United States v. Ustica,*
    847 F.2d 42 (2d Cir. 1988) ................................................................... 64

## Statutes & Rules

18 U.S.C. § 1001 ................................................................................ 48

18 U.S.C. § 1343 .................................................................. 28, 39, 42

18 U.S.C. § 1346 ........................................................................ *passim*

Fed. R. App. P. 28 ............................................................................ 27

Fed. R. Crim. P. 29 .......................................................................... 19

Fed. R. Crim. P. 33 ............................................................................ 8

## Other Authorities

S. Rep. No. 95-114 (1977) ................................................................. 49

## PRELIMINARY STATEMENT

Defendant Full Play Group, S.A., a foreign sports marketing company, traded in media rights to international soccer competitions. As part of a wide-ranging federal prosecution, the government charged Full Play with conspiracy to commit honest-services wire fraud. The alleged conspiracy consisted of agreements to make or facilitate payments to South American and Caribbean soccer officials in exchange for agreements to sell media rights to Full Play or its allies.

There was no dispute at trial that Full Play agreed to the payments. Indeed, that was the first thing that Full Play's counsel told the jury. But the district court had to resolve whether Full Play's conduct amounted to honest-services wire fraud supporting criminal liability in the United States under 18 U.S.C. § 1346. Under binding precedent, the answer to that question depends on whether Full Play had fair notice that, in the bribery-soaked world of international soccer, its agreement to pay foreign officials of foreign organizations the money that they routinely demanded constituted a violation of U.S. law.

Correctly holding that it did not, the district court granted Full Play's Rule 29 motion for acquittal. The government's arguments for

1

reversal boil down to saying it makes no legal difference, under Section 1346, whether an honest-services wire fraud case involves *foreign* commercial bribery or *domestic* commercial bribery. Foreigners operating outside the United States involved in transactions outside the United States should be just as aware as domestic parties engaged in domestic transactions of what amorphous class of conduct a vague, barely constitutional statute makes a U.S. crime.

But that is wrong under the limiting construction of Section 1346 that this Circuit and the Supreme Court have adopted. Section 1346 states that a "scheme or artifice to defraud," under the wire and mail fraud statutes, "includes a scheme or artifice to deprive another of the intangible right of honest services." Congress enacted that statute to reinstate the body of law that existed before the Supreme Court decided *McNally v. United States*, 483 U.S. 350 (1987). The Court held in that case that the fraud statutes did not criminalize honest-services fraud but instead required a scheme to obtain money or property.

Congress didn't define "the intangible right of honest services" in Section 1346. In fact, it provided *no textual guidance at all* about the intangible right it codified and the circumstances in which it arises.

2

Accordingly, to avoid having to invalidate the statute as unconstitutionally vague, this Circuit and, later, the Supreme Court adopted a limiting construction of Section 1346. The statute criminalizes only the core applications of honest-services-fraud liability found in more than a smattering of pre-*McNally* decisions. Defining honest-services fraud as what was recognized by the heartland of pre-*McNally* precedent, courts have said in binding precedent, is necessary to salvage even a narrow version of Section 1346 that provides the clarity required of criminal laws and fair notice to potential defendants.

The district court correctly held that this straightforward principle requires Full Play's acquittal on honest-services wire fraud charges that are premised on foreign commercial bribery. No pre-*McNally* (or even post-*McNally*) decision by any federal court supports an expansive application of Section 1346 to foreign commercial employment relationships and duties. And, in the district court's words, "the Supreme Court's strongly worded rebukes," in recent decisions, of "expanding the federal wire fraud statutes" without clear direction from Congress are all the more reason to decline the government's invitation to unleash federal

3

prosecutors and courts as the global police of private, overseas, commercial bribes and kickbacks.

## ISSUE FOR REVIEW

Did the district court err by acquitting Full Play on the ground that payments by a foreign company to foreign employees of foreign commercial organizations is not sufficient evidence of honest-services wire fraud because 18 U.S.C. § 1346 does not criminalize the use of wires in connection with foreign commercial bribery?

## STATEMENT OF THE CASE

Defendant Full Play Group, S.A., is a Uruguayan sports marketing company with a principal place of business in Argentina. GA:8. The government charged Full Play with conspiring to commit wire fraud by scheming to bribe top officials at the Confederación Sudamericana de Fútbol ("CONMEBOL") and the Confederation of North, Central America and Caribbean Association Football ("CONCACAF")—each a regional soccer confederation affiliated with the Fédération Internationale de Football Association ("FIFA"). GA:1–71.

### A.   The Organization Of International Soccer

FIFA, headquartered in Switzerland, is the international body governing most of global soccer (or "football," as it is known outside the

4

United States). GA:82–83. FIFA has more than 200 member associations representing nations and territories around the world. GA:3. FIFA also has six continental confederations, including CONMEBOL and CONCACAF. *Id.* FIFA, its member associations, and their confederations together and independently finance the promotion of global soccer by selling media and broadcasting rights for high-profile matches and tournaments, including the quadrennial FIFA World Cup. GA:7–8.

CONMEBOL, one of soccer's oldest confederations, represents organized soccer in South America. GA:5. It has ten member associations and is based in Paraguay. *Id.* One of CONMEBOL's counterparts, CONCACAF, represents organized soccer across North America, Central America, and the Caribbean. It comprises 41 member associations and is incorporated in Nassau, Bahamas. *Id.* CONMEBOL and CONCACAF each organize World Cup qualifiers, exhibition matches (called "friendlies"), and international competitions—such as CONMEBOL's Copa América and Copa Libertadores—among their member associations' teams. GA:100–01; GA:153; GA:463.

CONMEBOL and CONCACAF, distinct from FIFA, each have the authority to award media rights for the competitions and matches they

organize. *See* GA:135. Sports marketing companies negotiate with CONMEBOL and CONCACAF to buy those media rights, which they then distribute to television and radio broadcast networks, sponsors, and licensees.

### B. The U.S. Prosecution Of Global Soccer Bribery

Since "at least as early as the 1980s," top soccer executives at FIFA, CONMEBOL, CONCACAF, and many of their respective member associations demanded and received payments from sports marketing companies "in return for their granting those companies broadcasting and marketing rights to tournaments under the leaders' control." *United States v. Napout*, 963 F.3d 163, 169 (2d Cir. 2020). This widespread practice, at the very highest levels of those soccer organizations, became an ingrained part of negotiating for and securing those media-rights contracts. *See generally* SA:459–69.[1]

In May 2015, the government indicted numerous FIFA, CONMEBOL, and CONCACAF officials for their alleged participation in bribery schemes related to international soccer matches and

---

[1] "SA" refers to the Defendant-Appellee's joint supplemental appendix.

tournaments. SA:1–164. A superseding indictment followed six months later. SA:165–404. Many of the charged defendants pleaded guilty, and some of them agreed to cooperate with the government. SGA:2.

Three soccer officials, however, exercised their right to trial. In June 2017, the government obtained another indictment pertaining to those three officials—Juan Ángel Napout, Manuel Burga, and José Maria Marin—charging them with, among other things, conspiracy to commit honest-services wire fraud.[2] *See generally* DE:603–04. Following a trial presided over by Judge Pamela K. Chen—the same judge who would later enter the judgment of acquittal in this case—a jury convicted Napout of racketeering conspiracy and wire-fraud conspiracy but acquitted him of money-laundering conspiracy. It convicted Marin on all counts except for a money-laundering conspiracy. DE:873. Burga was ultimately acquitted on all counts. DE:871, 874.

---

[2] At various times relevant to the indictment, Napout was FIFA's vice president, CONMEBOL's president and vice president, and the Paraguayan soccer federation's president and vice president; Burga was the Peruvian soccer federation's president and on FIFA standing committees; Marin was the Brazilian soccer federation's president and on various FIFA standing committees. *See* DE:604 (S-2 Indictment).

Napout and Marin moved for judgments of acquittal under Rule 29 or a new trial under Rule 33. DE:887–89. Judge Chen denied those post-trial motions, and held that there was sufficient evidence of defendants' fiduciary duties to their employers. DE:952. This Court affirmed. Reviewing the relevant issues only for plain error, the Court held that the district court was not required to dismiss the indictment *sua sponte* on vagueness grounds. *See Napout*, 963 F.3d at 184. The Court did not reach the question now raised in this case, although a concurring judge would have sided with the government had the issue been properly presented.

### C. The Alleged Schemes Involving Full Play

On March 18, 2020, nearly five years into the government's "almost decade-long prosecution," SGA:1, a grand jury returned a third superseding indictment. That document charged three new defendants with participating in several wire-fraud and money-laundering schemes, conspiracy to commit wire fraud and money laundering, and a RICO conspiracy. GA:1. The new defendants were Full Play and two Twenty-First Century Fox executives. One of the latter, Hernan Lopez, is an

appellee before this Court. The other, Carlos Martinez, was acquitted by the jury. DE:1964, 1967.

The alleged schemes in which the indictment implicated Full Play were connected to media-rights negotiations for CONMEBOL's World Cup qualifiers and friendlies, Copa Libertadores, and Copa América. SGA:3.

### 1.   The Qualifiers And Friendlies Scheme

Decades after top soccer executives began demanding and obtaining bribes for steering contracts to preferred sports marketing companies, Hugo and Mariano Jinkis formed Full Play to compete for such rights, and it initially focused on securing CONMEBOL's media and broadcasting rights to specific World Cup qualifier matches and friendlies. *See* SGA:6; GA:142–44.

At the time, established companies already had longstanding relationships with CONMEBOL's top officials and the leadership of its biggest and most influential national associations, Argentina and Brazil. SA:554–55; GA:154; 172–75; 179–80. So new entrant Full Play instead focused on building relationships with the presidents of six smaller CONMEBOL associations—Bolivia, Colombia, Ecuador, Paraguay, Peru,

9

and Venezuela. Those presidents, the so-called "Group of Six," ultimately received payments from Full Play in exchange for their support in helping Full Play to secure rights to qualifiers and friendlies. SA:457–58; 772–76; GA:204–05.[3] Although some of these matches were played in the United States, Full Play's contracts were with CONMEBOL or its member associations, and Full Play made no payments to any U.S. employee of any U.S. entity.

### 2. The Copa Libertadores Scheme

Each year, CONMEBOL organizes its popular Copa Libertadores tournament among its member associations' top club teams. GA:153–54. Starting in 1999, a sports marketing company called T&T Cayman secured exclusive media and broadcasting rights to the Copa Libertadores, as well as other CONMEBOL tournaments. SGA:8. In 2002, a joint venture that was owned in part by a Fox subsidiary purchased a 50% stake in T&T Cayman, which it then co-owned with

---

[3] The Group of Six consisted of Rafael Esquivel, who was the president of the Venezuelan soccer federation, Luis Bedoya, president of the Colombian soccer federation, Luis Chiriboga, president of the Ecuadorian soccer federation, Manuel Burga, president of the Peruvian soccer federation, Carlos Chavez, president of the Bolivian soccer federation, and Juan Ángel Napout, president of the Paraguayan soccer federation. GA:217; 221–22.

10

another company called Torneos. SGA:9. Fox, which later acquired a 75% stake in T&T Cayman, was the ultimate beneficiary of its lucrative television broadcasting rights to the Copa Libertadores. SGA:9; GA:137–38; SA:445–46.

Torneos CEO Alejandro Burzaco—a cooperating witness who testified at length during trial—explained that T&T Cayman was able to secure these media rights because, starting in 2002, it paid bribes to six top CONMEBOL officials: CONMEBOL's president, first vice president, secretary general, and treasurer, and the presidents of the Argentine and Brazilian national soccer associations. GA:134–138; 174–75. When viewed in the light most favorable to the government, the evidence at trial suggested that T&T Cayman's bribes to CONMEBOL officials allowed it to purchase media rights to the Copa Libertadores for less than their fair market value. SGA:8.

In 2009, T&T Cayman's Copa Libertadores contract was threatened by competitors, so Burzaco was looking for ways to reinforce its claim to those tournaments. SA:453–54. Burzaco knew about Full Play's relationships with the Group of Six presidents, and became concerned that Full Play might leverage those relationships into a competing bid

for the rights. SA:457–58. Burzaco contacted Full Play's owners, Hugo and Mariano Jinkis, and obtained their assurances that Full Play would not compete with T&T Cayman for the Copa Libertadores rights. GA:204–05.

Later the same year, in a further effort to stave off competition, Burzaco expanded T&T Cayman's payments to include the Group of Six presidents. SA:466–67. Those presidents had conveyed their displeasure with having been left out of what had become customary payments associated with obtaining CONMEBOL's media rights. SA:459. Because of its ties to the Group of Six, Full Play agreed to act as Burzaco's go-between and "paying agent" to those association presidents. GA:215–19.

### 3. The Copa América Scheme

CONEMBOL also sold exclusive media rights for its Copa América tournaments generally played every three to four years among the South American confederation's national teams. GA:153. The same CONMEBOL officials and association presidents required payments from marketing companies in exchange for facilitating those contracts. *See id.*

In 2009, Full Play expressed its interest in acquiring the Copa América media rights. GA:358–59. It was made clear to Full Play that, to obtain those rights, it would need to offer larger payments to the CONEMBOL executives and presidents than they were already receiving from the existing rights-holders. *Id*. Full Play met those demands to secure media rights for a series of Copa América tournaments.

All but one of the relevant Copa América tournaments were held in South America—Argentina in 2011 and Chile in 2015—and the media and broadcasting rights for those tournaments were controlled solely by CONMEBOL. *See* GA: 357; SA:492–93. Most of the trial testimony and evidence about the so-called Copa América scheme therefore focused on Full Play's additional payments to the same CONMEBOL officials to secure rights to these tournaments. *See, e.g.*, SA:484–91; 493–502; 503; 504–05; 514; 518–21; 492; 494–95; 540–41; 542–44; 548–53; 560–718; 749–52; 753–57; 777–80; GA:464-78;1012–46; 1054–1139.

By contrast, the 2016 version of the Copa América celebrated the tournament's one hundredth anniversary, and so was designated as the Copa América 2016 Centenario ("Centenario"). GA:363. To bring even greater attention to the Centenario, CONMEBOL organized it jointly

13

with CONCACAF as a special, one-time event with matches played in the United States. GA:363–64; 540–41.

In 2013, Full Play, Burzaco, and Traffic, another South American sports marketing company, formed a partnership called Datisa through which they negotiated with CONMEBOL and CONCACAF for the Centenario's media rights. *See* GA:364–65; 367–69. CONMEBOL's officials and federation presidents, as well as CONCACAF's president, Jeffrey Webb, and secretary general, Enrique Sanz, negotiated with Datisa on behalf of their respective confederations. GA:365. Webb was also president of the Cayman Islands soccer federation, a CONCACAF member association. *Id*.

The negotiations took place all around the world, except in the United States. In 2013, Burzaco and Mariano Jinkis attended a meeting about the Centenario in Zurich, Switzerland, at which Sanz, on Webb's behalf, asked Burzaco and Jinkis to pay Webb $10 million for his agreement to grant media rights to Datisa, and Burzaco and Jinkis agreed. GA:367–69; *see also* GA:393; 395–96; 483–84; 541. In 2014, in Mauritius, Datisa and CONCACAF signed that media-rights contract. GA:374–75. Then, in early 2015, Burzaco attended a meeting in the

14

Bahamas among CONCACAF and CONMEBOL executives to set terms for selling advertising and television rights for the Centenario. GA:416–17. Finally, in November 2015, Burzaco met with Webb in Chile to discuss how to make the $10 million payment. GA:393; 395–96. Ultimately, Webb was arrested and Datisa never paid him. GA:53–54 ¶ 154.

### D. Defendants' Motion To Dismiss And Trial

1. Full Play and Lopez moved to dismiss their indictment on three grounds: (1) that the honest-services wire fraud charges were unconstitutionally vague; (2) that the indictment impermissibly applied the wire-fraud statute extraterritorially; and (3) that the indictment did not sufficiently allege an offense. DE:1594–1.

Full Play's vagueness challenge principally asserted that Section 1346 does not provide fair notice that foreign private employees' breaches of fiduciary duties to their foreign private employers may be considered deprivations of that statute's intangible right of honest services, generating federal criminal liability in the United States. Specifically, Full Play argued that, as a Uruguayan corporation with a principal place of business in Argentina, two countries where commercial bribery is not

criminal, it did not have fair notice that making or facilitating payments to officials of CONMEBOL—a private commercial entity in Paraguay— might subject Full Play to an honest-services fraud prosecution in the United States. DE:1594–1 at 7.

Full Play demonstrated its lack of fair notice through extensive expert declarations that, in Paraguay (CONMEBOL's location) and in Uruguay and Argentina (Full Play's locations): (1) private-sector bribery resulting in the deprivation of an intangible right is not criminally proscribed; (2) that private employers' ethical codes do not establish fiduciary duties the breach of which creates criminal liability; (3) a private employee's receipt of a bribe, in violation of a private employer's code of ethics, is not a crime; and (4) a private business's payment of a bribe to a private employee, in violation of a private employer's code of ethics, is not a crime. *See* DE:1594–4; 1594–5; 1594–6.

The court denied Full Play's pretrial vagueness challenge to the application of Section 1346 in this case. First, the court held that Section 1346 permitted Full Play's prosecution under the wire-fraud statute for participating in a bribery or kickback scheme. DE:1645 at 13–14. It also held that distinguishing between bribes to foreign employees and bribes

16

to domestic employees would be inconsistent with *United States v. Bahel*, 662 F.3d 610 (2d Cir. 2011), in which this Court affirmed the honest-services conviction of a U.N. official who worked at its New York headquarters. *Id*. at 17.

2. The case proceeded to a seven-week jury trial, where the government endeavored to establish that Full Play conspired in a scheme to deprive CONEMBOL and CONCACAF of the intangible right of honest services identified by Section 1346. The government made Burzaco its centerpiece witness to payments that Full Play and others made or facilitated to the Group of Six presidents in connection with contracts for exclusive media rights to their matches and tournaments.[4] *See* GA:131–300; GA:303–430.

As it relates to the Centenario, and to CONCACAF and its president, Jeffrey Webb, the testimony and evidence was far more limited. Burzaco testified that payment and contract discussions between Full Play and Webb or his representatives had taken place in several different countries other than the United States. GA:367–69; 375–79;

---

[4] Burzaco pleaded guilty in 2015 to multiple offenses relating to his extensive role in various bribery schemes involving the television rights for South American soccer. *See* DE:90.

393–95; 416–17. Full Play's Chief Financial Officer, Santiago Peña, also testified that he maintained a ledger of Full Play's payments, and was informed by the Jinkises that Webb would receive a $10 million payment for signing the Centenario contract. GA:483–84. But, even though the government had identified Webb as a potential trial witness, it ultimately declined to call him to testify. GA:434–40; SA:747. In the end, the government's opening and closing arguments never mentioned the Centenario, CONCACAF (or its code of ethics), or Webb. *See* SA:422–40; 807–50.

The jury convicted Full Play of wire-fraud and money-laundering conspiracies involving the World Cup qualifiers and friendlies, Copa Libertadores, and Copa América schemes. DE:1964.

### E. Full Play's Rule 29 Motion And Judgment Of Acquittal

Full Play moved after trial for acquittal under Rule 29. DE:1946–1. In a 54-page decision, the district court acquitted Full Play of all counts. SGA:1–54. Judge Chen straightforwardly held that Section 1346 "does not criminalize the conduct alleged in this case," under binding Supreme Court decisions, because of "the absence of precedent applying honest services wire fraud to foreign commercial bribery." SGA:29.

18

The district court's opinion (at SGA:30–31) traced the historical development, mostly in cases that "involved public employees," of "what came to be known as 'honest services fraud,'" and the Supreme Court's rejection of that concept in *McNally v. United States*, 483 U.S. 350 (1987). In *McNally*, the district court explained (at SGA:30 n.16), the Supreme Court concluded that an honest-services doctrine untethered to statutory text would leave the mail and wire fraud statutes' "outer boundaries ambiguous," and do so without any clear statement by Congress that it intended for those statutes to protect more than ordinary property rights.

Congress responded promptly to *McNally*, however, by enacting Section 1346, which states that the mail and wire fraud statutes shall prohibit "a scheme or artifice to deprive another of the intangible right of honest services." SGA:30–31. But, as the district court observed, Congress did not "define or elaborate on" what that intangible right covered, "and thus the doctrine's scope remained ambiguous." SGA:31.

That ambiguity came to a head, the district court explained, in *Skilling v. United States*, 561 U.S. 358 (2010). In *Skilling*, nine Justices voted to reverse an Enron officer's honest-services conviction for undisclosed corporate self-dealing. SGA:31. Such liability, the Court

19

held, depended on an impermissibly vague and "amorphous category" of circumstances for which "no consensus" existed on whether they amounted to honest-services fraud. *See* SGA:31–32.

A six-Justice majority nevertheless held, in *Skilling*, that Section 1346 could be "salvaged" if its scope was limited to only the "bribe-and-kickback core of the pre-*McNally* case law." SGA:31 (quoting 561 U.S. at 408–09). Three Justices disagreed, and would have struck down Section 1346 as irredeemably vague, including because the majority had no occasion to "solve the most fundamental indeterminacy: *the character* of the 'fiduciary capacity' to which the bribery and kickback restriction applies." SGA:32 (quoting 561 U.S. at 421 (Scalia, J., concurring)).

The district court also acknowledged that, while Full Play's Rule 29 motion was pending, the Supreme Court had once again clarified the limits on honest-service wire fraud in *Percoco v. United States*, 598 U.S. 319 (2023). In *Percoco*, the district court explained, the Supreme Court had unanimously reversed a decision of this Court by rejecting that any duties a private citizen owes to the public, based on his control or domination of decisions made by government officials who rely on him, fall under "the intangible right of honest services" in Section 1346.

SGA:40. The district court emphasized *Percoco*'s reiteration that "*Skilling*'s teaching is clear: '[T]he intangible right of honest services' must be defined with the clarity typical of criminal statutes and should not be held to reach an ill-defined category of circumstances simply because of a *smattering* of pre-*McNally* cases." *Id.* (quoting 598 U.S. at 328–29). The district court also observed that two Justices would have gone even further in *Percoco*, and held that Section 1346 is unconstitutionally vague on its face because, "[t]o this day, no one knows what 'honest-services fraud' encompasses." SGA:41 (alteration in original) (quoting 598 U.S. at 333 (Gorsuch, J., concurring)).

The district court also noted (at SGA:37–38) the Supreme Court's decision in *Ciminelli v. United States*, 598 U.S. 306 (2023), issued the same day as *Percoco*. In *Ciminelli*, the Supreme Court rejected an expansive property-deprivation theory of wire-fraud liability, adopted by this Court, that would "vastly expand[] federal jurisdiction without statutory authorization." SGA:37–38 (quoting 598 U.S. at 315). The district court concluded that the Supreme Court's "rebuke" of this Circuit's "longstanding" application of a "right to control" theory of property deprivation, under the wire-fraud statute, "underscored" that

"'federal prosecutors'" should avoid expansive liability theories that would "'make a federal crime of an almost limitless variety of deceptive actions'" that had not traditionally been within the purview of the federal criminal law. SGA:38 (quoting 598 U.S. at 315–16) (cleaned up).

Finally, the district court carefully addressed (at SGA:33–36, 44–46) this Court's decisions in *United States v. Bahel*, 662 F.3d 610 (2011), *United States v. Napout*, 963 F.3d 163 (2020), and *United States v. Avenatti*, 81 F.4th 171 (2023), and concluded that, for different reasons, none of those cases resolved the question presented here. *See infra* Part I.B. and II (discussing *Bahel*, *Napout*, and *Avenatti*).

Ultimately, the district court held that binding precedent required it to enter a judgment of acquittal in this case. *Percoco* had made even clearer, the court explained, that "the source of the fiduciary duty," not just the "type of conduct," is subject to the limiting construction imposed on Section 1346 to prevent its unconstitutional vagueness. SGA:43. The court also observed that *Percoco* supported a prior decision, in another district within this Circuit, that honest-services-fraud liability does not extend to the bribery of foreign officials in foreign countries. SGA:43 (citing *United States v. Giffen*, 326 F. Supp. 2d 497 (S.D.N.Y. 2004)).

These considerations and developments caused the district court "to reverse its previous ruling regarding § 1346's scope." SGA:46–47. The court concluded that there "is not even a 'smattering of pre-*McNally* decisions' (nor post-*McNally* decisions, for that matter) that support the application of § 1346 to foreign commercial bribery." SGA:48. In fact, the court stated, "[n]either the parties nor the Court have been able to identify a single pre-*McNally* case applying honest services wire fraud to foreign commercial bribery." *Id.* At bottom, the court held, that "absence of authority, when viewed in light of the Supreme Court's strongly worded rebukes in *Percoco* and *Ciminelli* against expanding the federal wire fraud statutes, compels this Court to find that § 1346 does not apply to foreign commercial bribery." *Id.*

## SUMMARY OF ARGUMENT

The district court correctly acquitted Full Play as a matter of law, on its review of the evidence, because foreign employers' relationships with their foreign employees do not implicate "the intangible right of honest services" under 18 U.S.C. § 1346. This Court should affirm.

23

I.  Foreign commercial bribery is not a deprivation of "the intangible right of honest services" that, under Section 1346, is subject to criminal wire-fraud liability.

A.  This Circuit and the Supreme Court have limited Section 1346 to only core applications of the honest-services doctrine before its rejection in *McNally v. United States*, 483 U.S. 350 (1987), and Congress's enactment of the statute to reinstate the pre-*McNally* decisions of lower courts. In *United States v. Rybicki*, 354 F.3d 124 (2d Cir. 2003), the en banc Court held that Section 1346 is not void for vagueness when properly read to have "reinstated" only the honest-services doctrine as it had been specified by the "principal pre-*McNally* decisions" known to Congress at the statute's enactment, *id.* at 138. Later, in *Skilling v. United States*, 561 U.S. 358 (2010), the Supreme Court cited *Rybicki* with approval in holding that Section 1346 is not unconstitutionally vague because it can be read as limited to a uniform and predictable standard rooted in the honest-services doctrine's "core applications" in the "body of pre-*McNally* honest-services law," *id.* at 404–05. Only that limiting construction saved the statute from complete, facial invalidation. And the

Supreme Court has adamantly adhered to that limiting construction ever since.

B.  In *Percoco v. United States*, 598 U.S. 319 (2023), the Supreme Court reiterated *Skilling*'s limiting construction of Section 1346 by holding that only a source of fiduciary duty identified in more than a mere "smattering" of pre-*McNally* cases could support an honest-services-fraud conviction.

C.  Foreign commercial bribery was not a core application of the honest-services doctrine before *McNally*. Under binding precedent, that undeniable proposition suffices to decide this case. Foreign commercial bribery under the now-settled standard for identifying core applications is not a deprivation of "the intangible right of honest services" as Section 1346 has been limited by *Rybicki*, *Skilling*, and *Percoco*.

Indeed, the government cannot identify *any* pre-*McNally* case in which a defendant was convicted of honest-services fraud based on foreign commercial bribery. Its halfhearted attempt to do so in its brief falls well short.

II.  This Circuit's decisions in *United States v. Bahel*, 662 F.3d 610 (2011), and *United States v. Napout*, 963 F.3d 163 (2020), do not save the government from the straightforward application of the settled standard.

A.  In *Bahel*, this Court held that the receipt of bribes by a procurement official who worked for the United Nations at its headquarters "within the territorial United States" falls under Section 1346. In doing so, this Court explicitly distinguished a decision by a district court within this Circuit, *United States v. Giffen*, 326 F. Supp. 2d 497 (S.D.N.Y. 2004), which held that bribery of a foreign official working for a foreign government is *not* covered by Section 1346. This case is like *Giffen*, not *Bahel*. There is no evidence that Full Play bribed any soccer official who worked within the United States for a soccer association.

B.  In *Napout*, this Court affirmed two soccer officials' wire-fraud conspiracy convictions in a prosecution related to the present appeal, holding that the government's evidence was sufficient to show that those officials had fiduciary duties to their confederation under certain codes of ethics, and that the district court had not committed plain error by not *sua sponte* dismissing defendants' indictment on vagueness grounds. Here, by contrast, Full Play's sufficiency challenge is to whether, as a

legal matter, evidence of foreign employees' fiduciary duties to foreign employers proves honest-services wire fraud under Section 1346. Defendants not only preserved that Rule 29 challenge, but they prevailed on it below.

III.  The district court correctly acquitted Full Play on wire-fraud conspiracy counts involving the so-called Copa América scheme. The evidence of promised payments involving just one of the Copa América tournaments—the Centenario held in 2016—was not sufficient to prove a *domestic* commercial bribery beyond a reasonable doubt. The official to whom Full Play agreed to make an unfulfilled payment, Jeffrey Webb, was based in the Cayman Islands and worked for a soccer confederation incorporated in the Bahamas. Nor is the government entitled to a retrial on that or any other count. Among other reasons why, such a retrial would violate the Double Jeopardy Clause of the Fifth Amendment.

IV.  Under Federal Rule of Appellate Procedure 28(i), Full Play also joins Points I, II.B, III, and IV of Lopez's brief.

## ARGUMENT

## I. Section 1346 Does Not Criminalize Foreign Commercial Bribery As Honest-Services Fraud

The district court's conclusion that "the intangible right of honest services" in Section 1346 does not prohibit foreign commercial bribery is deeply rooted in Second Circuit and Supreme Court precedent and should be affirmed.

### A. The Intangible Right Of Honest Services Is Limited To Its Core Applications Before Section 1346's Enactment To Avoid Unconstitutional Vagueness

The federal wire-fraud statute, 18 U.S.C. § 1343, prohibits wire transmissions for the purpose of executing a "scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." Until 1987, federal courts generally understood "scheme or artifice to defraud" to include schemes or artifices to deprive another of certain "intangible rights," including what came to be called "the intangible right of honest services." *Skilling v. United States*, 561 U.S. 358, 400 (2010).

1. At the time, most honest-services cases "involved public employees" within the United States, and so implicated the American public's longstanding expectation of honest services from their elected

28

and appointed officials. *Percoco v. United States*, 598 U.S. 319, 326 (2023); *see also* SGA:30 ("The majority of these pre-1987 honest services cases involved public employees . . . ."). Some cases nevertheless extended honest-services-fraud liability to certain domestic, private-sector relationships of trust—such as between employers and employees or unions and union officials. *See, e.g.*, *United States v. Mandel*, 591 F.2d 1347 (4th Cir. 1979); *United States v. Bohonus*, 628 F.2d 1167 (9th Cir. 1980); *United States v. Price*, 788 F.2d 234 (4th Cir. 1986), *vacated by Great Am. Savs. Bank v. United States*, 483 U.S. 1015 (1987).

In *McNally v. United States*, 483 U.S. 350 (1987), however, the Supreme Court took a different view than had all the lower courts to address the question. It held that "scheme or artifice to defraud" did *not* extend to deprivations of any intangible right of honest services. *Id.* at 358–60. After reviewing the statutory text and legislative history, *id.* at 356–60, the Court concluded that Congress had intended for the mail and wire fraud statutes to be "limited in scope to the protection of property rights," *id.* at 360.

2. Congress responded to *McNally* by enacting 18 U.S.C. § 1346, which states that, in the mail, wire, and other criminal fraud statutes,

"the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services." Section 1346 thus practically abrogated *McNally*'s holding by "specifically . . . cover[ing] one of the 'intangible rights' that lower courts had protected . . . prior to *McNally*: 'the intangible right of honest services.'" *Cleveland v. United States*, 531 U.S. 12, 19–20 (2000).

Although Section 1346 *codified* "the intangible right of honest services," it did not *define* that right. Section 1346's text says nothing about which relationships and duties make up "the intangible right of honest services" the deprivation of which can constitute mail or wire fraud. Indeed, as this Court has recognized, the statute "provides no textual guidance about the duties whose violation will amount to a deprivation of honest services." *United States v. Napout*, 963 F.3d 163, 183 (2020) (cleaned up) (quoting *United States v. Coppola*, 671 F.3d 220, 235 (2012)).

Almost immediately after the passage of Section 1346, judges resumed the struggle of trying to construe the now-statutory term "intangible right of honest services" in a way that would satisfy bedrock constitutional principles by providing fair notice to potential defendants

30

and real guideposts to judges and juries. *See, e.g.*, *United States v. Brumley*, 116 F.3d 728, 736-747 (5th Cir. 1997) (Jolly, J., dissenting) (Section 1346's application to certain conduct by state government officials is unclear), *vacated by* 91 F.3d 676 (1996); *United States v. Handakas*, 286 F.3d 92 (2002) (Section 1346 is unconstitutionally vague as applied to statutory duties to submit information to a state agency), *overruled by United States v. Rybicki*, 354 F.3d 124 (2003) (en banc).

3. In this Circuit, the en banc Court addressed Section 1346's vagueness in *United States v. Rybicki,* 354 F.3d 124 (2003). It held that "the intangible right of honest services," as codified but not defined by Section 1346, cannot be "virtually limitless." *Id.* at 142. Yet this Court avoided invalidating Section 1346 in its entirety, as unconstitutionally vague, by reading that statute to have "reinstate[d]" only that version of the intangible right of honest services that was recognized and applied before *McNally*. *Id.* at 136. In other words, Section 1346 is not unconstitutionally vague, and provides fair notice to defendants, only as to "principal pre-*McNally* decisions involving or purportedly involving 'honest services' fraud in the private sectors." *Id.* at 138. By stating that not just any pre-*McNally* decision would do, but that instead the crime

31

must have been identified in *principal* pre-1987 decisions, this Circuit's en banc Court correctly anticipated later holdings of the Supreme Court.

No judge of this Court advocated a broader reading of the crime codified in Section 1346. Instead, the four dissenters urged total invalidation of the statute, even on plain-error review, because "the so-called 'honest services' amendment to the wire and mail fraud statute, 18 U.S.C. § 1346, flunks the test for facial vagueness." *Id.* at 156 (Jacobs, J., joined by Walker, Cabranes, and B.D. Parker, JJ., dissenting). They believed that not even a narrow application premised on principal, pre-*McNally* cases could save the hopelessly vague statute from total unconstitutionality. *Id.* at 156–65 (dissenting opinion).

The majority, however, held that its strictly limiting construction comports with the statutory text. Section 1346 does not protect *any* and *all* intangible rights of honest services, the Court recognized, but rather "*the* intangible right of honest services." *Id.* at 137–38. The Court reasoned that the statute's use of "[t]he definite article 'the' suggests that 'intangible right of honest services' had a specific meaning to Congress when it enacted the statute." *Id.* Specifically, Congress had been squarely focused only on "recriminalizing mail- and wire-fraud schemes" that

previously had resulted in widely recognized criminal liability, but that *McNally* had excluded from the mail and wire-fraud statutes' ambit. *Id.* at 138. The en banc Court thus held that Congress intended Section 1346 to cover schemes and artifices to deprive others only "of *that* 'intangible right of honest services,' which had been protected before *McNally*." *Id.* at 137–38.

By contrast, this Court held that Section 1346 does *not* provide fair notice that it criminalizes the deprivation of any other intangible rights of honest services that were *not* already protected by the principal pre-*McNally* cases. *Id.* at 138–39. Accordingly, it would be inconsistent with due process to extend that statute beyond the scope of the intangible right as it had been understood and applied before 1987. *See id.* The result, the en banc Court held in *Rybicki*, is that courts applying Section 1346 must "look to cases decided before the enactment of section 1346 . . . in order to determine what section 1346 meant to Congress when it enacted the statute." *Id.* at 145.

4.   Later, the Supreme Court reached a similar conclusion in *Skilling v. United States*, 561 U.S. 358 (2010). The Supreme Court reversed, on vagueness grounds, an Enron official's honest-services-fraud

conviction premised on his undisclosed self-dealing to the detriment of his domestic employer and its shareholders. *Id.* at 415. The Court assumed factual guilt of the undisclosed self-dealing, and that such self-dealing violated the defendant's fiduciary duties to his employer (and its shareholders). *See id.* at 369 But the Court held that, even so, any criminal remedies for that conduct must stem from state law or some other source—not Section 1346. *Id.* at 408–9 Not every interference with an employment relationship is punishable in the United States at the federal level.

Like this Court before it, the Supreme Court stopped short of holding Section 1346 void for vagueness on its face. Rather, consistent with *Rybicki*, the Court held that Section 1346 provides fair notice, and is not unconstitutionally vague, so long as its reach is limited to the intangible right of honest services that had been articulated and applied by the "core" of pre-*McNally* cases. *Skilling*, 561 U.S. at 404–05. To repeat, from the very first authoritative decisions construing Section 1346, it has been *only* "principal" (*Rybicki*) or "core" (*Skilling*) pre-*McNally* decisions that can justify using the otherwise-vague term "honest services" to convert dubious conduct into a U.S. federal crime.

Federal prosecutors' mission creep cannot validly justify charging someone with honest-services wire fraud just because that person's conduct can arguably be squeezed within some obscure, pre-1987 precedent.

Rather, the Supreme Court reasoned in *Skilling*, Congress had intended to reinstate only that "body of pre-*McNally* honest-services law" by enacting Section 1346 to overturn *McNally*. *Id*. Potential defendants therefore could know what is and isn't subject to federal criminal liability by reference to the core of that body of principal cases. *Id*. at 405.

The Court thus examined the application of honest-services fraud theories in pre-*McNally* cases, and held that Section 1346 criminalizes bribe-and-kickback schemes but not other kinds of schemes. The Court thus rejected the government's argument that Section 1346 permitted the prosecution of honest-services fraud in circumstances involving an employee's undisclosed self-dealing. *Id*. at 410. "[A] limiting construction of § 1346," the Court emphasized, "must exclude this amorphous category of cases." *Id*.

That was so, the Court explained, even though *some* pre-*McNally* cases had upheld honest-services convictions for such conduct, because

those cases were infrequent and inconsistent. *Id.* *Skilling* held instead that Section 1346 had to reflect a uniform and predictable standard, rooted in the main "body of pre-*McNally* cases," for it to be a criminal law that defines the conduct that it proscribes with the necessary clarity and fair notice. *Id.* at 411. The Court thus rejected the government's "less constrained construction [of § 1346] absent Congress' clear instruction otherwise." *Id.*

### B.   Recent Supreme Court Cases Reinforce Constraints On Section 1346's Otherwise Limitless Reach

On May 11, 2023, while Full Play Group's Rule 29 motion was pending in the district court, the Supreme Court reversed this Circuit's affirmance of convictions in *Percoco v. United States*, 598 U.S. 319 (2023). That decision reinforces the settled point that "the intangible right of honest services" protected by Section 1346 is limited to the core applications of that right before *McNally* that were known to Congress (and potential defendants) at the time of the statute's enactment.

1.  The Supreme Court's recent *Percoco* decision, picked up where *Skilling* left off by reinforcing *Skilling*'s refusal to expand "the intangible right of honest services" beyond the core applications of that right before

*McNally*. *Percoco* makes clear that this core-application principle applies to the nature of the alleged fiduciary relationship.

In *Percoco*, a panel of this Court had held that a private individual could owe a duty of honest services to the public so long as he "dominated and controlled" some government business and government officials "actually relied on him because of a special relationship he had with the government." *United States v. Percoco*, 13 F.4th 180, 193–94 (2021). In reaching that conclusion, this Court relied on certain pre-*McNally* cases in which courts had held that expectations of honest services could be generated by fiduciary duties that arise from "functional," though not "formal," employment relationships. *Id.* at 195. This Court observed (13 F.4th at 196) that *McNally* itself had acknowledged an earlier honest-services decision by this Court holding that "an individual without formal office may be held to be a public fiduciary if others rely on him because of a special relationship in the government and he in fact makes governmental decisions." *McNally*, 483 U.S. at 355 (quotation marks omitted) (citing *United States v. Margiotta*, 688 F.2d 108, 122 (2d Cir. 1982)).

The Supreme Court reversed 9–0. Although it acknowledged that the "heartland" of pre-*McNally* cases might recognize the public's intangible right to honest services from some private individuals, 598 U.S. at 329–30, the Court nevertheless held that a "special relationship" of reliance or control was not enough. *Id.* at 330–33. And that was so even though *Skilling* had cited the very pre-*McNally* case (*Margiotta*) on which the panel decision relied. *Skilling*, the Supreme Court emphasized in *Percoco*, "was careful to avoid giving § 1346 an indeterminate breadth that would sweep in any conception of 'intangible rights of honest services' recognized by some courts prior to *McNally*." *Id.* at 328.

The Supreme Court thus reinforced *Skilling*'s holding that only "*core applications* of the honest-services doctrine" that courts had routinely recognized before Congress enacted Section 1346 are within the statute's scope. *Id.* (emphasis added) (quoting *Skilling*, 561 U.S. at 410). It went on to explain that "*Skilling*'s teaching is clear. 'The intangible right of honest services' must be defined with the clarity typical of criminal statutes and should not be held to reach an ill-defined category of circumstances simply because of a smattering of pre-*McNally* decisions." *Id.* at 328–29 (alteration marks omitted).

38

2. On the same day it decided *Percoco*, the Supreme Court also decided *Ciminelli v. United States*, 598 U.S. 306 (2023). *Ciminelli* involved an application of the word "property" in Section 1343, the wire-fraud statute. The Supreme Court struck down "the Second Circuit's longstanding 'right to control' theory of fraud," in which a defendant had been deemed to be "guilty of wire fraud if he schemes to deprive the victim of potentially valuable economic information necessary to make discretionary economic decisions." 598 U.S. at 308–09 (quotation marks omitted). In reasoning similar to that used in *Skilling* and *Percoco*, the Supreme Court held that the "so-called right to control" property theory was not a recognized property interest "when the wire fraud statute was enacted," and therefore is not an intended meaning of the term "property." *Id*. at 314 (quotation marks omitted).

The Court also criticized federal prosecutors' massive attempted enlargement of the circumstances that would give rise to federal criminal liability under the wire-fraud statute. It warned that adopting the government's position would have "vastly expand[ed] federal jurisdiction without statutory authorization." *Id*. at 315. The government's overbroad theory, the Court explained, was "in flat contradiction with our caution

that, 'absent a clear statement by Congress,' courts should 'not read the mail and wire fraud statutes to place under federal superintendence a vast array of conduct traditionally policed by the States.'" *Id.* at 315–16 (cleaned up) (quoting *Cleveland,* 531 U.S. at 27).

3. The government devotes considerable attention to arguing that *Percoco* and *Ciminelli* did not "abrogate" the "prior precedent" set by *Skilling* and *Rybicki.* U.S. Br. 67–74. That is true, but devastating—not helpful—to the government's overzealous theory, for the reasons discussed at length above.

The government bizarrely contends (at Br. 74) that a footnote in this Court's decision in *United States v. Avenatti*, 81 F.4th 171, 194 n.27 (2023), prohibited the district court from relying on either *Percoco* or *Ciminelli* in refusing to extend Section 1346 to cover foreign commercial bribery. But the *Avenatti* footnote did nothing of the sort, and the government struthiously ignores Judge Chen's sound reasons for not reading *Avenatti* that way. *See* SGA:45–46 & n.25.

A jury convicted Michael Avenatti of honest-services wire fraud for a scheme to deprive his client of legal services during negotiations with another party. 81 F.4th at 175. On appeal, Avenatti argued that he lacked

fair notice that he could be criminally liable, under Section 1346, for depriving his client of an intangible right to his honest services. This Court disagreed for reasons that have absolutely no bearing on the present case. *Id.* at 198–99.

The Court explained why in a footnote. 81 F.4th at 194 n.27. "Avenatti does not—and cannot—argue that he lacked notice that, as an attorney, he owed a fiduciary duty to his client." *Id.* Moreover, the district court had instructed the jury that Avenatti could be found guilty only if the jury found beyond a reasonable doubt that he solicited a bribe from Nike in exchange for taking actions toward settling his client's claims against Nike. The jury had so found. If honest-services fraud in the private sector is to be a federal crime at all, then for Avenatti to argue that he could not foresee being charged with a federal crime for that conduct bordered on the preposterous. How the government thinks that this Court's rejection of that silly argument leads to the conclusion that Full Play had fair notice, or that this Court has watered down the requirement that "core" and "principal" pre-*McNally* decisions be what provide a defendant with such fair notice, is hard to fathom.

The Court thus had no difficulty distinguishing *Ciminelli* and *Percoco* from what Avenatti was arguing. *Ciminelli*, the Court observed, involved deprivations of "property" under Section 1343 and not "the intangible right of honest services" under Section 1346. *Id.* And *Percoco*, the Court continued, addressed whether a defendant who was not a public employee owed honest services to the general public, not whether a lawyer owed honest services to a specific client. *Id.*

Those points have nothing to do with whether evidence of foreign commercial bribery is sufficient to sustain a conviction under Section 1346 as that statute has been construed in *Percoco, Skilling*, and *Rybicki*. The government's only path to argue otherwise is to claim that the *Avenatti* footnote was not limited to the easy facts of that case, but instead toppled the whole structure of precedent requiring that core, pre-*McNally* decisions provide fair notice to potential defendants that interfering with a particular source of fiduciary duty is a U.S. federal crime. That is not a plausible or honest reading of this Court's decision.

## C. Foreign Commercial Bribery Does Not Violate "The Intangible Right Of Honest Services" In Section 1346

The district court correctly held that any duties foreign employees have to their foreign employers not to accept bribes were not addressed

42

by any "core application" of the honest-services doctrine before *McNally*. SGA:48. The district court thus correctly held that foreign commercial bribery does not implicate "the intangible right of honest services" in Section 1346 as interpreted by *Percoco*, *Skilling*, and *Rybicki* to avoid its unconstitutional vagueness and ensure fair notice to defendants.

For starters, the "violation of a fiduciary duty is an element of honest services fraud." *Napout*, 963 F.3d at 181 (quotation marks omitted). *Rybicki*, *Skilling,* and *Percoco* thus require courts to evaluate whether a relationship allegedly giving rise to such fiduciary duties is among the "core applications" of the honest-services doctrine before *McNally*. When circumstances allegedly giving rise to such a fiduciary duty are not within those core applications, then defendants are not on fair notice that "the intangible right of honest services" extends to those relationships and they are not covered by Section 1346. *See Percoco*, 598 U.S. at 328; *Skilling*, 561 U.S. at 412; *Rybicki*, 354 F.3d at 138–39.

Twenty years ago, in *United States v. Giffen*, 326 F. Supp. 2d 497 (S.D.N.Y. 2004), the district court considered whether a U.S. citizen's bribery of a government official from the Republic of Kazakhstan deprived Kazakh citizens of the intangible right of honest services under

Section 1346, *id.* at 500. Applying *Rybicki*, the court surveyed the case law and acknowledged the "total absence of pre-*McNally* precedent supporting the Government's overseas application of the intangible rights theory." *Id.* at 505

The government tried to argue "that pre-*McNally* jurisprudence applied the wire and mail fraud statutes to criminalize deprivation of honest services to foreign citizens by their own governments," but the court observed that the government had offered only "the slenderest of reeds to support its expansive interpretation" of Section 1346. *Id.* at 504. Indeed, all the government could muster were two 1978 *indictments*, and it was forced to concede, at oral argument, "that there were no court decisions addressing the validity of the two 25-year old indictments" on which it relied. *Id.* Accordingly, the court dismissed the relevant counts of the indictment. *Id.* at 506–07. The government did not appeal.

The government's brief does not address *Giffen*, but that decision and the decision below are of a piece. As was true in *Giffen*, there are no pre-*McNally* cases applying honest-services fraud liability to foreign employees' duties to their foreign employers—let alone such a "core application" of the doctrine to those relationships. The district court

44

noted the government's admission that neither the Supreme Court nor any court of appeals had addressed whether the honest-services doctrine applies to overseas commercial employment. SGA:48 (citing DE:1999 at 44 n.6). And the district court likewise was unable "to identify a single pre-*McNally* case applying honest services wire fraud to foreign commercial bribery, i.e., bribery of foreign employees of foreign non-government employers." *Id.*

Under *Rybicki*, *Skilling*, and *Percoco*, that absence of authority is the answer. Because pre-*McNally* cases—or, for that matter, post-*McNally* cases—did not identify an intangible right of honest services between foreign employees and foreign employers, Congress did not intend to include it in Section 1346 and potential defendants are not on fair notice that such a right might generate federal criminal liability.

In this appeal, the government provides brief, parenthetical descriptions of a few cases that it says stand for the proposition that "foreign commercial bribery was clearly contemplated in traditional fraud cases." U.S. Br. 79. The government claims on appeal a surprising new discovery of case law that eluded the *Giffen* court, was not cited to

45

Judge Chen below by the government, and was not discovered by Judge Chen on her own.

It is hardly a shock, accordingly, that the government's new discovery turns out to be fool's gold. The cited cases do no such thing as what the government claims.

The government's principal citation is this Court's 83-year-old decision in *United States v. Groves*, 122 F.2d 87 (1941). The government describes *Groves* (at Br. 79) as having involved kickbacks to the Argentine employees of Argentine companies. But the two (of three) schemes in *Groves* that the government appears to be describing involved the defendants' fraudulent procurement of $400,000 *from the victim* (a company called G.I.C.). 122 F.2d at 89. The defendants, having fraudulently deprived their victim of that money, then divvied it up among themselves and other entities in what one witness described as a "kickback." *Id.* at 91. But that so-called kickback was simply the defendants' (and their allies') payday from their straightforward scheme

46

to defraud a victim of money or property in violation of the mail fraud statute. In short, *Groves* was not an honest-services-fraud case at all.[5]

The government's search for support in a smattering of other cases fares no better. The scheme the government highlights in *United States v. Sindona*, 636 F.2d 792, 795–96, 802 (2d Cir. 1980), even as the government describes it (at Br. 79), involved the bribery of a director of a "domestic bank" organized under the laws of the United States. It is thus beside the point that, as the government also notes (*id.*), the domestic bank for which the director served was partly owned by the defendant, a foreign national, or that the bribed director's day job was at a Canadian bank.

Moreover, *Sindona v. Grant*, 619 F.2d 167 (2d Cir. 1980), involves the same criminal defendant's habeas corpus challenge to his extradition to Italy. That extradition proceeding has nothing to do with the honest-services doctrine. The government makes creative use of a footnote in

_____

[5] The government may be correct that some of the players in *Groves* were the "Argentine employees of Argentine companies," but the decision does not say that. All the decision says is that the deprivations of money or property at issue took place surrounding a sale of securities of a Buenos Aires subway, and that some of the ill-gotten gains were then given to a Buenos Aires company that was not a defendant in the action. *See* 122 F.2d at 89.

that opinion, which describes the defendant's U.S. indictment as involving the bribery of an Italian bank manager. U.S. Br. 79–80 (citing 619 F.2d at 171–72 & n.5). But here, too, the government's own description of the allegation demonstrates its irrelevancy: The allegation was that the defendant bribed the general manager of an Italian bank in order to obtain his cooperation in siphoning funds away from the same "domestic bank" (for which Italian banker evidently provided services). *Id.*

The government also relies on two false-statement prosecutions, under 18 U.S.C. § 1001, where the defendants were convicted of concealing overseas kickbacks. U.S. Br. 80 (citing *United States v. Olin Matheson Chem. Corp.*, 368 F.2d 525, 526 (2d Cir. 1966) (per curiam), and *United States v. Austin Co.*, 273 F. Supp. 360, 361–62 (S.D.N.Y. 1967)). But those Section 1001 cases have nothing to do with the scope of the intangible right of honest services—even putting aside that they both involved false statements made to U.S. agencies (USAID and the U.S. Department of Agriculture, respectively).

*Even if* these five cases *could* be read as the government would have them—and not a single one actually can—then one case decided in 1941,

a pair of related cases decided in 1980, and two false-statement cases decided under a different statute do not qualify even as the kind of "smattering of pre-*McNally* decisions" the Supreme Court has *rejected* as being sufficient to establish a Section 1346 duty.[6] They are hardly a "core" application of the honest-services doctrine. *Percoco*, 598 U.S. at 328.

## II. This Circuit's Post-*Skilling* Decisions Do Not Require Reversal

The government mischaracterizes this Circuit's decisions in *United States v. Bahel*, 662 F.3d 610 (2011), and *United States v. Napout*, 963

---

[6] The government also relies (at Br. 80-81) on four Washington Post articles about U.S. companies' and executives' guilty pleas in late-1970s cases involving foreign bribery. But as the government acknowledges, these guilty pleas came shortly *after* Congress had enacted the Foreign Corrupt Practices Act (FCPA), in 1977, to "criminalize this type of [foreign] commercial bribery" by U.S. persons and entities. *United States v. Kay*, 359 F.3d 738, 746 (5th Cir. 2004) (cited at U.S. Br. 80); *see also id.* at 746 & n.27 (Congress enacted the FCPA in order "to ban payments made for the purpose of inducing foreign officials to act"). The legislative history of the FCPA further supports the understanding that the pre-*McNally* wire-fraud statute was *not* generally understood to prohibit foreign commercial bribery even by U.S.-based entities. *See generally id.* at 746–53; *see also* S. Rep. No. 95-114, at 4 (1977), *as reprinted in* 1977 U.S.C.C.A.N. 4098, 4101 (discovery that U.S. companies were bribing foreign officials made a "strong antibribery law . . . urgently needed"); S. Rep. No. 95-114, at 3, 1977 U.S.C.C.A.N. at 4100 (FCPA "[m]akes it a crime for U.S. companies to bribe a foreign government official for the specified corrupt purposes").

F.3d 163 (2020), as "binding precedent" requiring reversal. The holdings in those cases are distinguishable for several reasons and do not dictate the result here.

### A. *United States v. Bahel*

The government argues (at Br. 57) that this Court's decision in *Bahel* should have precluded the district court's judgment of acquittal, and requires reversal. Not so.

*Bahel* involved a foreign national's employment at the United Nations headquarters in New York. There, the defendant served as a top U.N. procurement official. 662 F.3d at 617. In connection with that role, the defendant accepted payments and other financial benefits (including below-market rent on a New York apartment) from friends whose company bid on and obtained U.N. contracts. *Id.* at 617, 620. The government charged the defendant with honest-services fraud and a jury convicted. *Id.* at 621.

On appeal, the defendant "argue[d] for the first time" that Section 1346 "cannot apply to foreign employees of the U.N." because it *never* applies to "employees of international organizations." *Id.* at 632; *see also id.* (noting that defendant argues "that he, as a foreign national, cannot

50

be prosecuted for honest services fraud under Section 1346"). This Court disagreed that *Skilling* or *Rybicki* had categorically excluded foreign nationals from being defendants in honest-services-fraud cases, and affirmed the defendant's convictions. *See id.*

In reaching that result, this Court distinguished *United States v. Giffen*, 326 F. Supp. 2d 497 (S.D.N.Y. 2004), which is discussed above in Part I.C. In *Bahel*, this Court recognized that *Giffen* "involved a United States citizen who was charged with honest services fraud for bribing a government official from the Republic of Kazakhstan, resulting in the deprivation of honest services for Kazakh citizens." 662 F.3d at 632. The *Giffen* court dismissed those portions of the indictment by holding that pre-*McNally* cases had not applied the honest-services doctrine to foreign officials' fiduciary duties to foreign citizens. 326 F. Supp. 2d at 506.

The *Bahel* panel neither endorsed nor rejected *Giffen*'s holding, but rather distinguished its facts. This Court said that *Giffen* was "unhelpful" to the defendant in *Bahel* because, "unlike in *Giffen*, the conduct at issue [in *Bahel*] took place within the territorial United States, and the victim was—not a foreign government's citizens—but the United Nations, an organization headquartered in the United States, entitled to defendant's

51

honest services in the United States, and receiving its largest financial contributions from the United States." 662 F.3d at 632; *see also id.* at 628 (emphasizing that U.N. anti-corruption measures were imposed in accordance with U.S. law).

The government's brief does not address *Bahel*'s explicit effort to distinguish *Giffen*. Instead, the government asserts that the facts in *Bahel* are "remarkably similar to those in this case" because both cases involve the bribery of a "foreign-born executive." U.S. Br. 57. But in this case, unlike *Bahel*, none of the officials who received or agreed to receive payments were working for an international organization *in the United States*, such that the organization was "entitled to defendant's honest services *in the United States*." *Bahel*, 662 F.3d at 632 (emphasis added). That was the critical fact on which this Court affirmed the honest-services-fraud convictions in *Bahel* and distinguished *Giffen*. In this case, moreover, the district court did not hold that Section 1346 liability depends on where a payment recipient *was born*, and Full Play has never argued that someone's nation of birth (as opposed to that person's nation of employment) matters.

52

**B.** ***United States v. Napout***

The government also misplaces its reliance on *Napout*, in which this Court affirmed Judge Chen's decision not to set aside the honest-services-fraud convictions of two soccer executives involving bribes they received while working for CONMEBOL or one of its member associations in South America. 963 F.3d 163.

1. The government principally contends (at Br. 63) that this Court's rejection of the *Napout* appellants' Rule 29 sufficiency challenge should have precluded the decision below, both as binding precedent and under the mandate rule. Neither of those theories holds water. Judge Chen—who had been *affirmed*, not reversed, in *Napout*—correctly understood that the issue in this case is different.

The *Napout* appellants challenged their convictions on the ground that the trial evidence was not sufficient to prove that "they owed a fiduciary duty to their employer (both CONMEBOL and FIFA) under the laws of Paraguay, the country where CONMEBOL is headquartered." 963 F.3d at 184 (citing No. 18-2820 Napout Br. 5). This Court disagreed, however, that the government needed to prove that Paraguayan law imposed a fiduciary duty on the executives. *Id.* Rather, this Court

53

explained, the government had asserted fiduciary duties arising directly from the executives having "acced[ed] to FIFA and CONMEBOL's rules, not the provision of the law of any state or country." *Id.* at 185.

The Court therefore held that "the government's evidence was easily sufficient to prove that FIFA and CONMEBOL's respective codes of ethics expressly provided that persons bound by those codes . . . had 'a fiduciary duty to FIFA and the confederations such as CONMEBOL.'" *Id.* (cleaned up). "Accordingly," this Court concluded, "'the existence of a fiduciary relationship between the employees and their employer was beyond dispute.'" *Id.* (cleaned up) (quoting *United States v. Nouri*, 711 F.3d 129, 137 n.1 (2d Cir. 2013)).

The Court's resolution of that Rule 29 challenge in *Napout* does not control the issue decided below and presented in this appeal. Full Play is not challenging whether the government's evidence was sufficient to establish that soccer officials in South America or the Cayman Islands were subject to their foreign employers' codes of ethics. Instead, Full Play's successful challenge below established that any such relationships between foreign employees and their foreign employers, even if they would create a fiduciary relationship under Anglo-American common

54

law, are insufficient evidence of the intangible right of honest services that is codified in Section 1346 and limited by *Skilling*, *Percoco*, and *Rybicki*.

The government's reliance on the mandate rule (at Br. 63) fails for the same reasons, and for the additional reason that the mandate rule does not apply. The mandate rule establishes that "the district court is obliged, *on remand*, to follow the decision of the appellate court." *United States v. Minicone*, 994 F.2d 86, 89 (2d Cir. 1993) (emphasis added). But the district court did not enter the decision below on remand from this Court's decision in *Napout*. Rather, the district court decided Rule 29 motions by *different defendants* following their *separate trials*. The government does not provide authority for holding separate parties to the mandate in an appeal to which they were not—and could not have been—participants. Such an application of the mandate rule across related-but-distinct cases would impermissibly deny different parties their due-process rights.

2. The government also (at Br. 62–65) misses the critical point in this Court's denial, on plain-error review, of the *Napout* appellants' vagueness challenge to applying Section 1346 to foreign commercial

bribery. *See* 963 F.3d at 181–84. Although the government is careful not to say that the *Napout* panel's plain-error ruling actually governs in this case, it nevertheless mischaracterizes the significance in this appeal of this Court's holding that it is not "clear under current law," and "unsettled, at best," "whether a foreign employee's duty to his foreign employer qualifies as an actionable element under § 1346." 963 F.3d at 184.

For starters, *Napout* emphasized that a "violation of a fiduciary duty is an element of honest services fraud." *Id.* at 181 (quotation marks omitted). And it recognized that questions about "what may serve as 'the *source* of the fiduciary obligation' that can sustain a conviction under the statute" are among the "lingering ambiguities in § 1346." *Id.* at 183. (quoting *Skilling*, 561 U.S. at 417 (Scalia, J., concurring in the judgment)). *Napout* therefore cannot be squared with the government's argument (at Br. 55) that only the nature of the conduct matters to the scope of Section 1346, and not the source of the fiduciary duty, that if breached, gives rise to prosecution.

What is more, it was the *Napout* appellants' lack of "authority directly supporting their position"—*i.e.*, affirmatively establishing that

56

foreign commercial bribery is outside Section 1346's ambit—that dictated affirmance on plain-error review. 963 F.3d at 184, But here, it is *the government's* lack of authority demonstrating that foreign commercial bribery was a core application of the honest-services doctrine before *McNally* that dictated acquittal and requires affirmance on *de novo* review. As *Rybicki*, *Skilling*, and *Percoco* each make clear, the government must establish criminal liability under Section 1346 based on a kind of fiduciary relationship and course of conduct that had resulted in honest-services-fraud liability in more than a "smattering" of pre-*McNally* cases. And as discussed above (*supra* Part I.C), the government can make no such showing with respect to foreign commercial bribery involving foreign employees and their foreign employers.

The government thus tries to distract from that deficit by contending that the *Napout* panel had intended to suggest that a case like this one should come out in the government's favor. The government devotes significant attention to the *Napout* panel's observation that the legal support for applying Section 1346 to foreign commercial bribery is "unsettled, at best," and to arguing that the phrase "at best" was a wink-and-a-nod indication that the law *might* be settled *in the government's*

*favor.* U.S. Br. 64–65. That is not how the district court understood *Napout*, nor is that the most natural reading of what the panel wrote. But, even if that *were* what the *Napout* panel meant, it would be pure dictum.

Also unavailing is the government's focus (at Br. 64–65) on Judge Hall's concurring opinion in *Napout*, in which he explained that he would have denied the *Napout* appellants' vagueness challenge under *de novo* review. Judge Hall and his colleagues on the *Napout* panel were not called on to consider Section 1346's scope in response to a Rule 29 sufficiency challenge, nor did they have the benefit of *Percoco*'s reinforcement that *Skilling*'s reasoning applies to limit the universe of potential fiduciary relationships that implicate the intangible right of honest services. In any event, Judge Hall's concurring opinion does not "constitute[] binding precedent." *Maryland v. Wilson*, 519 U.S. 408, 412–13 (1997).

## III. The District Court Properly Acquitted Defendant Full Play On All Counts And Without Ordering Any Retrial

The government asserts (at Br. 83–88) that, even if evidence of foreign commercial bribery cannot sustain an honest-services conviction, the district court nevertheless improperly acquitted Full Play on Counts

58

29 and 30 through 35—all involving what the government calls the "Copa América scheme." As for the other counts on which the district court acquitted Full Play, the government contends (at Br. 87–89) that the district court announced a "new rule" and so was required to order a new trial instead of entering judgment. The government is twice wrong.

## A. The District Court Did Not Err By Acquitting Full Play On The Copa América Counts

There was not sufficient evidence at trial that Full Play's alleged conspiracy to bribe CONCACAF president Jeffrey Webb, in connection with media rights to the 2016 Copa América Centenario, was something other than foreign commercial bribery. If foreign commercial bribery falls outside Section 1346—and it does, as demonstrated above—then the evidence presented at trial relating to Webb allows no escape from that rule. That is not, as the government asserts (at Br. 77), tantamount to requiring this case to have a "factual twin" among pre-*McNally* precedent, but rather applies this Court's and the Supreme Court's requirement that it fall comfortably within that precedent's "core," "principal" applications of the honest-services doctrine. *See supra* Part I.A.

The overwhelming evidence at trial was that the CONCACAF-Webb employment relationship was a foreign employment relationship. CONCACAF was (and still is) a Bahamas entity. GA:5. And Webb was based out of the Cayman Islands, where he was the president of the Cayman Islands soccer federation, one of CONCACAF's member associations. GA:106; GA:365.

Indeed, the government concedes (at Br. 86 n.13) that it presented no evidence at trial that Webb resided, or was otherwise based, in the United States. It nevertheless now asserts (at Br. 85, 87) that it *could* have presented such evidence. But such after-the-fact, hypothetical trial evidence is not a ground for reversing a defendant's acquittal based on the legal insufficiency of the actual trial evidence.

Moreover, the government's actual trial evidence showed that the key meetings about payments to Webb and the Copa América Centenario media rights took place outside the United States. For example, the government highlights (at Br. 84) a March 2013 meeting held in Zurich, Switzerland, where Webb's representative demanded payment for signing a Copa América Centenario media-rights contract. GA:367–68. Later, it was in Mauritius that Webb and other soccer executives actually

executed the media-rights contract with Full Play. GA:373–75. And then it was in Chile that Webb met to discuss CONMEBOL's and CONCACAF's organization of the Centenario and the future fulfilment of the payment he had demanded. *See* GA:393. Finally, as the Centenario drew closer, it was in the Bahamas that soccer executives held a CONCACAF meeting to discuss logistics for marketing and organizing the event. GA:416–17.[7]

To claim sufficient evidence of a *domestic* employment relationship between CONCACAF and Webb resulting in an expectation of honest services "within the territorial United States" (*Bahel*, 662 F.3d at 632), the government principally relies on stray references in two exhibits to CONCACAF's having been "based" or "headquartered" in either New York or Miami. *See* Br. 83–84 (citing GA:1047–53 and GA:1257). But CONCACAF comprises 41 national member associations across North

---

[7] At trial, the government focused on an internal meeting among Datisa participants that took place in Miami during May 2014. GA:378. At that internal meeting, Datisa executives discussed their payments to CONCACAF officials relating to the Centenario. GA:381. But no CONCACAF officials were at the meeting, and the payment to Webb had already been agreed to in Zurich some 14 months earlier. The meeting thus provides no evidence that Webb's employment relationship with CONCACAF was based in the United States.

America, Central America, and the Caribbean. GA:5. And there is no dispute that it is incorporated in the Bahamas and has offices there. GA:5. *See United States v. Pauling*, 924 F.3d 649, 661 (2d Cir. 2019) (affirming acquittal because "[i]t could not seriously be argued that such a 'modicum' of evidence could by itself rationally support a conviction beyond a reasonable doubt").

The relevant inquiry, for purposes of applying Section 1346, is whether CONCACAF's *employment relationship with Webb* was based in the United States, not simply whether CONCACAF has some presence there. Without any evidence of a domestic focus of Webb's employment by CONCACAF, a Bahamian organization, Full Play did not have fair notice that its unfulfilled, overseas agreement to pay Webb might implicate U.S. criminal law.

## B. The District Court Did Not Err By Not Granting The Government A New Trial

The government tacitly concedes (at Br. 88) that, "[a]s to the other counts" (*i.e.*, the qualifier/friendlies and Copa Liberatores counts) no rational jury could have found beyond a reasonable doubt that Full Play's payments to CONMEBOL officials implicated any U.S.-based employment relationships. It nevertheless argues that the district court's

62

judgment of acquittal on those counts was legal error because the district court based it on a new "theory" about which the government lacked "notice during trial" and "the jury was not instructed." Br. 88. Accordingly, the government says, "the proper course" for the district court to take "would have been to grant a motion for a new trial" so that "the government could offer additional evidence." *Id.*

That argument's use of the conditional past tense—*would have been*—is no accident. The government never actually asks this Court, were it to agree with the district court on the law, nevertheless to vacate the judgment of acquittal and remand for a retrial. *See* Br. 88-90. As the government must know, that remedy is not available on appeal. "[T]he Double Jeopardy Clause of the Fifth Amendment prohibits reexamination of a court-decreed acquittal to the same extent it prohibits reexamination of an acquittal by jury verdict." *Smith v. Massachusetts*, 543 U.S. 462, 466-67 (2005). This Court may reinstate the jury's verdict if it *disagrees* with the district court on the law or the sufficiency of the

evidence, *see id.* at 467, but it cannot order a retrial if it *agrees* with the district court on those things.[8]

In any event, the district court was correct to grant acquittal instead of *sua sponte* ordering a retrial. There is no logical way that a properly instructed jury, presented with some (unidentified) new evidence, might have found that the South American officials of a Paraguayan soccer confederation have a U.S.-based employment relationship that falls within the core, pre-*McNally* application of the honest-services doctrine (and, thus, Section 1346). The government fails even to suggest any.

Moreover, and for two reasons, the government did not lack "notice" (Br. 85; 88) that the district court might conclude, at the trial's end, that

---

[8] *See also Smith,* 543 U.S. at 473 n.7 ("Our double-jeopardy cases make clear that an acquittal bars the prosecution from seeking another opportunity to supply evidence which it failed to muster before jeopardy terminated." (quotation marks omitted)); *Evans v. Michigan*, 568 U.S. 313, 318 (2013) ("An acquittal is unreviewable whether a judge directs a jury to return a verdict of acquittal, or forgoes that formality by entering a judgment of acquittal herself."); *United States v. Ustica*, 847 F.2d 42, 45–46 (2d Cir. 1988) ("[W]here a conviction is set aside . . . on the ground of insufficiency of the evidence, a new trial will subject the defendant to double jeopardy, and thus such retrial is barred.").

foreign commercial employment relationships do not generate the intangible right of honest services that Congress codified in Section 1346.

First, defendants had moved to dismiss the indictment on vagueness grounds based on the same issue. DE:1594–1. It thus could hardly have been a surprise when defendants later challenged the sufficiency of the government's evidence on similar grounds, or that the trial record on this issue was going to be the subject of an appeal. Moreover, the government planned to call Webb to testify about Copa América Centenario, but declined. *See* GA:434–40; SA:747. Even if the government is right that it left "swaths" of evidence in the tank, doing so was the government's strategic choice made on full information, and does not provide an excuse to give the government "the proverbial 'second bite at the apple.'" *See Burks v. United States*, 437 U.S. 1, 17 (1978).

Second, neither the district court nor *Percoco* announced any new, unanticipated legal principle. Rather, as explained above (*see supra* Part I.A-B), both courts adhered to the "core application" interpretation (and limitation) of Section 1346 established in *Skilling* and *Rybicki*. And the

65

government has long had notice that the honest-services doctrine's core application, before *McNally*, did not involve foreign commercial bribery.[9]

## CONCLUSION

For the reasons stated above, this Court should affirm the district court's acquittal of Full Play on all counts.

---

[9] In the event that this Court were to hold that Section 1346, even as limited by *Skilling* and *Percoco*, applies to foreign commercial bribery, Full Play hereby contends that Section 1346 is unconstitutionally vague on its face. Recognizing that argument is foreclosed by binding precedent, we do not elaborate it, but we preserve it in the event that further review is necessary at a higher level.

Dated: April 2, 2024

Respectfully submitted,

MAYLING C. BLANCO
KATEY L. FARDELMANN
(pending admission)
Norton Rose Fulbright US LLP
1301 Avenue of the Americas
New York, NY 10019
Tel: (212) 318-3000

/s/ MICHAEL MARTINEZ
MICHAEL MARTINEZ
Kramer Levin Naftalis &
Frankel LLP
1177 Avenue of the Americas
New York, NY 10036
Tel: (212) 715-9100

CARLOS ORTIZ
KAYLEY B. SULLIVAN
Baker Hostetler
45 Rockefeller Plaza
New York, NY 10111-0110
Tel: (212) 589-4676

ROY T. ENGLERT, JR.
MATTHEW M. MADDEN
CHLOE C. BOOTSTAYLOR
Kramer Levin Naftalis &
Frankel LLP
2000 K Street NW, 4th Floor
Washington, DC 20006
Tel: (202) 775-4500

WILLIAM DEVANEY
Baker McKenzie
452 Fifth Avenue
New York, NY 10018
Tel: (212) 626-4100

*Counsel for Full Play Group, S.A.*

### CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Second Circuit Rule 32.1(a)(4) because the brief contains 12,768 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.


Dated: April 2, 2024                    /S/ *MICHAEL MARTINEZ*
                                        MICHAEL MARTINEZ