# 23-7183(L)

## 23-7186(CON)

*To Be Argued By*:
KAITLIN T. FARRELL

# United States Court of Appeals

### For the Second Circuit

◆◆

UNITED STATES OF AMERICA,

*Appellant,*

—against—

HERNÁN LOPEZ, FULL PLAY GROUP, S.A.,

*Defendants-Appellees,*

JEFFREY WEBB, EDUARDO LI, JULIO ROCHA, COSTAS TAKKAS, JACK WARNER, EUGENIO FIGUEREDO, RAFAEL ESQUIVEL, JOSÉ MARIA MARIN, NICOLÁS LEOZ, ALEJANDRO BURZACO, AARON DAVIDSON, HUGO JINKIS, MARIANO JINKIS, JOSÉ MARGULIES, also known as JOSÉ LÁZARO, ALFREDO HAWIT, ARIEL ALVARADO, RAFAEL CALLEJAS, BRAYAN JIMÉNEZ, RAFAEL SALGUERO, HÉCTOR TRUJILLO, REYNALDO VASQUEZ, JUAN ÁNGEL NAPOUT, MANUEL BURGA, CARLOS CHÁVEZ, LUIS CHIRIBOGA, MARCO POLO DEL NERO, EDUARDO DELUCA, JOSÉ LUIS MEISZNER, ROMER OSUNA, RICARDO TEIXEIRA, CARLOS MARTINEZ, GERARD ROMY,

*Defendants.*

—————

**On Appeal From The United States District Court
For The Eastern District of New York**

───────────────────────────────

### REPLY BRIEF FOR THE UNITED STATES

───────────────────────────────

AMY BUSA,
DAVID C. JAMES,
KAITLIN T. FARRELL,
ROBERT T. POLEMENI,
VICTOR ZAPANA,
ERIC SILVERBERG,
LORENA MICHELEN,
   *Assistant United States Attorneys,*
     *Of Counsel.*

BREON PEACE,
*United States Attorney,*
*Eastern District of New York*
*271-A Cadman Plaza East*
*Brooklyn, New York 11201*
*(718) 254-7000*

i

<u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES ................................................................iii

PRELIMINARY STATEMENT .................................................... 1

ARGUMENT ............................................................................... 5

    I.    The Opposition Briefs Avoid or Misstate the
        Facts and Procedural History ............................................. 5

        A.    The Facts ................................................................. 5

        B.    Procedural History ................................................. 9

    II.    The Defendants Avoid or Mischaracterize
        Key Aspects of the Relevant Cases ................................... 12

        A.    *Percoco* and *Abdelaziz* Did Not Charge
                Classic "Bribes" ........................................................ 12

        B.    *Percoco* Did Not Overrule *Bahel*, Which Is
                on All Fours With This Case .................................... 15

        C.    *Bahel* Rejected *Giffen*, Which Is Not Like
                This Case ................................................................. 17

        D.    *Percoco* Did Not Abrogate *Napout*, Which
                Relied on the Codes as Evidence of Duty .................. 19

        E.    Dismissive Adjectives Cannot Overcome
                *Avenatti*'s Analysis that a Pre-*McNally*
                Analogue Is Unnecessary ........................................ 22

    III.    The Defendants' Reliance on the Federal
        Bribery Statutes Is Unavailing ......................................... 23

    IV.    Lopez's Alternative Claim for Affirmance Is
        Meritless ............................................................................ 30

ii

CONCLUSION ........................................................................... 36

# TABLE OF AUTHORITIES

Page

## CASES

Anderson v. United States,
    417 U.S. 211 (1974) .............................................................. 31

Brzak v. United Nations,
    597 F.3d 107 (2d Cir. 2010) ................................................ 16

Chafin v. Chafin,
    568 U.S. 165 (2013) ................................................................ 9

Bascuñán v. Elsaca,
    927 F.3d 108 (2d Cir. 2019) ................................................ 24

McNally v. United States,
    483 U.S. 350 (1987) ....................................................... passim

Morrison v. Australia National Bank, Ltd.,
    561 U.S. 247 (2010) .............................................................. 17

Percoco v. United States,
    598 U.S. 319  (2023) ....................................................... passim

Skilling v. United States,
    561 U.S. 358 (2010) ....................................................... passim

United States v. Abdelaziz,
    68 F.4th 1 (1st Cir. 2023) ............................................. passim

United States v. Agrawal,
    726 F.3d 235 (2d Cir. 2013) ..........................................11-12

United States v. Avenatti,
    81 F.4th 171 (2d Cir. 2023) ...................................... 20, 22, 23

United States v. Bahel,
    662 F.3d 610 (2d Cir. 2011) ......................................... passim

United States v. Cirami,
  563 F.2d 26 (2d Cir. 1977) ............................................................ 21, 22

United States v. Giffen,
  326 F. Supp. 2d 497 (S.D.N.Y. 2004) ................................. 17, 18, 19, 30

United States v. Kosinski,
  976 F.3d 135 (2d Cir. 2020) ................................................................ 11

United States v. Napout,
  963 F.3d 163 (2d Cir. 2020) ......................................................... passim

United States v. Ng Lap Seng,
  934 F.3d 110 (2d Cir. 2019) ................................................................ 28

United States v. Polouizzi,
  564 F.3d 142 (2d Cir. 2009) ................................................................ 12

United States v. Reichberg,
  5 F.4th 233 (2d Cir. 2021) .................................................................. 32

United States v. Rybicki,
  354 F.3d 124 (2d Cir. 2003) ................................................................ 13

United States v. Skelos,
  988 F.3d 645 (2d Cir. 2021) ................................................................ 28

United States v. Tenzer,
  213 F.3d 34 (2d Cir. 2000) .................................................................. 21

United States v. Trapilo,
  130 F.3d 547 (2d Cir. 1997) ................................................................ 25

## STATUTES AND LEGISLATIVE HISTORY

15 U.S.C. § 78dd-1 ........................................................................ passim

18 U.S.C. § 201 .................................................................................. 25

18 U.S.C. § 215 .................................................................................. 25

v

18 U.S.C. § 666 ........................................................25

18 U.S.C. § 1343 ......................................................24

18 U.S.C. § 1346 .............................................. passim

S. 430, 99th Cong., 2d Sess. § 7 (1985) ....................29

Foreign Extortion Prevent Act, Pub. L. 118-31, Div. E, Title LI, § 5101, 137 Stat. 931 (2023) ..............................................30

Foreign Payments Disclosure: Hearings Before the Subcomm. on Consumer Prot. and Fin. of the H. Comm. on Interstate and Foreign Commerce, 94th Cong. (1976)........................................................26-27

Unfair Corporate Payments Act of 1977: Hearings Before the Subcomm. on Consumer Prot. and Fin. of the H. Comm. on Interstate and Foreign Commerce, 95th Cong. (1976) ..........................................27-28

## OTHER AUTHORITIES

Paraguayan Crim. Code, Art. 192 Fed. R. App. P. 32 ..............................7

T. 19, Swiss Crim. Code, Art. 322octies....................................................8

Agreement regarding the Headquarters of the United Nations, June 26, 1947, No. 147, available at https://treaties.un.org/doc/Publication/UNTS/Volume%2011/volume-11-I-147-English.pdf (last visited Apr. 22, 2024) ................................16

"Brazilian businessman details FIFA bribery at U.S. trial," ESPN,com (Dec. 5, 2017), https://www.espn.com/soccer/story/ /id/37539973/brazilian-businessman-details-fifa-bribery-us-trial, last visited Apr. 22, 2024 ......................................................................8 n.2

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

Docket No. 23-7183(L), 23-7186(CON)

UNITED STATES OF AMERICA,

Appellant,

-against-

HERNÁN LOPEZ, FULL PLAY GROUP, S.A.,

Defendants-Appellees,

JEFFREY WEBB, EDUARDO LI, JULIO ROCHA, COSTAS TAKKAS, JACK WARNER, EUGENIO FIGUEREDO, RAFAEL ESQUIVEL, JOSE MARIA MARIN, NICOLÁS LEOZ, ALEJANDRO BURZACO, AARON DAVIDSON, HUGO JINKIS, MARIANO JINKIS, JOSÉ MARGULIES,  also known as JOSÉ LAZARO, ALFREDO HAWIT, ARIEL ALVARADO, RAFAEL CALLEJAS, BRAYAN JIMENEZ, RAFAEL SAGUERO, HECTOR TRUJILLO, REYNALDO VASQUEZ, JUAN ÁNGEL NAPOUT, MANUEL BURGA, CARLOS CHAVEZ, LUIS CHIRIBOGA, MARCO POLO DEL NERO, EDUARDO DELUCA, JOSÉ LUIS MEISZNER, ROMER OSUNA, RICARDO TEIXEIRA, CARLOS MARTINEZ, GERARD ROMY,

Defendants.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

REPLY BRIEF FOR THE UNITED STATES

PRELIMINARY STATEMENT

The opposition briefs set up a classic strawman.  In

attempting to recast this appeal as a broad lament about the dangers of

2

government overreach, the defendants' briefs, and the brief of their amicus (an organization representing criminal defense lawyers), spend more than 150 pages arguing about a case that does not exist. This is not a case about prosecuting customers for violating Apple's terms of service (LB:51),[1] playing gotcha with shifting and opaque employment agreements (id., AB:3), targeting clueless foreigners engaged in local business customs who transmitted a stray U.S. wire (FPB:2, 15-16, AB:8), navigating an "undiscoverable and impenetrable jungle of foreign law" (LB:31), or using a "novel theory to prosecute conduct that took place entirely in a foreign country" (AB:10).

This is a case in which a unanimous jury found the defendants guilty of a U.S.-based conspiracy to use U.S. wires to bribe executives of international organizations subject to globally recognized and publicized anti-bribery codes. One bribed executive testified that he knowingly violated his fiduciary duties to the organizations. On a record

---

[1] "GB," "LB," "FPB," "AB," "GA," "SGA," "T," and "DE" refer, respectively to the government's opening brief, Lopez's brief, Full Play's brief, the brief of Amicus Curiae New York Council of Defense Lawyers, the government's appendix, the government's special appendix, the trial transcript, and docket entries below.

overflowing with evidence of both defendants' criminal willfulness and U.S.-based coverup attempts, there is no serious question that the defendants—an American media executive and a corporation with extensive U.S. business interests—in fact had fair notice that their conduct could constitute a crime. Thus, as recounted below, the defendants and their amicus mischaracterize, minimize, or avoid many of the facts and procedural history of <u>this</u> case, choosing instead to engage in histrionics about theoretical prosecutorial overreach as the principal basis for this Court to uphold a flawed district court decision.

The defendants' treatment of the applicable caselaw takes the same tack. As demonstrated in the government's opening brief, all the relevant, binding cases illustrate that the district court erred in misreading Supreme Court "signaling" to reverse trial convictions for insufficient evidence on the basis of a new, post-trial, bright-line duty rule about which the jury was never instructed and a version of which rule this Court previously rejected in <u>United States v. Napout</u>, 963 F.3d 163, 184-85 (2d Cir. 2020). The defendants' avoidance of this Court's clear guidance in at least two cases that a foreigner's accession to an international organization's code prohibiting bribery is sufficient to prove

4

duty, while simultaneously relying on Paraguayan laws, the Restatement of Trusts, the history of Anglo-American legal tradition, and other non-sequiturs seems designed to sow needless confusion in this straightforward duty case.

Lopez's analysis of certain other (but not all) federal bribery statutes is yet another red herring. The wire fraud statute is not a bribery statute, and no court has held they must be read in pari materia. The wire fraud statute and various federal bribery statutes vindicate substantially different interests, reach different conduct, and coexist in harmony, including when applied here.

Lopez's alternative argument for affirmance—that the government failed to prove a conspiracy to deceive CONMEBOL—fares no better. This formulation sidesteps the relevant inquiry and disregards the record facts. The record contains ample evidence that Lopez joined a conspiracy to defraud FIFA, CONMEBOL, and their constituent member-federations through the systemic bribery of their executives using U.S. wires to pay millions of dollars for Fox's benefit, in the face of clear misrepresentations to the organizations that such executives would not take bribes. Lopez's claims to the contrary are baseless.

5

The defendants' avoidance of the narrow legal theory on which the government seeks reversal, coupled with their mischaracterization of the facts of this case and the binding cases, lay bare the significant problems with the district court's decision. This Court should reverse and reinstate the trial verdicts.

<u>ARGUMENT</u>

I.    The Opposition Briefs Avoid or
      <u>Misstate the Facts and Procedural History</u>

   A.    <u>The Facts</u>

      The defendants and their amicus barely acknowledge the facts of this case, much less construe them in the light most favorable to the government as they must. The facts here do not remotely support the suggestion, peppered throughout all three briefs, that the government here unfairly and aggressively pursued naïfs in a distant land using only the slightest of jurisdictional toeholds. (<u>See</u> AB:7-8, 10, 11-12; LB:31, 51; FPB:2, 15-16). To the contrary, the defendants, their co-conspirators, and the criminal schemes had extensive U.S. ties and were extraordinarily sophisticated.

6

Many of the "facts" supplied by the defendants in service of their prosecutorial overreach arguments are demonstrably incorrect. For example:

- It is incorrect that the "foreign identity of the alleged bribe recipients and their foreign employer is beyond dispute" and thus, as Lopez argues, "dispositively removes the Copa Libertadores scheme from the ambit of U.S. honest-services fraud." (LB:57). As alleged in the indictment, Eugenio Figueredo, a FIFA and CONMEBOL official representing Uruguay, who was CONMEBOL's president during the height of Lopez and Full Play's participation in the conspiracy, became a U.S. citizen in 2006. (GA11, 63-65, T:1236:3-1245:19).

- It is incorrect to suggest that CONMEBOL's adoption of its own ethics code in December 2013 means that any bribes paid before then were not in violation of the executives' duties to CONMEBOL. (LB:11). The FIFA code of ethics applied to CONMEBOL throughout the scheme. (GA:92-99, 110, 1726-809). CONMEBOL's adoption of its own, separate code in December 2013, spearheaded by corrupt executive Juan Ángel Napout, was part of an effort to obscure just how corrupt he and his co-conspirator executives were. (T:4877:3-9, 4867:19-4868:12). The bribe payments in which Lopez and Full Play partook continued after CONMEBOL adopted its code, in an ongoing violation of the executives' duty not to accept bribes.

- It is incorrect that the "government's theory was" only "that CONMEBOL officials violated a duty of loyalty to CONMEBOL" and the bribed executives breached no duty of loyalty to FIFA, or any individual federation. (LB:53-54, 40). The indictment alleged a scheme to defraud CONMEBOL, FIFA, and their constituent organizations (i.e., the individual member-countries' federations). (GA:42, 50-52). Although CONMEBOL, rather than FIFA, owned the media rights to

the Copa Libertadores and Copa América (and thus might be the only victim in a deprivation-of-money-or-property wire fraud theory, which is not at issue here), all organizations were defrauded of the right to the executives' honest services when they took bribes in violation of their express representation that they would not do so in the course of their soccer executive duties. (T:4868:13-4871:2, 4877:10-4878:6).

- It is incorrect that the government never mentioned Centenario, CONCACAF or Jeffrey Webb in its jury addresses (FPB:18). (See T:7137-38).

- It is incorrect that the government relied on the uncorroborated testimony of one cooperating witness, Alejandro Burzaco, to implicate Lopez in the bribery scheme. (LB:6). Burzaco's testimony was extensively corroborated by voluminous documentary evidence (including bribe ledgers referencing Fox and contemporaneous emails commemorating Lopez and Burzaco's bribe discussions) and other witnesses, as set forth in detail in the government's opening brief and trial summation arguments. (See GB:18-28).

- It is incorrect for Full Play and Lopez to repeatedly assert that commercial bribery is legal in Paraguay. (See LB:9; FPB:16 (relying on declaration by attorney with Spanish law degree); AB:13). The Paraguayan government stated otherwise in this case when, in 2017, it granted the United States' extradition request for Nicolas Leoz, a Paraguayan soccer executive charged in the same schemes as Full Play and Lopez, on the basis that there was dual criminality. (DE:836-5 (Exhibit E)). The Paraguayan court recognized that Article 192 of the Paraguayan Criminal Code prohibits an analogous crime to commercial bribery, which is punishable by five years' imprisonment. (Id. at 34).[2] Switzerland, where FIFA is

---

[2] Similarly, Argentina denied the request to extradite Full Play's principals, Hugo and Mariano Jinkis, to the United States on the

8

headquartered and incorporated, also criminalizes commercial bribery. <u>See</u> T. 19, Swiss Criminal Code, Art. 322<u>octies</u>.

_____

grounds that their conduct was separately punishable in Argentina, and they would be held accountable there (they were not). (DE:836-7 (decision denying extradition request)); <u>see also</u> "Brazilian businessman details FIFA bribery at U.S. trial," ESPN.com (Dec. 5, 2017), <u>https://www.espn.com/soccer/story/_/id/37539973/brazilian- businessma n-details-fifa-bribery-us-trial</u>, last visited Apr. 22, 2024. Hugo and Mariano Jinkis traveled frequently to the United States but began avoiding U.S. travel once they learned that U.S. criminal authorities were investigating their U.S.-based criminal activity. (T:1339:5-1342:11; GX-702L, GX-702M (border crossing records)). That they have avoided extradition illustrates that foreign defendants have considerable procedural safeguards protecting them from being haled into U.S. courts, even where their U.S.-based misconduct was extensive, contrary to the parade of horribles outlined by the amicus. This is particularly true of the hypotheticals the defendants and their amicus present about individuals, unlike the Jinkises, who have scant or no U.S. ties and who do not travel to the United States. (AB:9, 10; FPB:2, 15-16). Such individuals would have robust procedural rights to challenge extradition from their home countries.

Additionally, it is ironic that the amicus brief asserts arguments about the unfairness of pretrial detention (AB:14-18) in a case where Lopez resided pretrial in his Hollywood mansion (DE:1374), and Full Play is a corporation to which pretrial detention is inapplicable. Similarly, Juan Ángel Napout, José Maria Marin, and Manuel Burga lived comfortably in private accommodations up to and through the duration of the <u>Napout</u> trial. Amicus's arguments about the pretrial detention of defendants in other cases, about whom magistrate judges in this Circuit applied the law and the facts to determine their individual pretrial risks, have no place in this appeal.

9

Facts matter. "Federal courts may not . . . give opinions advising what the law would be upon a hypothetical state of facts." Chafin v. Chafin, 568 U.S. 165, 172 (2013).[3]  This Court should reject the defendants' and the amicus's attempt to turn this into a broad complaint about prosecutorial overreach and focus instead on the facts proven at trial and the narrow legal issues of this appeal.

B.    Procedural History

Nor do the defendants accurately recount the procedural history.  Lopez claims that he has always argued not only that 18 U.S.C. § 1346 is vague and extraterritorial as applied, but also that "foreign commercial bribery" is categorically excluded from the ambit of § 1346, as ultimately held by the district court.  (LB:40 (quoting a sentence spoken at pre-trial oral argument on Lopez's motion to dismiss on vagueness grounds)).  Thus, he claims, Percoco v. United States, 589 U.S. 319 (2023), simply reinforced an argument he had been making from the outset.  (Id. at 40-42).

---

[3]    Unless otherwise noted, case quotations omit internal quotation marks and citations and adopt all alterations.

10

But as the district court noted in its opinion (SGA:29 n.15), the court and the government always understood Lopez to be challenging § 1346 on the grounds of vagueness and extraterritoriality until Lopez's reply brief. This is because, until the reply, Lopez's arguments were always framed as challenges based on "vagueness" and "extraterritoriality." (DE:1595-1 at 12 (§ 1346 "is unconstitutionally vague as applied"), 13 (alleging the indictment "conflicts with the Supreme Court's guidance on the extraterritorial application of U.S. criminal laws"); T:7024-25, 7027 (Lopez charge conference argument that his "motion to dismiss the indictment . . . argued strenuously, that for vagueness reasons and extraterritoriality under 1346, [the element of fiduciary duty] couldn't be established" and "we would argue [it] is constitutionally vague if [the codes are] the source of the duty"); DE:1987-1 at 2 ("As detailed in Mr. Lopez's motion to dismiss, to hold that honest services fraud reaches foreign commercial bribery in violation of such a nebulously defined fiduciary duty would render 18 U.S.C. § 1346 unconstitutionally vague as applied"), 9 ("Mr. Lopez renews his arguments that the honest services fraud statute does not encompass the extraterritorial commercial bribery alleged here, as raised in his motion

to dismiss and at oral argument on the same." "Nor is there any indication in § 1346's legislative history that Congress intended the statute to reach such distinctly extraterritorial situations.")). Cf. Napout, 963 F.3d at 182-83 (rejecting Napout's claim he preserved a vagueness challenge; although certain arguments contained vagueness language, they were framed as a failure to prove that his receiving bribes breached his fiduciary duty).

Lopez's proposed jury instructions illustrate the accuracy of the district court's and government's understanding of his arguments: Lopez sought no instruction relating to the purported statutory limitation for which he now claims he always advocated. (DE:1783 at 25-33 (proposing no such limiting instruction)). Indeed, if, as Lopez now suggests, he was arguing all along for the court's post-trial, bright-line rule excluding from the statute's scope any "foreign commercial bribery" (and the government and the court simply misunderstood), then there is no excuse for Lopez's failure to request a jury instruction so limiting the statute's scope. A defendant cannot deliberately plant a poison pill into jury instructions and then rely on it as a basis for his post-trial acquittal. See United States v. Kosinski, 976 F.3d 135, 153 (2d Cir. 2020); United

States v. Agrawal, 726 F.3d 235, 259 (2d Cir. 2013); United States v. Polouizzi, 564 F.3d 142, 153 (2d Cir. 2009).

To be clear, the government does not believe that happened here—rather, Lopez's arguments transitioned from vagueness and extraterritoriality to a related, but distinct, argument about limited statutory scope post-Percoco. But it is inaccurate to suggest, as Lopez does, that what turned out to be the case-determinative issue has been at the forefront all along and that there was adequate opportunity for the relevant factual development and legal argument before the trial convictions were reversed on this basis.

II. **The Defendants Avoid or Mischaracterize Key Aspects of the Relevant Cases**

The defendants' treatment of the caselaw is similarly problematic. Those aspects of the governing cases that do not support their prosecutorial-overreach theme are ignored, while the defendants emphasize reliance on clearly distinguishable, nonbinding cases.

A. *Percoco* and *Abdelaziz* Did Not Charge Classic "Bribes"

Percoco is simply not the criticism of prosecutorial overreach the defendants claim it to be. The identified error with Percoco's § 1346 conviction was a longstanding overbroad jury instruction on duty, not the

13

government's trial theory or proof. The Supreme Court's decision permitted the government to re-try Percoco using a narrower duty instruction. Percoco, 598 U.S. at 329-30, 333.

The trial-conviction reversals in Percoco and the "Varsity Blues" case, United States v. Abdelaziz, 68 F.4th 1 (1st Cir. 2023), on which the defendants also rely, merely flesh out the principle articulated in Skilling v. United States, 561 U.S. 358, 401 (2010), that the honest-services wire fraud statute encompasses only bribe and kickback schemes. In both Percoco and Abdelaziz, the key issue was whether the corrupt payments were bribes accepted by someone owing a duty. A corrupt payment constitutes a "bribe" only if its purpose is to induce someone (the payee) who owes a duty to another to act in the interest of the payor rather than the person or entity to whom the payee owes the duty. See United States v. Rybicki, 354 F.3d 124, 139 (2d Cir. 2003) (en banc). In other words, in the absence of a breached duty, a corrupt payment is not a classic bribe.

The government did not charge a paradigmatic bribe in either Percoco or Abdelaziz. See Percoco, 598 U.S. at 329-30; Abdelaziz, 68 F.4th at 30 (noting that the alleged bribe was paid directly to the

14

purported victim); <u>cf.</u> <u>Skilling</u>, 561 U.S. at 413. Lopez elides this fact. (LB:34 ("The result in <u>Percoco</u> did not turn on whether the charged conduct involved 'bribery' in some general sense—no one disputed that.")). Percoco was a private citizen alleged to have taken a bribe in violation of a duty to the public. The relevant jury instruction was so broad as to capture legal payments to lobbyists lawfully acting within the bounds of their profession—<u>i.e.</u>, payments that are not bribes. As the Supreme Court held, there would have been no error had the jury been instructed more specifically on an agency relationship between Percoco and New York State, <u>Percoco</u>, 598 U.S. at 329-30, such that Percoco's acceptance of the same payment would have constituted a bribe. Indeed, the Court contemplated situations in which private individuals could enter into agreements that make them actual agents of the government and thus create a fiduciary duty between them and the government and the public it serves that would qualify under § 1346. <u>Id.</u> at 329-30. In <u>Abdelaziz</u>, wealthy parents relied on a corrupt college-admissions advisor's assistance to gain their children's admissions to colleges by lying about the children's athletic accomplishments and making large donations to the schools. Those payments, too, were not bribes because

15

the purported victims of the scheme (the schools) were also the payment recipients.  Abdelaziz, 68 F.4th at 27 ("The government's honest services fraud theory essentially charges the defendants with a non-traditionally recognized form of bribery.").

Percoco and Abdelaziz thus crystalized and clarified Skilling's holding that the honest-services wire fraud statute encompasses only bribe and kickback schemes.  In contrast to the facts in those cases, the corrupt payments here were made to induce the executives to act in the defendants' favor, despite the clear dictate from their organizations they could not accept bribes: a classic bribe scenario.

B.    *Percoco* Did Not Overrule *Bahel*,
       Which Is on All Fours With This Case

The defendants do not claim that Percoco overruled United States v. Bahel, 662 F.3d 610 (2d Cir. 2011).  This is fatal to their argument.  Bahel is on all fours with this case, particularly on the dispositive issue of fiduciary duty.  Both cases involved bribery of a foreigner working for an international organization whose member-countries agreed to a common set of rules, including ones prohibiting bribery.  The defendants' attempts to distinguish Bahel fall short.

16

Full Play focuses on the idea that there is "no evidence that Full Play bribed any soccer official who worked within the United States for a soccer association" (FPB:26), evidently interpreting the district court's rule precluding foreign commercial bribery from the ambit of § 1346 as a rule about the employee's physical location (e.g., FPB:61). But Bahel held that the identity of the actors is irrelevant and focused instead on the location of the wire fraud scheme. 662 F.3d at 632. Napout already held that the wire fraud schemes at issue in this case are domestic, 963 F.3d at 180-81, like the one in Bahel.

Lopez attempts to distinguish Bahel on the ground that "the organization there"—the United Nations—"was neither foreign nor commercial." (LB:37). This is both incorrect and beside the point. The UN is not a domestic organization. Although located in New York, the UN is technically not even on United States soil—its physical plant is international territory with extraterritorial status under U.S. law. See Brzak v. United Nations, 597 F.3d 107, 111-13 (2d Cir. 2010); Agreement regarding the Headquarters of the United Nations, June 26, 1947, No. 147, https://treaties.un.org/doc/Publication/UNTS/Volume%2011/volume -11-I-147-English.pdf (last visited Apr. 22, 2024). This Court noted the

UN's location within New York as one of many ways to distinguish it from the facts of <u>United States v. Giffen</u>, 326 F. Supp. 2d 497 (S.D.N.Y. 2004) (discussed further below), but did not hold that the UN is a domestic organization (clearly, it is not). It, like FIFA, is an international organization with agreed-upon rules acceded to by all member countries. The UN is also like FIFA in the sense that, while its founding mission is diplomatic rather than commercial, it engages in substantial commercial activity, including awarding contracts like those for which Bahel was bribed.

C. *Bahel* Rejected *Giffen*, Which Is Not Like This Case

The defendants insist this case is like <u>Giffen</u>. But other than being an outdated and unrepeated example of the pre-<u>Skilling</u> concerns regarding § 1346's vagueness, <u>Giffen</u> has no bearing on this case. <u>See</u> <u>Bahel</u>, 662 F.3d at 632 (deeming <u>Giffen</u> "unhelpful"); <u>Napout</u>, 963 F.3d at 184 (<u>Giffen</u> is "not . . . directly analogous").

<u>Giffen</u> was decided six years before <u>Skilling</u> cabined the reach of § 1346 to bribe and kickback schemes, when concerns about the statute's vagueness were at their apex, and <u>Morrison v. Australia National Bank, Ltd.</u>, 561 U.S. 247, 255 (2010), reinvigorated the

18

statutory presumption against extraterritoriality. <u>Giffen</u> rejected, on a motion to dismiss, a § 1346 charge based on the deprivation of honest services owed by two Kazakh government officials to their own citizenry. In stark contrast to this case, and lacking <u>Skilling</u>'s guidance, the indictment failed to allege any facts supporting that the officials had any duty of honest services to the Kazakh public. In the absence of allegations supporting the existence of such a duty, the government instead sought to engraft the American notion of honesty in public service onto the Kazakhs.

This case is a far cry from <u>Giffen</u>. It does not unfairly engraft anything on anyone—the bribed executives chose to represent countries in international organizations that acceded to a set of rules agreed upon by all member-countries prohibiting bribery. The bribed executives fraudulently misrepresented their compliance with those rules, and the defendants aided them in their efforts to keep the payments secret. Much of the misconduct occurred in the United States, including the wires transmitting the bribes. This Court has endorsed the theory of this case in <u>Napout</u>, 963 F.3d at 182, while dismissing <u>Giffen</u> as irrelevant and inapplicable, <u>see</u> <u>Bahel</u>, 662 F.3d at 632 ("<u>Giffen</u> does not dictate the

19

outcome of this case, . . . this Court has not itself so construed § 1346").
Giffen does not do the work that the defendants claim.

> D.    *Percoco* Did Not Abrogate *Napout*, Which
> Relied on the Codes as Evidence of Duty

As they did with Bahel, the defendants do their best to avoid
Napout's most obvious propositions.  Lopez argues that "[b]y holding that
the FIFA and CONMEBOL codes of ethics sufficed to prove a fiduciary
relationship, the Napout Court did not hold that such documents
established the requisite element for § 1346."  (LB:44-45).  Full Play
argues that they are "not challenging whether the government's evidence
was sufficient to establish that soccer officials . . . were subject to their
foreign employers' codes of ethics" but rather whether "any such
relationships between foreign employees and their foreign employers,
even if they would create a fiduciary relationship under Anglo-American
common law, are insufficient evidence of the intangible right of honest
services . . . ."  (FPB:54-55).  But no amount of twisting and turning can
avoid this passage of Napout:

> The appellants' sufficiency argument miscasts the
> fiduciary duty they were convicted of breaching.
> The appellants were not prosecuted for breaching
> a fiduciary duty created by Paraguayan law—or

Brazilian, Swiss or U.S. law, for that matter. The government alleged, and the jury found, that the appellants' conduct of accepting bribes had violated the fiduciary duty they owed to FIFA and CONMEBOL under the organizations' codes of ethics. In other words, the "fiduciary duty"—the legal obligation to provide "honest services"—that the appellants owed to their employer, the breach of which, accomplished by wire fraud, was the crime for which they were convicted, arose from their acceding to FIFA and CONMEBOL's rules, not the provision of the law of any state or country. And the government's evidence was easily sufficient to prove that FIFA and CONMEBOL's respective codes of ethics expressly provided that persons bound by those codes, including, inter alia, that all soccer officials, such as Marin and Napout, had a fiduciary duty to FIFA and the confederations such as CONMEBOL, and were required to act with absolute loyalty to them. Accordingly, the existence of a fiduciary relationship between the employees and their employer was beyond dispute.

Napout, 963 F.3d at 184-85. This passage, coupled with this Court's confirmation in United States v. Avenatti, 81 F.4th 171 (2d Cir. 2023) (discussed below), that Percoco does not require more than a smattering of pre-McNally[4] cases addressing a particular duty source when the duty

_____

[4] In McNally v. United States, 483 U.S. 350 (1987), the Supreme Court ruled that the deprivation of honest services was not

is clear, and <u>Bahel</u>'s confirmation that a code-based fiduciary source is appropriate in the context of international organizations, is fatal to the defendants' arguments.

On the grounds that nothing was remanded to the district court following the <u>Napout</u> mandate because this Court denied the <u>Napout</u> defendants' appeal, the defendants take issue with the government referring to the district court's disregard of this passage as a violation of the "mandate rule." (LB:43; FPB:53). The government was invoking the longstanding principle that "[w]hen an appellate court has once decided an issue, the trial court, at a later stage in the litigation, is under a duty to follow the appellate court's ruling on that issue, and is precluded from altering the appellate decision." <u>United States v. Cirami</u>, 563 F.2d 26, 32 (2d Cir. 1977); <u>see also</u> <u>United States v. Tenzer</u>, 213 F.3d 34, 40 (2d Cir. 2000) (referring to this <u>Cirami</u> quote as "the mandate rule"). However phrased, it was clearly erroneous for the district court to not acknowledge <u>Napout</u>'s Rule 29 analysis, quoted above, when the

---

within the reach of the mail fraud statute. Congress responded by passing § 1346.

same issue—sufficiency of the evidence—regarding the identical codes were at issue at a "later stage" of the same "litigation." <u>Cirami</u>, 563 F.2d at 32. The defendants fixate on the term "mandate rule," without responding to the fundamental point: <u>Napout</u> is not merely law of the Circuit, but also law of the case.

E. Dismissive Adjectives Cannot Overcome *Avenatti*'s Analysis that a Pre-*McNally* Analogue Is Unnecessary

<u>Avenatti</u>, 81 F.4th 171, eviscerates the defendants' theory that more than a smattering of pre-<u>McNally</u> cases addressing a particular duty source is required for an honest-services conviction to stand. Full Play's observations about <u>Avenatti</u> (FPB:40-41) concede the government's point that <u>Percoco</u>, by its plain language, only requires a pre-<u>McNally</u> analogue in unclear circumstances. <u>See</u> <u>Percoco</u>, 598 U.S. at 328-29 (§ 1346 "should not be held to reach an ill-defined category of circumstances simply because of a smattering of pre-<u>McNally</u> decisions"); <u>cf.</u> <u>Abdelaziz</u>, 68 F.4th at 27 (looking to pre-<u>McNally</u> precedent where government charged "non-traditionally recognized form of bribery"). This Court in <u>Avenatti</u> pointed to no pre-<u>McNally</u> case for the obvious proposition that an attorney owes a duty to his client. 81 F.4th at 194

23

n.27. Nor must the government point to a pre-McNally case for the obvious proposition that an executive owes a duty to not accept bribes where he represents a member-nation of an international organization and all such member-organizations have agreed and publicly announced that the executives owe such a duty and will not take bribes. See Bahel, 662 F.3d at 617. Full Play's resort to dismissing the government's reliance on Avenatti for this proposition as "silly," "bizarre[]" and "struthious[]" (FPB:40-41), rather than actually engaging with the argument, reveals its position's weakness.

## III. The Defendants' Reliance on the Federal Bribery Statutes Is Unavailing

The defendants' argument that "Congress's adoption of specific and limited bribery statutes further undermines the government's argument that § 1346 covers all bribery worldwide" (LB:27), lays another pointless blow on a strawman. Nowhere does the government suggest that "§ 1346 covers all bribery worldwide." This appeal addresses the narrow circumstance of an international organization's code acceded to by all member-countries to unify the worldwide governance of a sport under one agreed-upon set of rules. In

any event, the defendants' analysis of the federal bribery statutes is flawed.

As a threshold problem, the defendants assume, without the support of a case holding, that § 1346 should be read in pari materia with the federal bribery statutes. But the wire fraud statute is not a bribery statute, and § 1346 was not drafted as a bribery statute, although the Supreme Court in Skilling later limited its application to bribe and kickback schemes. This Court in Napout addressed the focus of the wire fraud statute:

> In Bascuñán v. Elsaca, 927 F.3d 108 (2d Cir. 2019), we made clear that the conduct regulated by § 1343 – that is, the statute's focus – was not merely a scheme to defraud, but more precisely the use of the . . . wires in furtherance of a scheme to defraud. . . . [Honest-services wire fraud] is not something different from wire fraud; it is a type of wire fraud that is explicitly prohibited by that statute. The statute includes a provision specific to honest[-]services wire fraud not because it is in some essential aspect different from other wire fraud, but to clarify the application of the law of wire fraud to honest services fraud.

Napout, 963 F.3d at 179 (holding that "the use of the . . . wires must be essential" to the scheme to avoid "haul[ing] essentially foreign allegedly fraudulent behavior into American courts"). In other words, "what is

proscribed is [the] use of the telecommunications systems of the United States in furtherance of a scheme" to defraud.  United States v. Trapilo, 130 F.3d 547, 552 (2d Cir. 1997) (noting that the "identity and location of the victim" are "irrelevant").  Although the means of defrauding someone under an honest-services theory is limited to bribery and kickback schemes, that does not render the wire fraud statute a bribery statute that must be read in pari materia with all other bribery statutes.  They vindicate substantially different interests.

Even assuming that the wire fraud statute must be read in pari materia with the federal bribery statutes, the defendants' analysis still falls short.  The defendants observe that 18 U.S.C. §§ 201 and 666 by their own terms apply only domestically as evidence that Congress intended § 1346 to apply only domestically.  This argument ignores that there are other pre-McNally federal bribery statutes, such as 18 U.S.C. § 215, which criminalizes bribery of bank officials, that are not so limited. Cf. Abdelaziz, 68 F.4th at 30-32 (noting § 215 explicitly excluded from its ambit bribes paid to the principal, and relying on that to conclude that payments to the victim universities were not a "bribe").  Nor is § 1346 so textually limited.

The defendants then argue that the existence of the Foreign Corrupt Practice Act ("FCPA"), 15 U.S.C. § 78dd-1, et seq., is evidence that § 1346 does not apply to foreign commercial bribery. (LB:28). This ignores the history and purpose of both laws.

The FCPA, in broad strokes, criminalizes bribery of foreign public officials by companies (and their employees) that trade their securities on U.S. exchanges, and related recordkeeping violations. The statute is codified in Title 15—the title addressing commerce and trade—not Title 18, the criminal statutes. The U.S. Securities and Exchange Commission and Department of Justice have co-extensive jurisdiction over the statute. Id. This is because, principally, the misconduct Congress was concerned with when it passed the FCPA in 1977 was U.S. companies lying to their U.S. shareholders, through falsified books and records, about funneling money to foreign public officials to obtain business opportunities. See Foreign Payments Disclosure: Hearings Before the Subcomm. on Consumer Prot. and Fin. of the H. Comm. on Interstate and Foreign Commerce, 94th Cong. 1-2 (1976) (statement of Rep. John M. Murphy, Chairman, Subcomm. on Consumer Prot. and Fin., H. Comm. on Interstate and Foreign Commerce). Numerous

instances of large U.S. corporations bribing foreign public officials and lying about it on their public accounting statements came to light—evidently for the first time—during the Watergate investigation in the early to mid-1970s, including with respect to defense contractor Lockheed Martin, which was bribing high-ranking ministers of Japan and Italy. See id. at 2.  This conduct by U.S. corporations was viewed as a national security threat that undermined the United States' efforts to fight communism abroad.  See id.; Unfair Corporate Payments Act of 1977: Hearings Before the Subcomm. On Consumer Prot. and Fin. of the H. Comm. on Interstate and Foreign Commerce, 95th Cong. 168-69 (statement of Rep. Michael J. Harrington) (hereinafter "Unfair Corporate Practices Hearing"); id. at 172-73 (statement of Rep. Stephen J. Solarz). Notably, during the hearings that led to the passage of the FCPA, several government officials noted that the SEC and IRS had referred to the Department of Justice numerous criminal investigations of foreign bribery by U.S. companies.  See Unfair Corporate Practices Hearing at 22 (statement of Assistant Attorney General Patricia Wald); id. at 176 (statement of Secretary of Treasury W. Michael Blumenthal); id. at 184-85; see also id. at 235 (statement of Chamber of Commerce opposing

proposed bill because it would do little to deter such bribe payments beyond what securities, tax and criminal laws already do).

Under the FCPA, unlike under the wire fraud statute, the government can prosecute cash bribes occurring overseas, or wire transfers in foreign currencies that never travel through the United States, or other extraterritorial schemes, provided they involve a company whose shares are traded on an American stock exchange. Moreover, although honest-services fraud contemplates "official action on a specific and focused question or matter," United States v. Skelos, 988 F.3d 645, 656 (2d Cir. 2021), no such "official act" quo is needed in an FCPA prosecution, see United States v. Ng Lap Seng, 934 F.3d 110, 134 (2d Cir. 2019).

Simultaneously with the FCPA being passed, U.S. Attorney's Offices were in fact charging such misconduct under the mail and wire fraud statutes until prosecutions under the FCPA became more widespread. These cases, and particularly their press coverage, are cited in the government's brief on pages 80 and 81 to demonstrate their ubiquity at the time of the FCPA's passage. Clever insults aside (see LB:39 ("That argument has the distinct ring of scraping the bottom of the

29

barrel"); FPB:46 ("fool's gold")), the defendants fail to engage with the well-publicized existence of these prosecutions, which undermines the argument that the FCPA was passed because no one contemplated prosecuting such cases using the wire fraud statute.

Indeed, the Senate understood that the pre-McNally mail and wire fraud statutes criminalized use of the mails and wires in furtherance of bribing foreigners owing fiduciary duties abroad and considered whether to limit those statutes' application in the case of foreign bribery of public officials. During the three Congresses immediately preceding McNally (before the Supreme Court's rejection of the intangible-rights theory), the Senate proposed bills amending the FCPA. Each of those bills contained amendments that would have expressly precluded the application of mail and wire fraud statutes to foreign bribery of public officials now covered by the FCPA. See S. 430, 99th Cong., 2d Sess. § 7 (1985). The Senate of the 97th Congress in fact passed the 1981 version, although the House of Representatives did not. The inclusion of the proposed FCPA amendment in the pre-McNally Senate bills would have been pointless if honest-services fraud before McNally did not encompass violations of foreign fiduciary duties.

Lopez's reliance on Congress's recent passage of the Foreign Extortion Prevention Act ("FEPA"), Pub. L. 118-31, Div. E, Title LI, § 5101, 137 Stat. 931 (2023), fares no better. The two statutes are far from concentric circles. As with the FCPA, FEPA has only partial overlap with the wire fraud statute and vindicates different interests. FEPA enables the Department of Justice to prosecute kleptocrats and other corrupt foreign officials residing in foreign countries who solicit bribes from U.S. companies. In a pure solicitation case, just as one example, there would be no integral U.S. wires such that the conduct could be prosecuted using the wire fraud statute. Nor is it clear that, unlike here where there is strong proof of a duty through reference to a written code adopted by all of the international organization's member countries, the government would be able to establish that a kleptocrat or public official owed a duty to his country's public, particularly in countries without well-developed democratic regimes (as was the problem in <u>Giffen</u>), although such conduct would be covered by FEPA.

IV. <u>Lopez's Alternative Claim for Affirmance Is Meritless</u>

Lopez claims that the government did not introduce evidence that the conspiracy was calculated to deceive CONMEBOL, which he

insists is necessary for his conviction to stand. This argument is unavailing.

To convict the defendants of conspiring to commit honest-services wire fraud, the jury need not have found that their scheme was calculated to defraud just CONMEBOL. Rather, the defendants were charged with conspiring to "devise a scheme and artifice to defraud FIFA and CONMEBOL and their constituent organizations." (DE:1963 at 33). As the district court instructed the jury, "the word 'and' really means 'or' in this context," such that the "Government need only prove that the Defendants agreed to device a scheme or artifice to defraud FIFA or CONMEBOL or their constituent organizations." (Id. at 34). Accordingly, even if the scheme were not calculated to defraud CONMEBOL (and it was), it would suffice that at least one of the purposes of the scheme—"whether primary or secondary," Anderson v. United States, 417 U.S. 211, 226 (1974)—was designed to defraud FIFA, FIFA's constituent organizations, or CONMEBOL's constituent organizations.

The government proved beyond a reasonable doubt that the defendants' scheme was calculated to do all those things. Congress

32

defined the term "defraud" as "to deprive another of the intangible right of honest services," 18 U.S.C. § 1346, which means to "accept[] bribes," Skilling, 561 U.S. at 412. As explained above, a reasonable jury could have found that the defendants conspired to participate in a scheme where soccer officials did in fact take, and promised to undertake official action on specific soccer rights contracts and counteroffers "as the opportunities arose." United States v. Reichberg, 5 F.4th 233, 247-48 (2d Cir. 2021). Their actions in signing undervalued contracts and protecting them from counteroffers, in exchange for the defendants' and their coconspirators' ongoing payment of bribes, deprived soccer organizations of the opportunity to capitalize on the skyrocketing market for soccer rights—money that would have inured to the benefit of the entire confederation, including national teams, youth leagues, and development programs. (See, e.g., T:272:11-17; accord T:5078:22-5079:14 (former ESPN president John Skipper testimony detailing growing value of soccer broadcasting rights following 2010 World Cup)). The defendants offer no cases suggesting that an honest-services wire fraud conviction requires more "decei[t]" than the exploitation of an organization's agents through the payment and promise of bribes. (LB:58).

As the government proved, and as the jury recognized, the defendants' lies and deception—through coverups, sham contracts, secret ledgers, off-books money, and other means—were calculated not only to fool third-party "banks, auditors, business partners or government authorities." (LB:60). They also were designed to fool the governing bodies of international soccer—and they worked. As FIFA legal counsel Lara Elliott testified, between 2010 and 2015, the conspirators' bribery scheme was never disclosed to FIFA's executive committee (T:299:2-8)— the body that oversaw the adoption and implementation of the FIFA code of ethics, which prohibited the very bribery at the heart of this case (see GA:1305-08, 1329-1483). That testimony was corroborated by coconspirator and former Colombian football president Luis Bedoya, who told the jury that he hid his bribes from FIFA, CONMEBOL, and his own federation. (T:4669:6-13). The deception was for good reason: When corruption was made public, soccer officials were forced to resign. (See, e.g., T:965:19-966:24, 1236:3-17).

Lacking evidence of institutional (as opposed to individual) knowledge, Lopez conflates CONMEBOL with its leaders. (See, e.g., LB:61). But they are not one and the same. CONMEBOL consists of 10

34

member national associations, beyond the presidents who formed its leadership. (See, e.g., T:268:9-269:5, 370:14-21). Their constituencies are comprised of the national and club soccer teams who rely on CONMEBOL and their country's representative to ensure adequate payment and resources for their participation in soccer tournaments. (T:989:6-990:1, 1009:2-1011:16). That many (but not all) of these 10 presidents accepted bribes does not negate the fact that the scheme was designed to deceive—and, indeed, defraud—the confederation, its umbrella organization (FIFA), and its constituent national associations. Bedoya testified that he hid the corruption from "CONMEBOL" because the bribes he accepted were "ill-gotten." (T:4717:8-12). His account is consistent with other witness testimony detailing how the push for secrecy originated with certain CONMEBOL officials. (See, e.g., T:3351:5-6 (Peña testimony that bribes were kept secret "because the request of the soccer officials to my bosses asked to keep them confidential"); T:4716:11-4717:7 (Bedoya testimony recalling conversation with Napout saying that bribes "have to be kept very secret")). Indeed, as Burzaco testified, two CONMEBOL officials (Sebastián Bauzá and Harold Mayne-Nicholls) were "not receiving bribes from T&T Cayman for the Copa Libertadores" (T:619:8-

35

11), and Mayne-Nicholls refused to sign the original CONMEBOL contract that Full Play procured through bribery (T:4686:2-16), reinforcing the notion that participation in corruption by certain CONMEBOL officials is not the same as participation by CONMEBOL in that corruption.

Finally, Lopez ignores that the scheme by design deceived CONMEBOL in part by obscuring Fox's institutional role in the bribery. Bedoya testified that he did not initially understand which entity acquired the Copa Libertadores broadcasting rights from CONMEBOL. (T:4704:12-4705:6). Nor did he understand that Fox owned the Fox Joint Venture, T&T Cayman. (T:4705:7-9). His confusion was understandable: Fox executives were publicly lying about the company's role as a joint venture partner in T&T Cayman to obscure their involvement in a corrupt entity. (See GX-959-T ("[Q:] What is the relationship between T&T and Fox Sports? [Martinez]: We purchase the rights from T&T, which they purchased from Conmebol."); accord GX-2011-T (copy of article sent to Bedoya, Napout, and Sergio Jadue)).

CONCLUSION

For the reasons stated above and in the government's brief dated January 2, 2024, this Court should vacate the judgments of acquittal as to Lopez and Full Play; reinstate the jury verdicts as to Lopez and Full Play; and remand for further proceedings.

Dated:     Brooklyn, New York
           April 23, 2024

                              Respectfully submitted,

                              BREON PEACE,
                              United States Attorney,
                              Eastern District of New York.

              By:    _____/s/_____
                              KAITLIN T. FARRELL
                              Assistant U.S. Attorney

AMY BUSA,
DAVID C. JAMES,
KAITLIN T. FARRELL,
ROBERT T. POLEMENI,
VICTOR ZAPANA,
ERIC SILVERBERG,
LORENA MICHELEN,
Assistant United States Attorneys,
      (Of Counsel).

### CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Second Circuit Rule 32.1(a)(4) because the brief contains 6,945 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

Dated:  Brooklyn, New York
       April 23, 2024

                    /s/
                    _____
                    AMY BUSA
                    Assistant U.S. Attorney