23-7183-cr (L)
*United States v. Lopez*

# In the
# United States Court of Appeals
## For the Second Circuit

————

AUGUST TERM 2024

ARGUED: JANUARY 8, 2025
DECIDED: JULY 2, 2025

Nos. 23-7183-cr (L); 23-7186-cr (CON)

UNITED STATES OF AMERICA,
*Appellant,*

*v.*

HERNÁN LOPEZ, FULL PLAY GROUP, S.A.,
*Defendants-Appellees.*[*]

————

Appeal from the United States District Court
for the Eastern District of New York.

————

Before: WALKER, ROBINSON, and MERRIAM, *Circuit Judges.*

————

Following a lengthy trial, Defendants-Appellees Hernán
Lopez, a top executive at Twenty-First Century Fox, and Full Play
Group, S.A., a South American sports marketing company, were each
convicted of conspiracy to commit honest services wire fraud in

————

[*] The Clerk of Court is respectfully directed to amend the caption as set
forth above.

23-7183-cr (L)

connection with their involvement in a notorious FIFA corruption scandal. Each Defendant then moved under Rule 29(c) of the Federal Rules of Criminal Procedure for a judgment of acquittal, principally arguing that, as a matter of statutory construction, honest services wire fraud under 18 U.S.C. § 1346 did not criminalize their conduct.

Although the district court (Chen, *J.*) had previously denied pre-trial motions to dismiss the indictment that raised similar arguments, it granted Defendants' post-trial motions. The district court reasoned that, following the Supreme Court's decisions in *Percoco v. United States*, 598 U.S. 319 (2023), and *Ciminelli v. United States*, 598 U.S. 306 (2023), honest services fraud did not encompass Defendants' conduct and therefore the evidence adduced at trial was insufficient to sustain Defendants' convictions.

For the reasons that follow, we hold that the district court erred in concluding that Defendants' conduct did not fall within the ambit of § 1346. We therefore **VACATE** the judgments of the district court and **REMAND** for further proceedings consistent with this opinion.

————

KAITLIN T. FARRELL (Amy Busa, David C. James, Robert T. Polemeni, Victor Zapana, Eric Silverberg, Lorena Michelen, *on the brief*), Assistant United States Attorneys, *for* Joseph Nocella, Jr., United States Attorney for the Eastern District of New York, NY, *for Appellant United States of America*.

ALEXANDRA A.E. SHAPIRO, Shapiro Arato Bach LLP, New York, NY (Daniel J. O'Neill, Theodore

23-7183-cr (L)

Sampsell-Jones, Shapiro Arato Bach LLP, New York, NY; John Gleeson, David Sarratt, Joshua N. Cohen, Debevoise & Plimpton LLP, New York, NY, *on the brief*), *for Defendant-Appellee Hernán Lopez*.

MICHAEL MARTINEZ, Gibson, Dunn & Crutcher LLP, New York, NY (Roy T. Englert, Jr., Chloe C. Bootstaylor, Kramer Levin Naftalis & Frankel LLP, Washington, DC; Matthew M. Madden, Hogan Lovells US LLP, Washington, DC; Mayling C. Blanco, Katey L. Fardelmann, Norton Rose Fulbright US LLP, New York, NY; Carlos Ortiz, Kayley B. Sullivan, Baker Hostetler, New York, NY; William Devaney, Baker McKenzie, New York, NY, *on the brief*), *for Defendant-Appellee Full Play Group, S.A.*

Casey E. Donnelly, Michael S. Schachter, Willkie Farr & Gallagher LLP, New York, NY, *for amicus curiae New York Council of Defense Lawyers*.

————

JOHN M. WALKER, JR., *Circuit Judge*:

Following a lengthy trial, Defendants-Appellees Hernán Lopez, a top executive at Twenty-First Century Fox, and Full Play Group, S.A., a South American sports marketing company, were each convicted of conspiracy to commit honest services wire fraud in connection with their involvement in a notorious FIFA corruption scandal. Each Defendant then moved under Rule 29(c) of the Federal Rules of Criminal Procedure for a judgment of acquittal, principally

3

23-7183-cr (L)

arguing that, as a matter of statutory construction, honest services wire fraud under 18 U.S.C. § 1346 did not criminalize their conduct.

Although the district court (Chen, *J.*) had previously denied pre-trial motions to dismiss the indictment that raised similar arguments, it granted Defendants' post-trial motions.  The district court reasoned that, following the Supreme Court's decisions in *Percoco v. United States*, 598 U.S. 319 (2023), and *Ciminelli v. United States*, 598 U.S. 306 (2023), honest services fraud did not encompass Defendants' conduct and therefore the evidence adduced at trial was insufficient to sustain Defendants' convictions.

For the reasons that follow, we hold that the district court erred in concluding that Defendants' conduct did not fall within the ambit of § 1346.  We therefore **VACATE** the judgments of the district court and **REMAND** for further proceedings consistent with this opinion.

**BACKGROUND**

## I.    Factual Background

### A.    Relevant People and Organizations

Defendant Lopez, an American citizen and resident, held, until 2016, top executive positions at Twenty-First Century Fox ("Fox"), an American media conglomerate.  He ran Fox's Latin American division until he was promoted to run Fox's entire international division.  Defendant Full Play is a private sports marketing company incorporated in Uruguay with its principal office in Argentina.

The Fédération Internationale de Football Association ("FIFA") is the international body governing organized soccer.  FIFA is a nonprofit entity organized under Swiss law and headquartered in

23-7183-cr (L)

Zurich, Switzerland. It comprises over 200 member associations, each representing organized soccer in a particular nation or territory, including the United States. To become a member of FIFA, an association must first join one of six continental confederations, which include the Confederación Sudamericana de Fútbol ("CONMEBOL") (the South American confederation), headquartered in Paraguay, and the Confederation of North, Central American, and Caribbean Association Football ("CONCACAF"), headquartered in the United States.

As a condition of membership in FIFA, member associations agree to be bound by FIFA's statutes and code of ethics. FIFA's written code of ethics was introduced in 2004 and prohibits officials (defined to include executives of FIFA, its continental confederations, and member associations) from accepting bribes or otherwise abusing their positions of power for personal gain. The code also imposes on officials a duty of "absolute loyalty" to FIFA. Gov. App'x 114. Many confederations, including CONMEBOL, have also adopted their own ethics codes that prohibit officials from using their positions to obtain personal benefits and require "absolute loyalty" to CONMEBOL, FIFA, and the associations. *Id.* at 567. CONMEBOL's code of ethics was adopted in 2013.

Both FIFA and the continental confederations host and own the broadcast and media rights to popular international soccer tournaments. For example, FIFA hosts the World Cup tournament, the most watched sporting event in the world,[1] in which teams from

---

[1] According to FIFA, the 2022 Men's World Cup final reached an average live audience of 571 million viewers across the globe. Felix Richter, *Super Bowl Pales in Comparison to the Biggest Game in Soccer*, STATISTA (Feb. 6, 2025), https://www.statista.com/chart/16875/super-bowl-viewership-vs-world-cup-

5

23-7183-cr (L)

all six confederations compete every four years for the title of world champion. CONMEBOL hosts the Copa América tournament, another popular quadrennial event with teams from each of CONMEBOL's ten South American countries plus invited teams from outside the region. CONMEBOL also hosts the Copa Libertadores, an annual tournament involving the region's club teams. Additionally, the six confederations each organize World Cup qualifier matches (where teams compete to qualify for the World Cup), and individual national associations organize matches between national or club teams, referred to as "friendlies." Gov. App'x 463.

FIFA, CONCACAF, CONMEBOL, and the individual member associations typically contract with sports marketing companies, such as Full Play, to transfer the highly lucrative rights to their soccer events. Those companies then sell the rights to television and radio networks, which broadcast games, as well as to sponsors and licensees.

### B.     The Schemes

Corruption in international soccer is not new. It was rampant for decades before the events at issue here. This case concerns Lopez's and Full Play's participation in bribery schemes for the media rights

---

final/#:~:text=Speaking%20of%20football%2C%20soccer%2C%20i.e.,international%20audience%20of%2062.5%20million [https://perma.cc/G9FS-CYWP]. This popularity is not unique to men's soccer. Women's soccer is also very popular around the world, with the most recent Women's World Cup final, held in 2023, drawing a global live audience of 67.6 million viewers and reaching over 222 million people across various platforms. *See FIFA Women's World Cup Australia & New Zealand 2023: Global engagement and audience detailed report*, FIFA, https://digitalhub.fifa.com/m/efa90ed1ddbe3bf/original/FIFA-Women-s-World-Cup-Australia-New-Zealand-2023-Global-Engagement-Audience-Detailed-Report.pdf at 18, 19 (last visited June 12, 2025) [https://perma.cc/N5PH-4A9L].

23-7183-cr (L)

to the Copa América and the Copa Libertadores tournaments, as well as World Cup qualifiers and friendlies.

The government adduced evidence that, between 2009 and 2015, Full Play bribed the federation presidents of Paraguay, Bolivia, Colombia, Venezuela, Peru, and Ecuador (known as the "Group of Six") in exchange for the media rights to their federations' respective World Cup qualifiers and friendly matches, some of which were played in the United States. Full Play used United States dollars and bank accounts to fund these bribes.

Between 2010 and 2015, Full Play also bribed the Group of Six and CONMEBOL officials in connection with the Copa América tournament.[2] And, between 2000 and 2015, Full Play helped another media company, T&T Sports Marketing, Ltd. ("T&T"),[3] transmit millions of dollars in bribes to the Group of Six in connection with Copa Libertadores media rights, so that Full Play could further solidify its relationships with the officials. Many of these payments were wired through United States bank accounts.

To conceal these bribes from authorities, Full Play used code names on ledgers and encouraged bribe recipients to move their bank accounts from American banks to overseas banks. Evidence also

---

[2] The government submitted evidence that Full Play had also promised a $10 million bribe to the head of CONCACAF in connection with the Copa América Centenario—a 2016 soccer tournament organized by CONMEBOL and CONCACAF among South American, Central American, and North American national teams, hosted in the United States—but Full Play's owners were indicted before the tournament took place and before any payments were made.

[3] T&T was a joint venture of Fox and Torneos y Competencias, an Argentinian sports media company. The government alleged that T&T was used "as a pass-through vehicle" to purchase Copa Libertadores media rights from CONMEBOL, after which the rights were sold to Fox at cost. Gov. App'x at 166.

showed that Full Play's owners met in the United States to discuss how to make their illegal payments appear legitimate.

As for Lopez, the government alleged that he was involved only in the Copa Libertadores scheme. It submitted that he had studied T&T's Copa Libertadores media rights contracts and understood that T&T was likely paying bribes to secure those contracts, which he identified as being undervalued and containing unusually long terms. In 2011, after Lopez confirmed with the head of Torneos y Competencias, Alejandro Burzaco, that T&T was indeed using bribery to obtain media rights, Lopez's division of Fox acquired 75% of the economic rights to T&T. Lopez intervened in the due diligence process for the acquisition to ensure that auditors' red flags did not stymie the deal.

For the next three years, Lopez "perpetuated, protected, and hid the bribes," which were funded by Fox. Gov. Br. at 24. Throughout this time, Lopez held meetings in the United States with coconspirators to effectuate the scheme. The government's evidence also demonstrated how Lopez exploited his relationship with bribed executives to benefit his own career. In late 2011, for example, Lopez obtained from a top FIFA executive inside information to help Fox outbid a competitor for the broadcasting rights to the 2018 and 2022 World Cups.

In 2014, Lopez attempted to cover up the bribes by bringing whistleblower allegations to Fox, resulting in an audit that he was, in large part, able to control. Later, with Carlos Martinez (a subordinate to Lopez) and Burzaco, he devised a contract to minimize the paper trail of bribes traceable to Fox while maintaining payments to soccer

23-7183-cr (L)

executives, but the government's first indictment was unsealed before the contract was finalized.

## II.    Procedural Background

### A.    Initial Indictment and 2017 Trial

In May 2015, the government indicted numerous FIFA, CONMEBOL, and CONCACAF officials, as well as sports marketing executives, for their alleged participation in bribery schemes. Many defendants pleaded guilty.

In November 2017, trial proceeded against three defendants, Juan Ángel Napout (former CONMEBOL president and Paraguayan soccer executive), José Maria Marin (former president of the Brazilian national association), and Manuel Burga (Peruvian soccer executive); Napout and Marin were convicted, and we affirmed the convictions on appeal. *See United States v. Napout*, 963 F.3d 163, 168, 190 (2d Cir. 2020).

On March 18, 2020, the grand jury returned a third superseding indictment, adding charges against Full Play, Lopez, and Martinez. The indictment charged Lopez and Full Play with, *inter alia*, wire fraud conspiracy and substantive wire fraud arising out of the Copa Libertadores scheme. The indictment also charged Full Play with additional counts of wire fraud conspiracy and wire fraud arising out of the bribery schemes to obtain media rights to the World Cup qualifiers, friendly matches, and Copa América.

### B.    Motions to Dismiss the Indictment

Before trial, Full Play and Lopez each moved to dismiss the indictment on several grounds, including that the honest services

wire fraud charges were unconstitutionally vague as applied to them. *See United States v. Full Play Grp., S.A.*, No. 15-CR-252, 2021 WL 5038765, at *4 (E.D.N.Y. Oct. 29, 2021). The district court denied the motions. *Id.* at *1, *15.

The district court had "no trouble rejecting Defendants' . . . vagueness arguments" in view of *Skilling v. United States*, 561 U.S. 358 (2010), "as well as Second Circuit precedent both before and after *Skilling*." *Full Play Grp.*, 2021 WL 5038765, at *6. It reasoned that the schemes at issue—*i.e.*, bribery schemes—were, under *Skilling*, undoubtedly covered by the honest services fraud statute, 18 U.S.C. § 1346. *Id.* The district court further rejected Defendants' argument that the alleged breaches of fiduciary duty were not cognizable under § 1346. *Id.* at *7 ("As a general principle, '[t]he "existence of a fiduciary relationship" between an employee and employer is "beyond dispute," and the violation of that duty through the employee's participation in a bribery or kickback scheme is within the core of actions criminalized by § 1346.'" (quoting *United States v. Nouri*, 711 F.3d 129, 137 n.1 (2d Cir. 2013))). Lastly, the district court rejected Defendants' argument that § 1346 was not intended to reach foreign bribery schemes. *Id.* In so doing, it relied on *United States v. Bahel*, 662 F.3d 610 (2d Cir. 2011), which upheld the honest services fraud conviction of a foreign employee of the United Nations who had accepted bribes from a foreign vendor. *Id.*

### C.    2023 Trial

Trial commenced in January 2023. After the government rested its case, Defendants orally moved for acquittal under Federal Rule of Criminal Procedure 29(a), and the district court reserved decision.

23-7183-cr (L)

On March 9, 2023, a jury found Full Play and Lopez guilty on all counts tried against them, including conspiracy to commit honest services wire fraud.[4]

### D.    Post-Trial Rule 29 Motions

After trial, Lopez and Full Play renewed their motions for acquittal pursuant to Federal Rule of Criminal Procedure 29(c), arguing that the evidence presented at trial was insufficient to sustain their convictions.  This time, the district court granted their motions. *United States v. Full Play Grp., S.A.*, 690 F. Supp. 3d 5, 8 (E.D.N.Y. 2023); *see also* Special App'x 1–55.

The district court concluded that "§ 1346 does not criminalize the conduct alleged in this case and that therefore the evidence at trial was insufficient to sustain Defendants' convictions under that statute." *Full Play Grp.*, 690 F. Supp. 3d at 25.  It observed that *Ciminelli v. United States*, 598 U.S. 306 (2023), and *Percoco v. United States*, 598 U.S. 319 (2023), two Supreme Court decisions issued while the Rule 29 motions were being briefed, "signal[led] limits on the scope of the honest services wire fraud statute." *Full Play Grp.*, 690 F. Supp. 3d at 8.  It further reasoned that there was an absence of cases decided before *McNally v. United States*, 483 U.S. 350 (1987),[5] that applied

---

[4] Defendants were also charged with, and convicted of, money laundering conspiracy.  And although Defendants were charged with substantive fraud and racketeering, the government ultimately did not proceed to trial on those counts.

[5] As discussed further below, *McNally* held that the federal mail fraud statute, 18 U.S.C. § 1341, was confined to the protection of property rights and thus did not reach the intangible right to honest services.  483 U.S. at 356.  *McNally* was later abrogated by the enactment of § 1346.

honest services wire fraud to foreign commercial bribery[6]; that this court viewed as unsettled the question of "'whether a foreign employee's duty to his foreign employer qualifies as an actionable element under § 1346'"; that *Ciminelli* and *Percoco* strongly discouraged expanding the reach of the federal wire fraud statutes; and that no Second Circuit precedent compelled the conclusion that the conduct at issue fell within the scope of § 1346. *Id.* at 33–37 (quoting *Napout*, 963 F.3d at 184).

Judgments of acquittal as to Lopez and Full Play were entered on September 12, 2023. The government timely appealed.

## DISCUSSION

On appeal, the government challenges the district court's post-trial Rule 29 ruling on the basis that the district court erred in determining, as a matter of law, that § 1346 does not cover foreign commercial bribery. Defendants argue that the ruling was correct. They also assert that acquittal is warranted for additional reasons not reached by the district court: that (1) the government failed to prove a fiduciary duty giving rise to honest services fraud liability; and (2) the government failed to prove a conspiracy to deceive CONMEBOL.

For the reasons set forth below, we agree with the government and hold that § 1346, as construed by the Supreme Court and this court, encompasses Defendants' conduct. We further reject

---

[6] The district court defined "foreign commercial bribery" as the "bribery of foreign employees of foreign non-government employers," *Full Play Grp.*, 690 F. Supp. 3d at 37, and the parties use that phrase in the same sense here, *see* Gov. Br. at 6 (recognizing that district court used the term to mean bribery of a foreign employee of a foreign employer); Lopez Br. at 24 (same); Full Play Br. at 45 (same). We adopt the same meaning of this phrase when using it in this opinion.

23-7183-cr (L)

Defendants' argument that the government failed to prove a breach of fiduciary duty. We leave for the district court to decide in the first instance whether the evidence presented by the government was sufficient to prove a conspiracy to deceive CONMEBOL.

**Standard of Review**

"We review *de novo* a district court's grant of a Rule 29 motion based on a finding that the trial evidence was insufficient to support the jury's verdict, applying the same standard the district court applies in review of the evidence." *United States v. Landesman*, 17 F.4th 298, 319 (2d Cir. 2021). A defendant challenging the sufficiency of the evidence bears a heavy burden, and we must view the evidence presented in the light most favorable to the government and draw all permissible inferences in the government's favor. *Id.* A "jury verdict must be upheld if *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Guadagna*, 183 F.3d 122, 130 (2d Cir. 1999) (internal quotation marks omitted).

Questions related to the interpretation of a criminal statute are reviewed *de novo*. *Napout*, 963 F.3d at 178.

**I.    Whether Defendants' Conduct Falls Within the Scope of § 1346**

The government argues that the district court's Rule 29 ruling was mistaken in multiple respects. It primarily contends that, in determining that foreign commercial bribery falls outside the ambit of § 1346, the district court failed to follow binding precedent of this court and the Supreme Court, including *United States v. Rybicki*, 354 F.3d 124 (2d Cir. 2003) (en banc), *Skilling v. United States*, 561 U.S. 358

(2010), *United States v. Bahel*, 662 F.3d 610 (2d Cir. 2011), and *United States v. Napout*, 963 F.3d 163 (2d Cir. 2020). Relatedly, the government argues that the district court erred in its interpretation and application of *Percoco*, 598 U.S. at 319, and *Ciminelli*, 598 U.S. at 306, neither of which controls here nor abrogates binding precedent.

In response, Lopez and Full Play argue that, because foreign commercial bribery was not clearly established as honest services fraud before *McNally v. United States*, 483 U.S. 350 (1987), and because the nature of the requisite fiduciary duty is unsettled law, the conduct here cannot be criminalized under § 1346, especially in light of *Percoco* and *Ciminelli*'s warnings against expanding the reach of the wire fraud statutes beyond Congress's express commands.

We agree with the government. Accordingly, we conclude that the district court erred in holding that Lopez and Full Play's conduct was not within the bounds of § 1346.

## A.    Legal Background

We think it useful to provide an overview of the development of the honest services fraud doctrine and a discussion of certain cases relied upon by the parties.

Until 1987, federal courts read both the mail fraud statute, 18 U.S.C. § 1341, and the wire fraud statute, 18 U.S.C. § 1343, to encompass "schemes to deprive another of the intangible right of honest services" in addition to schemes to obtain money or property. *Rybicki*, 354 F.3d at 133 (internal quotation marks omitted).

> Over time, the honest services doctrine became applicable to four general categories of defendants: [1] government officials who defraud the public of their

23-7183-cr (L)

own honest services; [2] elected officials and campaign workers who falsify votes and thereby defraud the electorate of the right to an honest election; [3] private actors who abuse fiduciary duties by, for example, taking bribes; and [4] private actors who defraud others of certain intangible rights.

*Id.* (internal quotation marks omitted) (brackets in original).

Then, in 1987, the Supreme Court decided *McNally*, holding that the mail fraud statute was confined to the protection of property rights and thus did not reach honest services or other intangible rights. 483 U.S. at 356, 360. In so holding, the Court explained that it refused to "construe the statute in a manner that leaves its outer boundaries ambiguous," and noted that "[i]f Congress desires to go further, it must speak more clearly than it has." *Id.* at 360.

Thereafter, Congress did speak more clearly. In 1988, it enacted 18 U.S.C. § 1346, which clarified that, for the purposes of, among others, the mail and wire fraud statutes, 18 U.S.C. §§ 1341 and 1343, "the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services." Pub. L. No. 100–690, Title VII, § 7603(a), 102 Stat. 4508 (1988).

Congress did not define "the intangible right of honest services," but case law has since provided guidance and guardrails for courts interpreting the statute's reach. This court addressed § 1346 in *Rybicki*, in which the defendants—lawyers who had been convicted of mail and wire fraud for paying claims adjusters employed by insurance companies to expedite the settlement of their clients' claims—challenged § 1346 on vagueness grounds. 354 F.3d at 128. Upon rehearing *en banc*, we rejected the defendants' challenge and held that their conduct fell "squarely within the meaning of 'scheme

15

or artifice to deprive another of the intangible right of honest services' as distilled from the pre-*McNally* private sector cases." *Id.* at 142. Notably, the court viewed pre-*McNally* case law as "pertinent," but not binding "in the *stare decisis* sense." *Id.* at 145.

A few years later, in *Skilling*, the Supreme Court construed § 1346 to reach only schemes that involved bribery or kickbacks, concluding that "[r]eading the statute to proscribe a wider range of offensive conduct . . . would raise the due process concerns underlying the vagueness doctrine." 561 U.S. at 408. The Court reasoned that "Congress intended § 1346 to refer to and incorporate the honest-services doctrine recognized in Courts of Appeals' decisions before *McNally*," and the "vast majority" of those decisions "involved offenders who, in violation of a fiduciary duty, participated in bribery or kickback schemes." *Id.* at 404, 407 (internal quotation marks and citation omitted). "[B]y confining [the statute's] scope to the core pre-*McNally* applications," the Court "salvaged" "Congress' reversal of *McNally* and reinstatement of the honest-services doctrine" without "transgressing constitutional limitations." *Id.* at 408–09.

Applying its construction of § 1346, *Skilling* overturned the conviction of Enron's CEO, Jeff Skilling, who had been convicted of honest services wire fraud on the theory that he manipulated and issued false statements regarding Enron's publicly reported financial results, thereby depriving Enron and its shareholders of his honest services. *Id.* at 369. Because the government had *not* alleged that Skilling solicited or accepted payments in exchange for making such misstatements, the Court determined that Skilling's conduct was beyond the reach of § 1346. *Id.* at 413–14. The Court also implicitly acknowledged that the violation of a fiduciary duty was an element

of honest services fraud. *Id.* at 407; *see also United States v. Mangano*, 128 F.4th 442, 470 (2d Cir. 2025) ("As a result of [*Skilling*'s] construction, a violation of a fiduciary duty is an element of honest services fraud." (internal quotation marks and citation omitted)).

Shortly after *Skilling*, we decided *Bahel*, in which the defendant, a foreign employee of the United Nations who, in contravention of the organization's rules, had accepted bribes from a foreign vendor. 662 F.3d at 617. The defendant argued that his conviction for use of mail or wires to further honest services fraud on this ground exceeded the scope of § 1346. *Id.* at 632. We disagreed. Notably, we rejected Bahel's argument that he could not be prosecuted for honest services fraud because "none of the pre-*McNally* cases extended an 'honest services' theory of fraud to an international setting involving foreign nationals," observing that neither *Skilling* nor *Rybicki* had limited § 1346 based on the identity of the actors involved in the scheme. *Id.* (alterations accepted) (internal quotation marks omitted). We further noted that this court had not construed § 1346 to exclude bribery of foreign officials in foreign countries, and that, in any event, the conduct at issue (1) took place within the territorial United States and (2) victimized "an organization headquartered in the United States, entitled to defendant's honest services in the United States, and receiving its largest financial contributions from the United States." *Id.* Finally, we rejected the contention that a violation of local law was required for a breach of fiduciary duty. *Id.* at 633.

As mentioned above, in 2020, we affirmed the honest services fraud convictions of two defendants—Napout and Marin—who had been prosecuted as part of the same investigation at issue here. *Napout*, 963 F.3d at 190. We rejected the defendants' argument that § 1346 was unconstitutionally vague as applied to them. *Id.* at 181–

84.   Having determined that the vagueness challenge had to be reviewed for plain error, thereby requiring the defendants to show an error that was "clear under current law," we concluded that their challenge could not succeed because "whether a foreign employee's duty to his foreign employer qualifies as an actionable element under § 1346 is a question that remains unsettled, at best." *Id.* at 183–84.  We also rejected the defendants' contention that there was insufficient evidence to establish the existence of a fiduciary duty, observing that "the government's evidence was easily sufficient to prove that FIFA and CONMEBOL's respective codes of ethics expressly provided that persons bound by those codes, including, *inter alia*, that 'all' soccer 'officials,' such as Marin and Napout, had 'a fiduciary duty to FIFA and the confederations such as CONMEBOL,' and were required to 'act with absolute loyalty' to them." *Id.* at 185 (alterations accepted).[7]

More recently, in *Percoco*, the Supreme Court addressed the fiduciary duty element of § 1346.  598 U.S. at 319.  The question in *Percoco* was whether a private citizen who had influence over government decision-making, but who did not hold public office, could be convicted of honest services wire fraud.  Although the Court declined to hold that a person outside public employment could *never* have a fiduciary duty to the public, the Court found that the jury instructions before it, which "told the jury that Percoco owed a duty of honest services to the public if (1) he dominated and controlled any

---

[7] In a concurrence, Judge Hall opined that even on *de novo* review, he would have concluded that § 1346 was not unconstitutionally vague as applied to the defendants because they, "by virtue of their relationship with FIFA and CONMEBOL, had a fiduciary duty not to accept bribes or kickbacks, a duty that was explicitly laid out by the two associations' respective codes of conduct," and "the element of honest services in § 1346 encompasses 'the obligations of loyalty and fidelity that inhere in the employment relationship.'" *Napout*, 963 F.3d at 190–92 (Hall, J., concurring) (quoting *Skilling*, 561 U.S. at 417 (Scalia, J., concurring)).

18

governmental business and (2) people working in the government actually relied on him because of a special relationship he had with the government,"[8] were too vague. *Id.* at 330 (internal quotation marks omitted).

On the same day that it issued *Percoco*, the Supreme Court issued *Ciminelli*, which did not address honest services wire fraud but warned against "expand[ing] federal jurisdiction without statutory authorization." 598 U.S. at 315 (holding invalid this court's "right-to-control" theory of wire fraud).

We draw several conclusions from the cases discussed above. *First*, for § 1346 to apply, the conduct at issue must involve bribery and/or kickbacks. *See Skilling*, 561 U.S. at 409.

*Second*, the requisite fiduciary relationship cannot be determined based on a test for dominance and control or reliance, *see Percoco*, 598 U.S. at 330, but an employer-employee relationship, or a similar relationship, is a well-accepted example of a fiduciary relationship that falls within the scope of § 1346, *see Skilling*, 561 U.S. at 407 n.41 (listing employer-employee relationship as example of fiduciary duty that was usually "beyond dispute" in pre-*McNally* cases); *Rybicki*, 354 F.3d at 126–27 (including "relationship that gives rise to a duty of loyalty comparable to that owed by employees to employers" as example of fiduciary duty); *see also Nouri*, 711 F.3d at

---

[8] The jury instructions were based on this court's decision in *United States v. Margiotta*, 688 F.2d 108 (2d Cir. 1982), which outlined two tests for determining when a private person owes a fiduciary duty to the general citizenry: "(1) whether others relied upon the accused because of his special relationship in the government and (2) whether he exercised de facto control over governmental decisions." *Percoco*, 598 U.S. at 326–27 (internal quotation marks omitted) (alterations accepted).

137 n.1 ("The existence of a fiduciary relationship between an employee and employer is beyond dispute, and the violation of that duty through the employee's participation in a bribery or kickback scheme is within the core of actions criminalized by § 1346." (internal quotation marks omitted)).

*Third*, a violation of local law is not required to establish a breach of a fiduciary duty, *see Bahel*, 662 F.3d at 633, and an employee's violation of his employer's codes of conduct—including the exact codes at issue here—may establish such a breach, *see Napout*, 963 F.3d at 184–85 (violation of FIFA and CONMEBOL codes of ethics); *see also Rybicki*, 354 F.3d at 127 (employers had "written polic[ies] that prohibited the [employees] from accepting any gifts or fees and required them to report the offer of any such gratuities"); *Bahel*, 662 F.3d at 617 (United Nations rules, including duty to avoid using position for personal gain, informed "contours of the duty Bahel owed to his employer").

*Fourth*, the presence of foreign defendants or an international component to a scheme does not categorically remove an offense from the ambit of § 1346. *See Bahel*, 662 F.3d at 632 (rejecting argument that schemes involving "an international setting involving foreign nationals" are beyond reach of § 1346).

## B. Application of § 1346 to Lopez and Full Play

As an initial matter, we note that the district court plainly relied on *Percoco* and *Ciminelli* as the basis for its departure from its prior rejection of nearly identical arguments regarding the scope of § 1346 raised in Defendants' motions to dismiss the indictment. *See Full Play Grp.*, 690 F. Supp. 3d at 8 ("Although before trial the Court rejected some of the same legal arguments Defendants now renew in their

post-trial motions, because of intervening Supreme Court decisions signaling limits on the scope of the honest services wire fraud statute, the Court grants Defendants' motions and vacates their convictions."), 36 ("In light of the Supreme Court's guidance in *Ciminelli* and *Percoco*, this Court is compelled to reverse its previous ruling regarding § l346's scope."). Neither *Percoco* nor *Ciminelli*, however, controls this case.

*Percoco* considered fiduciary duties under § 1346 in the context of duties to the public, specifically in the unique context where the defendant did not actually hold public office. 598 U.S. at 322. It did not address commercial actors or employment relationships like those at issue here. *Ciminelli* was even further afield—it addressed the scope of § 1343, not § 1346. 598 U.S. at 308. Indeed, counsel for Full Play conceded at oral argument that *Ciminelli* and *Percoco* did not change the landscape of the honest services fraud doctrine for purposes of this case. Oral Arg. Recording at 47:40-49:00.

Intellectually curious jurists, and certainly law professors, can debate whether *Percoco* and *Ciminelli* "signal[ed] limits on the scope of the honest services wire fraud statute." *Full Play Grp.*, 690 F. Supp. 3d at 8 (emphasis added). But in adjudicating the case before us, we must focus on the concrete holdings of the cases that currently bind us rather than on "signals" that may forecast future decisions. *See In re Grand Jury Subpoenas Dated Sept. 13, 2023*, 128 F.4th 127, 140 (2d Cir. 2025) ("[A] Court of Appeals should follow the case which directly controls." (internal quotation marks omitted)). Here, those concrete holdings lead us to conclude that Defendants' conduct falls within the scope of § 1346.

23-7183-cr (L)

### 1. Precedent Does Not Require a Pre-*McNally* Factual Twin

We do not view precedent as requiring us to find a pre-*McNally* case factually identical to this one to conclude that the conduct here falls under § 1346.

Lopez and Full Play essentially contend that because they cannot find exact replicas of the fact pattern we are confronted with here—including the specific sort of fiduciary relationship at issue here—in pre-*McNally* case law, foreign commercial bribery of the sort with which they were charged is not encompassed by § 1346. *See, e.g.*, Lopez Br. at 2 ("No pre-*McNally* case involved commercial bribery that allegedly deprived a foreign private employer of the honest services of its foreign employees."). But such a methodology is unduly restrictive. To be sure, the Supreme Court endorsed the approach of looking to pre-*McNally* case law to determine the general conduct and duties encompassed by § 1346. *See Skilling*, 561 U.S. at 404 (looking "to the doctrine developed in pre-*McNally* cases in an endeavor to ascertain the meaning of the phrase 'the intangible right of honest services'" and confining § 1346 to the "core" conduct covered by those cases; *see also Percoco*, 598 U.S. at 328 ("*Skilling* was careful to avoid giving § 1346 an indeterminate breadth that would sweep in any conception of 'intangible rights of honest services' recognized by some courts prior to *McNally*."). Neither the Supreme Court nor this court, however, has held that whenever a *specific fact pattern* cannot be located in virtually identical form in pre-*McNally* case law, it is not covered by § 1346.

*Percoco* observed that a "smattering of pre-*McNally* decisions" is insufficient to transform an "ill-defined category of circumstances" into situations that trigger "[t]he intangible right of honest services."

22

598 U.S. at 328–29. It does not follow that more than a "smattering of pre-*McNally* cases" is *necessary* to establish that a *particular scheme* is criminalized by § 1346. Neither the Supreme Court nor this court has ever held that pre-*McNally* decisions are the only sources that inform our analysis of § 1346. Indeed, we have recognized well-accepted fiduciary duties as falling within the scope of § 1346 without looking to pre-*McNally* case law for factual analogies. *See, e.g.*, *United States v. Avenatti*, 81 F.4th 171, 194 n.27 (2d Cir. 2023) (stating that defendant "cannot . . . argue that he lacked notice that, as an attorney, he owed a fiduciary duty to his client" and citing *United States v. Chestman*, 947 F.2d 551, 568 (2d Cir. 1991) (en banc), for proposition that attorney-client relationship was "hornbook fiduciary relationship").

Rather than investigate whether pre-*McNally* case law contains perfectly analogous foreign commercial bribery prosecutions, we find it more useful to dissect the schemes before us into their salient components and look at each separately to determine whether any component takes the scheme outside the scope of § 1346. Such components include the conduct at issue; the players involved in the scheme; where the scheme took place; and the nature of the fiduciary duty that was purportedly breached. Although the district court similarly disentangled the relevant issues, *see Full Play Grp.*, 690 F. Supp. 3d at 33, unlike the district court, we conclude that this approach inexorably leads to the conclusion that Defendants' schemes are properly encompassed by § 1346.

### 2.    Defendants' Conduct is Covered by § 1346

Defendants do not dispute that Lopez and Full Play's conduct, *i.e.*, engaging in bribery, is an example of the core conduct proscribed by § 1346. Nor do they argue that certain international elements of

the schemes, such as Full Play's foreign citizenship or the fact that certain conduct occurred abroad, *in themselves* place Defendants' activities beyond the reach of § 1346.  The crux of Defendants' argument, rather, is that the fiduciary duty that was breached—the bribed foreign officials' duties to their foreign employers—is not cognizable under § 1346.

We disagree.  The fiduciary nature of the relationship between the bribed officials and their respective organizations, *i.e.*, an employer-employee relationship, is one that is commonly recognized, including by pre-*McNally* cases, as "beyond dispute."  *See Skilling*, 561 U.S. at 407 n.41; *Nouri*, 711 F.3d at 137 n.1; *see also Rybicki*, 354 F.3d at 126–27 (recognizing fiduciary duty where defendant and victim were "in a relationship that gives rise to a duty of loyalty comparable to that owed by employees to employers").  And, like the United Nations in *Bahel*, *see* 662 F.3d at 617, FIFA and CONMEBOL had express rules proscribing the use of an employment position for personal gain and imposing on officials a duty of "absolute loyalty." Gov. App'x 114, 567.  Indeed, Defendants do not dispute that an employer-employee relationship is a well-recognized fiduciary relationship that falls within the scope of § 1346; they argue instead that a *foreign* employee's duty to his *foreign* employer does not yield a cognizable duty under the honest services doctrine.

Yet *Bahel* counsels that the foreign identity of the officials and their employers does not remove the schemes from § 1346's reach. There, like here, the bribed official was a foreign national and the victim was a multinational organization with global operations.  662 F.3d at 616.  And there, like here, there was relevant misconduct within the United States contributing to the breach of duty. Moreover, *Bahel* explicitly observed "that fraud actionable under

24

Section 1346 is limited to the nature of the offenses prosecuted in the pre-*McNally* cases (*i.e.*, bribery and kickback schemes)—not the identity of the actors involved in those cases." *Id.* at 632.

Defendants attempt to distinguish *Bahel* by focusing on its dicta regarding the United Nations being "headquartered in the United States, entitled to defendant's honest services in the United States, and receiving its largest financial contributions from the United States" and pointing out that CONMEBOL is headquartered in Paraguay. Lopez Br. at 37 (quoting *Bahel*, 662 F.3d at 632); Full Play Br. at 51–52 (same).[9]  But *Bahel* does not hold that the headquarters of an organization is dispositive.  In any event, the victim of the Copa América Centenario scheme, CONCACAF, *is* headquartered in the United States.  And, although FIFA and CONMEBOL are not based in the United States, the United States Soccer Federation is involved with both organizations: it is a member of FIFA and has hosted tournaments and games connected to both FIFA and CONMEBOL, such as the Copa América Centenario, a joint CONCACAF-CONMEBOL tournament, and friendlies with CONMEBOL teams.

Lopez and Full Play also argue that it would be improper to recognize a fiduciary duty where relevant foreign laws may not recognize such duties.  *See* Lopez Br. at 38 ("[T]here is no . . . hornbook law establishing a fiduciary relationship between foreign employers and their foreign employees—American hornbooks and

---

[9] Defendants argue that this case should be analogized instead to *United States v. Giffen*, which held that a United States citizen's bribing of a Kazakhstani government official fell outside the scope of § 1346.  326 F. Supp. 2d 497, 505-06 (S.D.N.Y. 2004).  Aside from its lack of precedential value, *Giffen* is factually distinguishable.  There, the bribed official breached a duty to a foreign public.  *Id.* at 506-07.  Here, the bribed officials breached a duty to international organizations with significant ties to the United States.

25

Restatements do not apply in Paraguay."), 45 ("There is no reason to believe that Paraguay, a civil-law country, recognizes any sort of fiduciary duty akin to what courts have created as a matter of Anglo-American common law.").  As discussed above, however, our cases have indicated that an analogous violation of local law is not required to establish a breach of fiduciary duty.  *See, e.g.*, *Bahel*, 662 F.3d at 633; *see also Napout*, 963 F.3d at 191 (Hall, *J.*, concurring).

Finally, Defendants and the district court read much into our statement in *Napout* that "whether a foreign employee's duty to his foreign employer qualifies as an actionable element under § 1346 is a question that remains unsettled, at best."  963 F.3d at 184.  *Napout*, however, was addressing a vagueness challenge on plain error review, and made clear that the defendants had "pointed [the court] to no authority directly supporting their position" that there was no cognizable breach of fiduciary duty (and thus failed to establish an error that was clear under current law).  *Id.*  Taken in context, this statement does not undercut our conclusion that there exists a cognizable fiduciary duty here.  In fact, the statement implied that, at worst, the law *foreclosed* the defendants' argument that there was no cognizable breach, as Judge Hall opined in concurrence.  *See id.* at 191 (Hall, *J.*, concurring).

We conclude, therefore, that the nature of Defendants' conduct (bribery), coupled with the character of the relationship between the bribed officials and the organizations to whom they owed a duty of loyalty (employer-employee relationships), place the schemes presumptively within the scope of § 1346.  Further, the foreign identity of certain organizations and officials does not remove the schemes from the ambit of § 1346, especially where, as here, relevant conduct occurred in the United States, for the benefit of United States-

23-7183-cr (L)

based executives and organizations (*e.g.*, Lopez and Fox), and the victims were multinational organizations with global operations and significant ties to the United States.

### 3.    Defendants' Other Arguments

Lopez and Full Play argue that the limited scope of domestic bribery statutes, 18 U.S.C. §§ 201 and 666, in combination with Congress's "surgical precision" when extending other criminal statutes to foreign commercial bribery, indicates that § 1346 does not cover foreign commercial bribery. Lopez Br. at 27–30 (discussing the Foreign Corrupt Practices Act and the Foreign Extortion Prevention Act). But the wire fraud statute is not a bribery statute, and although we may look to the bribery statutes to shed light on what Congress meant by "bribery" or "kickback" in the wire fraud context, *see Skilling*, 561 U.S. at 412, that does not mean that we should read the statutes in a like manner. Further, we have specifically observed that the wire fraud "statute reaches *any* scheme to defraud involving money or property, [regardless of] whether the scheme . . . involves foreign victims and governments." *United States v. Trapilo*, 130 F.3d 547, 552 (2d Cir. 1997) ("[W]hat is proscribed is [the] use of the telecommunication systems of the United States in furtherance of a scheme" to defraud, and the "identity and location of the victim . . . are irrelevant.").

Lopez and Full Play also argue that "principles of international comity counsel against interpreting vague statutes to cover internal domestic affairs of foreign nations." Lopez Br. at 32. Yet limitations on the international application of the wire and mail fraud statutes already exist. Statutes are presumed to have only domestic application, and this court has explained "that in order for incidental

domestic wire transmissions not to haul essentially foreign allegedly fraudulent behavior into American courts, 'the use of the . . . wires must be essential, rather than merely incidental, to the scheme to defraud.'" *Napout*, 963 F.3d at 179 (quoting *Bascuñán v. Elsaca*, 927 F.3d 108, 122 (2d Cir. 2019)).[10]

\* \* \*

In sum, we hold that the schemes at issue here fall under § 1346 and that, therefore, the district court erred in holding that foreign commercial bribery is excluded from § 1346's reach as a matter of law and vacating Defendants' convictions.[11]

In so holding, we do not purport to establish a bright line rule for what qualifies as honest services wire fraud under § 1346, nor do we speculate as to where the outer bounds of the statute may lie. We look only at the facts before us to determine that, under binding precedent of this court and the Supreme Court, Defendants' conduct falls within the statute's purview.

## II.    Whether the Government Failed to Prove a Fiduciary Duty

Lopez and Full Play argue, in the alternative, that even if their conduct falls within the scope of § 1346, they should be acquitted because the government failed to prove a fiduciary duty. They

---

[10] The district court, in its pre-trial ruling on the motions to dismiss, rejected Defendants' argument that this case presented an impermissible extraterritorial application of the wire fraud statute. *Full Play Grp.*, 2021 WL 5038765, at *8 n.5. In its decision on the Rule 29 motions, the district court noted that it still rejected this argument, and the parties do not raise the issue of extraterritoriality in this appeal.

[11] In light of the above, we need not reach the government's argument that the district court failed to construe the evidence in the light most favorable to the government or that the government is entitled to a new trial.

23-7183-cr (L)

ground this argument in two principal points: (1) the foreign jurisdictions at issue in this case do not recognize a general fiduciary duty to employers and (2) the organizations' respective codes of ethics, as mere corporate policies, cannot establish the requisite fiduciary duty.

This argument was raised below but, because it was unnecessary to decide it given the district court's ruling, the district court did not reach it. Although "[i]t is this Court's usual practice to allow the district court to address arguments in the first instance," *Dardana Ltd. v. Yuganskneftegaz*, 317 F.3d 202, 208 (2d Cir. 2003), we think it is prudent to consider this argument here because the issue is closely tied to the question the district court did address, the scope of § 1346, and there is no need for fact finding or complex evidentiary analysis. *Cf. AXA Versicherung AG ex rel. Albingia Versicherungs AG v. N.H. Ins. Co.*, 348 F. App'x 628, 630–31 (2d Cir. 2009) (summary order) (remanding, where consideration of evidence was necessary, to allow district court, which was "intimately familiar with the full scope of . . . evidence[,] . . . the opportunity to address [the issue] in the first instance").

Our decision in *Napout* is instructive.[12] There, we held that evidence demonstrating soccer officials' acceptance of bribes in violation of FIFA and CONMEBOL's respective codes of conduct was sufficient to prove a breach of fiduciary duty for an honest services

---

[12] Lopez and Full Play argue that the holding of *Napout* does not survive *Percoco*, because *Napout* did not consider whether FIFA and CONMEBOL's codes of ethics satisfy *Percoco*'s "mandate" to define honest services "with the clarity typical of criminal statutes." Lopez Br. at 53 (quoting *Percoco*, 598 U.S. at 328). We are not persuaded. As we have already explained, it is our view that *Percoco* did not change the legal landscape relevant to this case. *Napout*'s sufficiency analysis thus remains instructive.

29

fraud conviction. 963 F.3d at 185. We observed that the FIFA and CONMEBOL codes "expressly provided that persons bound by those codes, including, *inter alia*, that all soccer officials, such as [the *Napout* defendants], had a fiduciary duty to FIFA and the confederations such as CONMEBOL, and were required to act with absolute loyalty to them." *Id.* (internal quotation marks omitted) (alterations accepted). Importantly, we explicitly rejected the relevance of foreign law for establishing the breach of fiduciary duty. *See id.* at 184–85 ("The appellants were not prosecuted for breaching a fiduciary duty created by Paraguayan law— or Brazilian, Swiss or U.S. law, for that matter.").

Here too, the relevant fiduciary duties were established by the bribed officials' relationships to FIFA, the continental confederations, and the individual national associations, not the laws of foreign countries. And, the contours of those duties were informed by the ethical codes to which the bribed officials were bound. *See Bahel*, 662 F.3d at 617 ("U.N. rules . . . inform[ed] the contours of the duty Bahel owed to his employer"). The FIFA code of ethics explicitly defined "official" to include executives of FIFA, its continental confederations, and its member associations, Gov. App'x 94–95, and prohibited those officials from accepting bribes, *id.* at 110. CONMEBOL's code also bound executives of member associations and prohibited them from the same conduct. *Id.* 565–67. The government's evidence thus easily sufficed to establish that the respective codes established a fiduciary duty that bound the bribe recipients, and that such duty was breached when the bribe recipients violated the codes.

Lopez and Full Play argue that the FIFA codes cannot supply the relevant duty here because "[t]he FIFA code could not have created a fiduciary duty between CONMEBOL and its employees;"

"FIFA's continental confederations (e.g., CONMEBOL) are not members of FIFA;" and there was no "evidence suggesting FIFA's code applied to regional events such as the Copa Libertadores, organized by regional authorities rather than FIFA itself." Lopez Br. at 54. These arguments are easily rejected. The FIFA code bound not only executives of FIFA, but also executives of the continental confederations and member associations. And the FIFA code does not limit its application to only those events that it directly organizes. The evidence therefore was sufficient to prove that the bribed officials here violated FIFA's code of conduct by engaging in bribery connected to the Copa Libertadores, Copa América, and the World Cup qualifiers and friendlies, thereby breaching their fiduciary duty to FIFA.

Lopez and Full Play's concern regarding the arbitrariness that would stem from "allowing criminal sanctions to flow from violations of employment policies" is not cause for alarm. Lopez Br. at 51. It is not the per se violation of an employment policy that triggers criminal liability. Rather, the existence of such policies is relevant to assessing whether a fiduciary duty exists—it does not "delegate[] lawmaking power to private parties," as Defendants contend. *Id.* at 52. And, ultimately, it remains the province of a jury to determine whether the facts adduced at trial establish the existence of a fiduciary relationship between the relevant parties.

## III. Whether the Government Failed to Prove a Conspiracy to Deceive CONMEBOL

Defendants raise an additional alternative argument in support of affirming the district court's Rule 29 ruling: that the government failed to prove a conspiracy to deceive CONMEBOL. Although raised below, the district court did not address this argument, given its

23-7183-cr (L)

(erroneous) holding that Defendants' conduct was not criminalized by § 1346.

We leave this issue to be addressed by the district court in the first instance on remand. *See Dardana*, 317 F.3d at 208; *AXA Versicherung AG*, 348 F. App'x at 631–32.

## CONCLUSION

For the foregoing reasons, we **VACATE** the judgments of acquittal as to Lopez and Full Play and **REMAND** with instructions to reinstate the jury's verdict and conduct further proceedings consistent with this opinion, including deciding whether to grant relief under Rule 29 on the basis that the evidence presented by the government was insufficient to prove a conspiracy to deceive CONMEBOL.